Garrett Skelly        (SBN  94895)
160 Centennial Way Ste 21
Tustin, CA 92780
Phone (714) 730-3708
Fax   (714) 730-3708
Email garrettgskelly@aol.com

Attorney for: Reginald Burgess, William Everden  and Class Members

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### _____ DIVISION

| | |
|---|---|
| REGINALD BURGESS, and WILLIAM EVERDEN, on behalf of themselves and all others similarly situated and behalf of the general public of the United States,<br>Plaintiffs,<br><br>CHRIS DOE, BOB DOE, BOB DOE2, RUTH DOE, ROSS DOE, and BRUCE DOE,<br>    Class Member Real Parties in Interest,<br>v.<br><br>OTTO BOCK HEALTHCARE, US;<br>ENDOLITE AMERICA a.k.a.  CHAS A BLATCHFORD & SONS, LTD;<br>OSSUR AMERICAS;<br>FILLAUER GROUP;<br>TRULIFE ;<br>HEALTH NET INC;<br>INTEGRATED HEALTH HOLDINGS INC, D/B/A/ WESTERN MEDICAL CENTER SANTA ANA;<br>NORM'S RESTURANTS INC;<br>EBAY INC.;<br>PAYPAL INC;<br>ALIEXPRESS.COM, and;<br>DOES, 1 TO 10<br>        Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br>**For violation of:**<br>1. Title III of the Americans with Disabilities Act (42 USC 12181,et seq.); and by 21 USC 331(a) "Misbranding";<br>2. Unruh Civil Rights Act (Cal. Civ Code § 51, et seq. );<br>3. California Disabled Persons Act (Cal. Civ. Code §54, et seq.);<br>4. Breach of Contract<br>5. Cal. Civ. Code 1750 et seq;<br>6. Breach Good Faith and Fair Dealing;<br>7.  Unfair Business Practices,<br>8.  Intentional Interference With Contract and Prospective Economic Advantage and by Negligence;<br>9.  Fraud<br>10.  Specific Performance;<br>11.  Strict Product Liability<br>12.   Negligence<br>And For Injunctive Relief<br>**JURY TRIAL DEMANDED**<br><br>**Honorable**<br>Date          Time          Rm |

# TABLE OF CONTENTS

I.   JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

II   VENUE . . . . . . . . ,. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

III  PARTIES   . . . . ,. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

PROSTHESIS SAFETY AND WHO KNOWS BETTER ?? . . . . . . . . .   30

TO UNDERSTAND THE INJURY ONE MUST UNDERSTAND THE

         FLAW OF THE PRODUCT AND THE CAUSATION TO INJURY   39

CLASS ACTION SUMMARY AND ALLEGATIONS . . . . . . . . . . . . . .   46

IV.  ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   53

AN EXTERNAL PROSTHETIC AND PARTS COMPRISING IT ARE

         BY DEFINTION NOT PRESCRIPTION MEDICAL DEVICES . .   55

A CLOSED DISTRIBUTION MODEL THUS VIOLATES THE ADA . .   62

REFUSAL TO SELL OR SERVICE IS AN ADA VIOLATION . . . . . . .   83

EBAY,  PAYPAL AND ALIEXPRESS TRANSGRESSIONS . . . . . . . .   86

THE NEXUS OF THE ADA TO THE UNRUH ACT AND ALL . . . . .   96

         DEFENDANTS ACTIONS AS VIOLATIONS TO LAW

HEALTH NET AND IHHI AS OLMSTEAD VIOLATORS . . . . . . . . . .   99

BURGESS'S eBay, PAYPAL AND ALIEXPRESS EXPERIENCES . . .   100

V.   FIRST CAUSE OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . .   102

VI.  SECOND CAUSE OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . .   105

VII.  THIRD CAUSE OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . .   106

VIII.  FOURTH CAUSE OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . .   111

IX.  FIFTH CAUSE OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . .   117

X.   SIXTH CAUSE OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . .   120

XI.  SEVENTH CAUSE OF ACTION . . . . . . . . . . . . . . . . . . . . . . . .   123

XII.  EIGHTH CAUSE OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . .   130

XIII.  NINTH CAUSE OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . .   133

XV. ELEVENTH CAUSE OF ACTION . . . . . . . . . . . . . . . . . . . . . . . .   136

XVI.  TWELFTH CAUSE OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . .   138

XVII.  THIRTEENTH CAUSE OF ACTION . . . . . . . . . . . . . . . . . . . . . .   139

PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   141

## TABLE OF CASES

Aicco, Inc. v. Ins. Co. of North Am., 90 Cal. App. 4th 579 (2001) . . . . . . .   124

Anderson v. Allstate Ins. Co., 630 F.2d 677, 683 (9th Cir. 1980) . . . . . . .   97

Applied Equipment Corp. v. Litton Saudi Arabia Ltd, 7 Cal. 4th 503, . . .   97
   510-511(1994).

Bank of the West v. Sup. Ct., 2 Cal. 4th 1254, 1266 (1992) . . . . . . . . . . .   124

Bovard v. American Horse Enterprises, Inc. (1988) 201 Cal.App.3d 832   47

Campbell v. General Dynamics Government Systems Corp., . . .   74,102,135
   407 F.3d 546  (1st Cir. May 23, 2005)

Chapman  v Pier One Imports #1132, 593 F.3d 974 (2010), 9th Circuit   81

Chevron U.S.A. Inc. v. Echazabal, 122 S.Ct. 2045 (2002) . . . . . . . . . . .   8,11

Comb v. PayPal settlement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

CRST Van Expedited, Inc v. Werner Enterprises, Inc 479 F.3d 1099 . . . .   95
(9th Cir March 15, 2007)

Davis v. Ford Motor Credit Co., 179 Cal.App.4th 581 (2009) . . . . . . . . .   126

Doran v. 7-Eleven Inc., 524 F.3d 1034, 1039 (9th Cir. 2008) . . . . . . . .   81

Drum v. San Fernando Valley Bar Association, 182 Cal.App.4th 247 . .   127
   (Feb. 24, 2010)

Dudley v. Hannaford Bros. Co. 333 F.3d 299 (1st cir June 24, 2003)   84,85,86

Echazabal v. Central District of Chevron USA, Inc., 226 F.3d 1063  . . . . .   8,11
(9th Cir. 2000)

Enyardt v NCBE, 10-15286 and 10-16392 (9th cir Jan 4, 2011) . . . . . . .   82,83

Erlich v. Menezes, 21 Cal 4th  543, (1999) . . . . . . . . . . . . . . . . . . . . . .   121

1  Federal Trade Commission v. Neovi, Inc., (No. 09-55093) 604 F.3d 1150        126

2       (9th Cir. May 14, 2010),

3  **Korea Supply Co. v. Lockheed Martin Corp**., 131 Cal.Rptr.2d 29        94,95,130

4  (2003); 29 Cal.4th 1134, 63 P.3d 937

5  Levine v. Blue Shield of California, 189 Cal.App.4th 1117 (Nov. 5, 2010),        125

6  Lockett v. Catalina Channel Express Inc, 496 F.3d 1061, . . . . . . . . . . .        83,84

7       (9th Circuit August 09, 2007)

8  Munson v Del Taco 46 Cal.4th 661, (6/11/09) . . . . . . . . . . . . . . . . . . . . . .        128

9  Overstock.com, Inc. v. Gradient Analytics, Inc., 151 Cal.App.4th 688, . . .        126

10      715 (2007)

11 Pacific Gas & Electric Co. v. Bear Stearns & Co. (1990) . . . . . . . .        116,132

12      50 Cal. 3d 1118    [270 Cal. Rptr. 1, 791 P.2d 587]

13 People v. Beaumont Inv., Ltd., 111 Cal. App. 4th 102,137 (2003) . . . . .        97

14 Rubio v. Capital One Bank,  (No. 08-56544) 613 F.3d  1195 . . . . . .        125,126

15      (9th Cir. July 21, 2010),

16 Seaman's Direct Buying Service Inc. v. Standard Oil Co. (1984) . . . . . . .        132

17      36 Cal.3d 752, 765.)

18 Shroyer v. New Cingular Wireless Services, 606 F.3d 658 (9th Cir. 2010)        128

19 Skaff v. Meridien North America Beverly Hills, LLC, 506 F. 3d 832    . . .        79,84

20      Court of Appeals, 9th Circuit 2007

21 Stevens v. Sup. Ct., 75 Cal. App. 4th 594, 602 (1999). . . . . . . . . . . . . .        124

22 Stop Youth Addiction, Inc. v. Lucky Stores, Inc., 17 Cal. 4th 553, . . . . . . .        124

23      560 (1998)

24 Townsend, v. Quasim, 328 F.3d 511, (9th circuit May 1, 2003) . . . . . .    85,86,104

25 Trafficante v. Metro. Life Ins. Co., 409 U.S. 205, 209 (1972) . . . . . . . . . . .        81

26 OLMSTEAD V. L. C. (98-536) 527 U.S. 581 (1999)    12,17,18,30,62,65,101,104

27 Wyatt v. Union Mortgage Co., 24 Cal. 3d 773, 786 (1979) . . . . . . . . . . .        97

28

# TABLE OF AUTHORITIES

15 U.S.C. 7001 . . . , . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

15 U.S.C. 7031 . . . , . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

21 C.F.R. 801.109   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1,51,58

21 C.F.R. 803   . . . , . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   80

21 C.F.R. 807 Subpart E . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   56

21 C.F.R. 820.198   . . . . . . . . . . . .   8,9,26,29,38,47,51,52,72,80,96,102

21 C.F.R. 820.200   . . . . . . . . . . . . . . . . . . . . . . . . .   47,51,72,96,102

21 C.F.R. 890.3420 . . . . . . . . . . . . . . . . . . . . . . . .   1,26,64,103,104

21 C.F.R. 890.3500 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26,64

28 C.F.R. 36.305   , . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   80

21 U.S.C. 331   . . , . . . . . . . .   1,6,24,26,29,39,87,88,96,101,105,106,111

28 U.S.C. § 1331 . . , . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

28 U.S.C. § 1332 . . , . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

28 U.S.C. § 1343 . . , . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

28 U.S.C. § 1367 . . , . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

28 U.S.C. § 1391 . . , . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

28 U.S.C. § 1441 . . , . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

42 U.S.C. § 12101 . . . . , . . . . . . . . . . . . . . . . . . . . . . .   77

42 U.S.C. § 12181 . , . . . . . . . . . . . . . . . . . . .   1,8,9,25,77

42 U.S.C. § 12182        6,19,25,26,27,28,30,39,47,52,53,76,77,79,91,96,101,103

42 U.S.C. § 12188 . . . . , . . . . . . . . . . . . . . . . . . . . . .   76

42 U.S.C. § 2000a-3 . . . , . . . . . . . . . . . . . . . . . . . . . . .   76

47 U.S.C. § 230 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   87

Cal. Bus. & Prof. Code 17200 , . . . . . . . . . . . . . . . . . . . . . .   94,95,123

Cal. Bus. & Prof. Code 17918 , . . . . . . . . . . . . . . . . . . . . . . . . .   93

Cal. Civ. Code 51   , . . . . . . . . . . . . . . . . . . . . . . . .   53,79,83,88,92

Cal. Civ. Code 54    , . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   107, 108

Cal. Civ. Code 1608 , . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   46,94,113

Cal. Civ. Code 1667 , . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   46,94,113

Cal. Civ. Code 1668 , . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   47,94,113

Cal. Civ. Code 1708 , . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   47,94,113

Cal. Civ. Code 1750 , . . . . . . . . . . . . . . . . . . . . . .   6,41,90,117,121,122

Cal. Civ. Code 1770 , . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   119

Cal. Civ. Code 1780 , . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   120

Cal. Civ. Code 1782 , . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   47,90,119

Cal. U. Com. Code 2313 , . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   89,111

Cal. U. Com. Code 2710 , . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   90

Cal. U. Com. Code 2713 , . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   90

Part 36.203(a)  ADA manual, US Dept of Justice . . . . . . . . . . . . . . . .   32

Presidential Executive Order 13217 . . . . . . . . . . . . . . . . . . . . . . . . .   104

Class Action Complaint
Case

# I. JURISDICTION

1.1    The Court has jurisdiction pursuant to 28 U.S.C. §1331 and 1343 on the grounds that this Complaint arises under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181, et seq.,

1.2    United States Code, Title 21 Chapter 9 The Federal Food, Drug, and Cosmetic Act; and, within that code more specifically  21 CFR 890.3420

1.3    21 USC 331(a) as to the "misbranding" of a medical device.

1.4    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) and (d)(6), commonly known as the "Class Action Fairness Act", or "CAFA", because there is diversity of citizenship, there are in excess of one hundred putative class members, and the claims of individual class members, in the aggregate, exceed the jurisdictional minimum of $5,000,000.00 ("five million dollars"), exclusive of interest and costs. This Court also has diversity jurisdiction over this action pursuant to 28 U. S.C. § 1441 and has personal jurisdiction over Defendant eBay due to the fact that eBay does more than nominal business in and has sufficient "minimum contacts" with the State of California.

1.5    This Court also has diversity jurisdiction over this action pursuant to 28 U.S.C. §1441 and has personal jurisdiction over Defendant eBay due to the fact that eBay does more than nominal business in and has sufficient "minimum contacts" with the State of California.

1.6    Further, the eBay user agreement in force and effect at the time these

Class Action Complaint
Case
-1-

transactions and transgressions before October 9, 2012 occurred specifies jurisdiction is to be in the courts of Santa Clara County California pursuant to California law.  eBay has since brought the same but a new agreement into effect on October 10, 2012 which relocates the choice of law provision for eBay to the State of Utah.

1.7   United States Code, 15 USC 7001 to 7031, also known as the Electronic Signatures in Global and National Commerce Act (ESIGN) as all the transactions and contracts were formed electronically and across state lines between all parties concerned.

1.8   28 USC 1367, this action involves causes of action to law of state laws and this court may interpret California law as there is a choice of law provision in the eBay User Agreement contract declaring California law the force majure, and that defendant and PayPal is found in this District.

## II.  VENUE

2.1   28 USC 1391(b)(1) as three defendants are found in the district of this court.

2.2    Defendant eBay has a proviso of a choice of venue of this district for litigation in its User Agreement contract applicable to this litigation.

## III.   PARTIES

3.1  PLAINTIFF REGINALD P. BURGESS (BURGESS) born March 5, 1956 is a resident of the City of Tustin, County of Orange, California with a mailing address of 630 N. Tustin Ave , #499, Orange, CA, 92867 and is a left leg trans

Class Action Complaint
Case

femoral amputee 57 years old and disabled.    Plaintiff has started and built the framework of a company, HPC Manufacturing  for an invention plaintiff owns, invented and has filed for a US Patent on 12/2/10 called the "flexi-socket." HPC currently has no distributors, customers or direct product line offered for sale.  Plaintiff Burgess trained as a prostheticist under a Certified Prostheticist. Plaintiff was prescribed a prescription drug, Nuerontin, which has affected his ability to think and hold control of thoughts.  Plaintiff has since stopped taking the drug once he discovered it was linked to these kinds permanent memory injury and even suicide in litigation filed involving the drug, but it is too late, the damage is done and he is one of the lucky ones to escape more serious effects of the drug.  Plaintiff suffers from a genetic condition of a tendency to Osteofibrous Dysplasia and resultant Adamantinoma; a condition where traumatized or fractured bones often will not heal properly.   Osteofibrous dysplasia (also known as ossifying fibroma) is a rare, normally benign non-neoplastic condition with no known cause. It is considered a [genetic] fibrovascular defect.   Osteofibrous dysplasia (OFD) is a rare, benign, fibro-osseous lesion that typically is seen within the cortex of the tibia in children. Adamantinoma (AD) is a rare, low-grade malignant primary bone tumor that occurs most often in the tibia and/or fibula of adolescent persons and young adults; however, it has been reported in other long bones, as well. Immunohistochemical and ultrastructural evidence has shown that the neoplastic cell in AD derives from an epithelial lineage. More recently, published reports have described another clinical entity-differentiated or OFD-like AD-that appears to lie between OFD and AD along a spectrum of disease. Controversy exists as to whether OFD is a precursor lesion to AD or whether OFD may be a residual lesion resulting from a spontaneously regressing AD. Management of OFD varies from observation to surgical intervention, depending on the age of the patient and the extent of the lesion. Management

Class Action Complaint
Case

of AD requires surgical resection with wide margins, followed by appropriate reconstruction, to minimize the risk of local recurrence or metastasis. In plaintiff's case, trauma to the fibula resulted in a malignant cancerous condition of aggressive squamous cell cancer which resulted in the transfemoral amputation of his left leg above the knee. Plaintiff Burgess is thus extremely careful not to be placed in positions or activities which might traumatize of fracture his bones in any part of his body.    Burgess has walked in a wide variety of knee and leg combinations, and being told and believing the Otto Bock C-Leg (C-Leg) was the most superior knee-leg combination on the market he obtained one already set up in 2009 and mounted it on his socket. The C-leg is a complete knee leg system, meaning it must use certain parts in order to allegedly operate properly. From the moment he put it on and began to walk in it, though it walked fine, he knew Otto Bock was selling a bill of goods untrue in a very clever and manipulative marketing campaign. The C-Leg was a very stiff walking leg combination because where the sensors controls for the Microprocessor  are located in the pylon at the foot attachment area which most people would know as the "ankle" area, and thus it cannot use a shock type pylon and indeed Otto Bock does not make one for the C-Leg. Typically this part is known as a shock and torsion pylon, and it twists about 15 degrees right or left and absorbs some impact of the heel strike like a shock absorber does on a vehicle. This device makes for a very soft walk. It compensates for what is called "flexion" where the human leg flexes to a slight bend as a natural "shock" absorption mechanism using muscles in the calf to absorb impact and body weight momentarily of each step. In a Stance aNd Support (SNS) type knee this is mimicked by use of a hydraulic or pneumatic cylinder. The C-leg is a SNS type knee. The problem is – the C-leg is not a true hydraulic knee leg and it is an electrically powered hydraulic system which if it looses power – it also looses support and if the amputee is depending on that resistance to be

there in a normal step – they will fall uncontrollably unexpectedly if it is not. Otto Bock advertises if the battery gets weak the valves will close and lock up the leg stiff, into a "safe mode" but that is only assuming the battery has a enough power to do that – however, if the battery is older and weaker – the battery will simply fail to close the valves and switch to the "safe mode". After 4 years of ownership of the C-leg – and plaintiff Burgess's was made in 2007 – it was discovered the battery will weaken such to the point it may not supply enough electrical power to the electric hydraulic valves, and unexpectedly switch modes to "Mode 2" and all support will be gone at a moment's notice. This does not occur ever in a manual SNS leg cylinder – also known commonly as the "Mauch" cylinder, and what Otto Bock has done is present the C-leg like it will always behave like a Mauch cylinder when the truth is it will not it if looses power. What Otto Bock has done is cleverly hide this dangerous safety fact under the wraps of complete in-house factory service so that the general amputee and prostheticist community cannot discover this. If they did discover this truth the C-leg would be considered a dangerous leg to walk on. The impetus of this lawsuit is why and how plaintiff Burgess discovered this, and how Otto Bock reacted under the Americans with Disabilities Act (ADA) to continue to do all it could to prevent the discovery of the truth, or complying with the ADA, thus forcing the filing of this action. Not only is the C-leg dangerous to walk on, because of this Burgess wanted to fix it to sell it by putting in a new battery, and Otto Bock's response was to interfere by insisting he service his out of warranty leg according to their warranty and send it to them disassembled. Otto Bock maintains the C-leg is a prescription medical device according to them and only they can service it for the "safety" of the wearer. This is all a form of clever medical extortion forcing wearers to pay un-necessary co-pays, be inconvenienced, and fees for services not required by law, as there is no such thing as a prescription required to own or

service an external prosthetic. The entire external prosthetics industry wants to operate under the fallacious "prescription required" axiom so as to keep prices artificially high and exclude wearers from being able to buy, service or build prosthetics or parts for themselves personally, as well as continue to fraudulently manipulate and bill the insurance industry despite this being a violation of 21 USC 331(a) known as "mis-branding" a medical device for profit and gain, which also violates 42 USC 12182 known as "discrimination" in the ADA. See the response letter in **Exhibit A** from Ossur, which admits that the "prosthetics manufacturers" have created (made up) the "prescription" requirement by confusing 21 CFR 801.109 which applies to INTERNAL prosthetic devices that their pre-market authorization does not fall under; and Fillauer (**Exhibit B**) and Otto Bock (**Exhibit C**) which seem to believe such a prescription requirement exists but cannot cite any such reference to law as to the demand under Cal. Civ. Code 1750 etc to cease and desist their unlawful policies and business practices. Fillauer counsel goes so far as to be confused that the CFR has to change to conflict with ADA law in order for them to need to comply and halt their unlawful practices when in reality the CFR simply needs to be amended to comply with existing consumer and ADA law. .

3.2  PLAINTIFF WILLIAM EVERDEN. is a resident of Colorado, is a C-leg wearer and wants to be able to service and build his own legs himself.

3.3  REAL PARTY IN INTEREST CHRIS DOE. is a resident of Florida, is an unknown AK wearer and wants to be able to service and build his own legs himself, but fears appearance in litigation will result in discrimination to him.

3.4  REAL PARTY IN INTEREST BOB DOE. is a resident of Alaska, is an Ossur Rheo Knee wearer and wants to be able to service and build his own legs

himself, but fears appearance in litigation will result in discrimination to him.

3.5    REAL PARTY IN INTEREST BOB DOE2. is a resident of California, is a Pile' Knee wearer and wants to be able to service and build his own legs himself, but fears appearance in litigation will result in discrimination to him

3.6   REAL PARTY IN INTEREST RUTH DOE. is a resident of California, and wants to be able to service and build her own legs herself, but has relocated and  also fears appearance in litigation will result in discrimination to her.

3.7   REAL PARTY IN INTEREST ROSS DOE. is a resident of South Dakota, and wants to be able to service and build his own legs himself, but has relocated and fears appearance in litigation will result in discrimination to him.

3.8  REAL PARTY IN INTEREST BRUCE DOE. is a resident of California, and wants to be able to service and build his own legs himself but has relocated and also fears appearance in litigation will result in discrimination to him.

3.9  DEFENDANT OTTO BOCK HEALTHCARE US is part of a global company that a man named Otto Bock founded as a company named Orthopädische Industrie GmbH in Berlin in 1919, and today has an American Office at Two Carlson Pkwy N. #100,  Minneapolis MN 55447 4467 and is upon reason and belief a wholly owned subsidiary of  OTTO BOCK HealthCare GmbH Max-Näder-Str. 15 37115 Duderstat, Germany.   OTTO BOCK has created and utilizes a discriminatory marketing model for its lower extremity prosthetics products in that while US law does not require any kind of certified person be utilized for a wearer to service their own prosthetic, OTTO BOCK will not allow the owner-wearer of the product the information, software or assistance

from them to allow the wearer to service their own item.  Instead insists on all sales and work be done through one of their "certified practitioners" who will charge a fee for everything and seek to bill an insurance carrier or often will not provide service if no insurance carrier is available to be billed.  This increases costs and in many ways extorts payment for services not needed.  In fact 21 CFR 820.198 tends to indicate it is the duty of the manufacturer of the device to communicate directly to the wearer and solve issues of the product with them.  OTTO BOCK through several communications refuses to disclose the simple information on how to replace a battery in their C-Leg device and to provide the owner the software to re-program their own C-Leg.  This marketing and service model violates Title III of the Americans with Disabilities Act (42 U.S.C. § 12181,et seq.).  Burgess did not discover this kind of conduct from Otto Bock until beginning July 1, 2013 the conduct unraveled and not that it was considered "personal injury" under the ADA as a claim in California.  Otto Bock's position is that to allow the ADA person to service their own prosthetic property is a "safety issue" stating they will not modify their policies based on what must be the "direct threat" defense.  See inter alia Chevron U.S.A. Inc. v. Echazabal, 122 S.Ct. 2045 (2002)  and the lower court ruling at Echazabal v. Central District of Chevron USA, Inc., 226 F.3d 1063 (9th Cir. 2000)

3.10    BLATCHFORD INC, (Hereinafter BLATCHFORD or ENDOLITE) is a Delaware corporation doing business as a foreign corporation in Ohio under the name ENDOLITE NORTH AMERICA, with an address of 1031 Byers Road, Miamisburg, OH 45342 showing and agent for service of process as TIMOTHY N. TYE, 5975 KENTSHIRE DRIVE, DAYTON, OH 45440 operating ENDOLITE NORTH AMERICA, LTD, according OHIO Secretary of State Document 200526302908 as a merged corporation into BLATCHFORD INC.  According to Endolite as found at

http://www.endolite.com/news/newsEndoMove.html;  October  22nd,  2010  –
Endolite  moved  its  North  American  Headquarters  from  Centerville,  OH  to
Miamisburg, OH.  Endolite in the US had been located in 3 buildings separated
by  about  100  yards  each.    The  21,000  square  feet  holds  our  warehouse,
manufacturing, assembly and administrative business units. Additionally there
is a large training center that will allow for customer visits and onsite training
by our [the] Education Department.  Endolite also insists on all sales and work
be done through a "certified practitioners" who will charge a fee for everything
and  seek  to  bill  an  insurance  carrier  or  often  will  not  provide  service  if  no
insurance carrier is available to be billed.  This increases costs and in many
ways extorts payment for services not needed.  In fact 21 CFR 820.198 tends to
indicate it is the duty of the manufacturer of the device to communicate directly
to the wearer and solve issues of the product with them.  This marketing and
service  model  violates  Title  III  of  the  Americans  with  Disabilities  Act  (42
U.S.C.  §  12181, et seq.).   Mr. Tye responded with a question to the CLRA
letter, but is not a member of the California Bar, and replied no further.

3.11    Defendant  Ossur  Americas  has  its  Headquarters  as  Ossur  Americas
Holdings Inc, 27051 Towne Centre Drive, Foothill Ranch, CA 92610 and was
founded in 1971, according to its website , Össur has amassed wide-ranging
expertise  in  the  development,  manufacture  and  sale  of  non-invasive
orthopaedics. An assertive acquisition strategy has complemented ambitious
organic growth over the last ten years and the Company is now a leading global
player in the industry.  Össur continues to conceive and harness the very best in
design and technological advances in its award-winning pursuit of "life without
limitations". Recognized by the World Economic Forum as a "Technology
Pioneer",  the  Company  invests  significantly  in  research  and  product
development, and Össur's innovative R&D unit helps ensure a consistently

strong position in the market.  The business employs a staff of around 1,600 across 14 strategic locations. Össur has extensive operations in the Americas, Europe and Asia, with numerous distributors in other markets. The Company's headquarters are in Iceland.  With its main Ossur Americas  operations center located in southern California, Össur Americas' service network extends right across North America, from Mexico to Canada. A specialist R&D unit in California for bracing and supports is complemented by a new, state-of-the-art manufacturing center in Tijuana, Mexico.  The Company is named after Össur Kristinsson, an Icelandic prosthetist who, in the early 1970's, focused on designing a better interface for prosthetic sockets. He soon discovered the ideal properties of silicone and put them to work in the form of the Iceross® liner. Within a short space of time his invention was helping thousands of amputees across the world to secure their prosthesis to their limb in a more effective and comfortable way.  OSSUR's response to the CLRA notice is **Exhibit A**

3.12    Defendant Fillauer Companies Inc, is located at P.O. Box 5189, 2710 Amnicola Hwy,  Chattanooga, TN 37406 and was started in 1914, by George Fillauer Sr. who founded the Red Star Pharmacy, the forerunner of Fillauer. In 1934, Carlton Fillauer, CPO, expanded his father's business to establish Fillauer Orthopedic as an innovator in the orthotics and prosthetics industry. Presently, Fillauer Companies, Inc., under the leadership of Karl Fillauer as Chairman and CEO, Ken Driver as Vice Chairman and Vice CEO, Dennis Williams as President and Fran Jenkins as Vice President, is comprised of the following subsidiaries, Fillauer LLC, Hosmer, Center for Orthotics Design, Motion Control, Centri, OTS Corp, Emotis and Fillauer Orthotic and Prosthetics Patient Care. The Fillauer Companies, Inc. has grown to be a globally renowned leader in the development, manufacturing, distribution and application of orthotic and prosthetic products.   Fillauer responded to the

Class Action Complaint
Case

-10-

CLRA notice stating it did not know how to answer the CLRA claims, from an attorney who was a shareholder [partner] with Chambliss, a Tennessee law firm, Stephen Burham, who is not a member of the California Bar, stating his client will not modify its policies based on the "direct threat" defense.  See inter alia Chevron U.S.A. Inc. v. Echazabal, 122 S.Ct. 2045 (2002)  and the lower court ruling at Echazabal v. Central District of Chevron USA, Inc., 226 F.3d 1063 (9th Cir. 2000)

3.13    Defendant Trulife has its Customer Service, Manufacturing and Distribution- Orthopaedics & Prosthetics Division at 26296 Twelve Trees Lane NW, Poulsbo, WA 98370 and is owned and managed by a group of highly professional and experienced healthcare executives since 1987.  Trulife is internationally based and totally engaged in the creation, development, manufacture and marketing of niche healthcare products.  The Group activities encompass Orthopaedics, Breastcare, Prosthetics and Pressurecare products and services.  Trulife did not respond to the CLRA Notice.

3.14   Defendant Norm's Restaurants according to the California Secretary of State shows the following business entity details Entity Name:      NORM'S RESTAURANTS, Entity Number: C0336375,  Date Filed:  04/08/1957, Status:   ACTIVE, Jurisdiction:   CALIFORNIA, Entity Address:       17904 LAKEWOOD BLVD,  Entity City, State, Zip:   BELLFLOWER  CA   90706, Agent for Service of Process: PHILIP H SINGERMAN,   Agent Address: 17904 LAKEWOOD BLVD,  Agent City, State, Zip:  BELLFLOWER,      CA  90706 as of December 12, 2013, and did not respond to communications sent to them as to ADA demands of requests to address damages.  In part because of the design of the C-leg, Otto Bock's obstinacy to allowing Burgess to repair his own leg, and the then discovery of the dangerous design of the C-leg which

caused Burgess not to trust the leg any longer, combined with a smooth shiny glazed ceramic tile floor and a rubber mat placed on that as a wet floor which held the moisture, Burgess slipped and fell in a Norm's Restaurant causing damage to his residual limb,  yielding the communications volley of **Exhibit I**

3.15   Defendant Health Net inc is a publicly traded company on the New York stock Exchange with a symbol "HNT" and is found in California as according to the California Secretary of State shows the following business entity details as Entity Name:         HEALTH NET OF CALIFORNIA, INC. Entity Number: C0819819,  Date Filed:        06/23/1977,  Status:        ACTIVE,   Jurisdiction: CALIFORNIA, Entity Address:    21650    OXNARD    STREET,    ATTN: LEIGHTON FLEENOR,  Entity City, State, Zip:        WOODLAND        HILLS CA 91367,   Agent for Service of Process: CT CORPORATION SYSTEM, Agent Address: 818 W SEVENTH ST,    Agent City, State, Zip: LOS ANGELES CA 90017, as of December 12, 2013; which as a pattern and practice denies ADA  qualified persons – in this case amputees – the proper referral to a physician who can care for them in a setting most appropriate to their needs and did not respond to communications sent to them as to ADA demands of requests to rectify the Olmstead violations[1] of refusing to properly serve medical care in the setting most appropriate to the needs of the individual as an ADA person requesting same.  A complaint letter was sent to Health Net

---

[1] An "Olmstead violation" is a failure to address the needs of an ADA qualified individual who seeks care in the realm of a setting most appropriate to their needs so named for the US Supreme Court ruling in *OLMSTEAD* V. L. C. (98-536) 527 U.S. 581 (1999), which has come to cover many aspects of ADA qualified individuals seeking appropriate medical care in the realm most appropriate to them as they seek same.

Class Action Complaint
Case

CEO, which was ignored and follow-up letter sent to the Agent for Service of process to which they then launched a claimed grievance investigation, but ultimate persistently ignored the request of Burgess to be seen "in the setting" [by the physician] "most appropriate to his needs" and resulted in the communications volley of **Exhibit D**.

3.16   Defendant Western Medical Center located at 1001 N Tustin Ave. Santa Ana, CA 92705 is a Health Net affiliated hospital that pursuant to 42 CFR Section 489.20, a hospital that meets the definition of a physician-owned hospital as specified in 42 CFR Section 489.3, and is a part of Integrated Healthcare Holdings, Inc., (IHHI) .   IHHI is a publicly traded hospital management company that was formed in 2003.   That presently owns and operates four hospitals in Orange County, California, with a total of 770 beds, 2787 employees, and 1725 active physicians.   These hospitals operate approximately 12 percent of the beds in Orange County and include Western Medical Center Santa Ana, which according to the California Secretary of State shows the following business entity details as Entity Name INTEGRATED HEALTHCARE HOLDINGS, INC., Entity Number: C2711231,  Date Filed: 12/16/2004, Status:  ACTIVE,   Jurisdiction: NEVADA,   Entity Address: 1301 NORTH TUSTIN AVENUE,  Entity City, State, Zip: SANTA ANA CA 92705,  Agent for Service of Process:   CT   CORPORATION   SYSTEM, Agent Address: 818  W  SEVENTH  ST,    Agent City, State, Zip: LOS ANGELES CA 90017 as of December 12, 2013, and did not respond to communications sent to them as to ADA demands of requests to rectify the Olmstead violations of refusing to properly serve medical care in the setting most appropriate to the needs of the individual as an ADA person requesting same.   IHHI operates and owns the   http://www.ihhioc.com   and http://www.westernmedicalcenter.com  domains among others.   IHHI is an

agent of Health Net and has ignored the request for X-Rays and participated in the "grievance procedure" of Health net yielding the communications volley of **Exhibit E** and **Exhibit F.** Somehow a entity called Angeles IPA is involved and apparently then approved a request to see an Orthopedic Surgeon – who is one of theirs which Burgess chose not see as a forced physician to be seen.

3.17    Defendant eBay, upon information and belief, is a Delaware corporation with the principal place of business located in San Jose, California. It is the leading provider of online consignment services using both an auction and fixed price "buy it now" format, where sellers place certain goods for sale, maintain possession of the item until it sells, and then drop ship direct to the customer upon notice from eBay the item has sold as buyers purchase them through eBay's online bidding or "buy it now" consignment service process. Upon information and belief, Defendant eBay does business throughout the world through its website (www.ebay.com) including substantial business in the State of California and have committed tortuous acts within said State. eBay Inc. is the parent company of PayPal. eBay operates as a part of its service a "Buyer Protection Program" which leads parties to believe under the eBay User agreement the principles of California consumer protection laws will be enforced in items sold through the eBay site. eBay recently revised it's User Agreement to be effective October 26, 2013  in such a fashion it appears to violate California law by admittedly being a California entity the person is contracting with, therein eBay seeks to use the standard and jurisdiction of the State of Utah and it's laws in its dealings with all its User Members.  eBay responded to the CLRA Notice by Ben Chapman, an associate at Cooley LLP, and a member of the California Bar, believing it had to do with Dunkel et al v eBay USDC CAND 12-cv-01452 EJD, and denied all claims or wrongdoing by eBay, reserving eBay's "rights".  **Exhibit G**

Class Action Complaint
Case

3.18    The  Plaintiffs are informed and believe and thereon allege that Defendant
PayPal, Inc. is a Delaware corporation doing business in the State of
California. PayPal's corporate headquarters are located in Santa Clara County,
California.  Defendant PayPal, upon information and belief, was and still is a
corporation duly organized and existing under and by virtue of the laws of the
State of Delaware and has its primary place of business at 2211 N First Street,
San Jose, California 95131-2021. It is a wholly-owned subsidiary of eBay;
using eBay to continue to violate the Comb v. PayPal settlement.   Defendant
PayPal is utilized as eBay's in-house payment transmitter.  This utilization by
eBay makes Defendant PayPal a widely popular payment transmitter in the
cyber marketplace. Defendant PayPal's payment system employs the existing
financial infrastructure of bank accounts and credit cards, but permits
individuals and businesses (particularly small businesses) to send and receive
online payments using only PayPal as an intermediary.  Upon information and
belief, Defendant PayPal does business throughout the world through its
website www.PayPal.com including more than isolated business in the State of
California and has committed tortuous acts within this state in violation of the
Comb v. PayPal settlement through eBay.  PayPal did not respond directly to
the CLRA notice and upon reason and believe are also represented by Cooley
LLP also by Ben Chapman.

3.19   Defendant ALIEXPRESS.COM is an Internet vendor on reason and belief a
subsidiary of the "ALIBABA GROUP" of unknown origin which appears is
incorporated under the laws of Hong Kong with US Offices as Aliexpress.com
/ Alibaba Group – America, 3945 Freedom Cir., Suite 600, Santa Clara, CA
95054, and is company involved in selling misbranded medical devices and in
open fraud with promises on their website they do not honor.  Aliexpress was

sent a CLRA Notice they did not respond to.  **Exhibit H**

3.20    Plaintiffs do not know the true names or capacities of the persons or entities sued herein as DOES 1 to 10, inclusive, and therefore sue such defendants by such fictitious names. Plaintiffs are informed and believe and thereon allege that each of the DOE defendants is in some manner legally responsible for the damages suffered by plaintiffs and the members of the class as alleged herein. Plaintiffs will amend this complaint to set forth the true names and capacities of these defendants when they have been ascertained, along with appropriate charging allegations, as may be necessary, but that in addition to other factors a "DOE" may any one of thousands of persons occupying and all times herein relevant referred to as a Certified Prostheticist, as certified by the on-line operation of http://www.bocusa.org or http://www.abcop.org who by nature of the certification itself are violators of Title III of the Americans with Disabilities Act (42 U.S.C. § 12181,et seq.); as *Prostheticists ("a.k.a. certified practitioners") are NOT, nor considered, Medical professionals and no licensing or other over-sight component exists in the State of California to regulate them – or the company which issues them a certification.   Thus a Prostheticist certification is largely a mechanics' "purchased" title.*

### SUMMARY OF THE BASIS OF THE LITIGATION

**3.21**  Senator Harkin completed and published the findings of a study  July 18, 2013 at  http://www.harkin.senate.gov/documents/pdf/OlmsteadReport.pdf  in the United States Senate HEALTH, EDUCATION, LABOR, AND PENSIONS COMMITTEE of which Tom Harkin, was the Chairman entitled "Separate and Unequal: States Fail to Fulfill the Community Living Promise of the

Americans with Disabilities Act" in which – amputees while mentioned nowhere in it – fit every specter of the foundation of the report as to the same issues facing them as ADA qualified individual facing the same discrimination and extortion to allowing them freedom of choice to build and maintain their lives in the setting [and manner] most appropriate to their needs. **Plaintiffs ask the court to take Judicial Notice of same** per Federal Rules of Evidence 201.

3.22   According to the Harkin report, Medicaid consumers are often not given a choice of types of services and an opportunity to receive services in the most integrated setting, especially those individuals discharged from hospitals.[2]

3.23   In 1999 the US Supreme Court in  OLMSTEAD V. L. C. (98-536) 527 U.S. 581 (1999)  defined that ADA persons have the Federally Protected right of choice in their medical care so long as it is not more costly than the present cost of the care they currently receive in any care plan conceived by others.

3.24   However, this suit is not about Medicaid – it is about the freedom of choice that the Olmstead ruling hinged on that ADA qualified individuals have a right to  goods and services provided to them "in the setting most appropriate to their needs" and that means they get to make the choice – not others.

3.25   "Health Plans" as those of Health Net and IHHI as operatives thereof are used to deny Olmstead rights to ADA qualified individuals forcing them to suffer decisions of the health plan in the best interests of the health plan itself.

---

[2] Charlene Harrington et al, Home and community – based services: public policies to improve access, costs, and quality (2009) available at http://www.pascenter.org/documents/PASCenter_HCBS_policy_brief.pdf.

Class Action Complaint
Case

3.26   An amputee is effectively a shut-in if they are not ambulatory and cannot walk and have no safe working comfortably fitting prosthetic.

3.27   Amputees requires special medical professionals who are trained in the science of amputated limbs and how the body reacts thereto

3.28   America is overrun with an ignore the law and force those wronged to pay to enforce the law mentality and for that alone punitive damages should apply.

3.29   This litigation has at least six facets:

    a.   That amputees are being discriminated upon under Title III of the ADA

    b.   That vendors and manufacturers of prosthetic devices are misbranding under 21 USC 331(a) as prescription medical devices to keep prices artificially high and out of the reach of many amputees; when indeed they are not.

    c.   That in these items a and b above fraud is being committed.

    d.   That some amputees are suffering harm due these three things above.

    e.   That most healthcare professionals and health plans ignore the ADA rights of an amputee and though inept to the knowledge of the amputee's condition – shrugs them off  in an Olmstead violation to deny them proper care.

    f.   That defendant Norm's Restaurants illustrates how thoughtlessness and disregard for ADAAG law in construction related matters can contribute to actually placing dangerous impediments in the public that can cause injury.

3.30   At the core of this litigation is  OLMSTEAD V. L. C. (98-536) 527 U.S. 581 (1999)   and though a case about mis-directing and misguiding mentally retarded ADA persons, the case stands for freedom of choice for ADA qualified individuals in all forms of interaction with society, and yet 23 years

after Olmstead, still the discriminatory attitudes exist and have even been woven into the delivery and accessibility to goods and services by companies, health plans and the providers thereof and even the law itself.   See e.g. http://www.pbs.org/newshour/bb/government_programs/july-dec13/ada_08-07.html

3.31    By no stretch of the imagination or law is it intended that an amputee be at the mercy or permission of another to find a way to walk again or sell their own property, and no such limitation is found in any law.

3.32   There is no law that prohibits any amputee from owning or building any such prosthetic device to do so themselves.

3.33   There is section 42 USC 12182 which prohibits others from preventing disabled persons to service themselves in the manner best suited to themselves.

3.34   There is a major impediment which begins after the amputation perpetrated by the healthcare industry in that they hold the reigns to the post amputation scenario, and today impede the ability to gain a prosthetic in the name of costs

3.35   Losing a leg is one of the most difficult things to cope with, and every amputee expects an ideal prosthesis that enables him or her to walk the same way he or she did before the loss of limb, and an amputation leaves the amputee in a permanent state of mental disability that matches or exceeds the physical disability of the amputation dependant on how people then treat them or their access to prosthetics and proper medical care as the need might arise.

3.36   The last thing an amputee should be faced with is extortion for mobility.

3.37   While an ability to walk again much like before the amputation is possible at a lower cost than one might think, the modular prosthetic device manufacturers and vendors have done all they can to extend the profit margin by designing and promoting ever increasingly expensive devices needlessly.

3.38   An amputation is likened to a castration, because in the flash of a moment one realizes they will forever be dependent on another form of assistance for mobility – be it a prostheticist building a prosthetic, crutches or a wheelchair.

3.39   Many amputees cannot afford a prostheticist and their insurance does not cover it – or if it does 20% of co-pay for typically a $25,000 billing is still as RUTH DOE put it – "the cost of small car" each time she visits a prostheticist.

3.40   This kind of cost need not be 75% or more as actually mark up costs inclusive of labor an amputee can do themselves if they could get the parts.

3.41   According to plaintiff Burgess, it  takes but one visit to a prostheticist to discover how personally suffocating and condescending that entire experience is, and the worst part is that one can tell they are not being told the truth, and instead websites and company literature is painted with glittering generalities showing amputees in usually still photos of motion like running, walking up or down slopes or stairs, hiking over rocks, fishing, bicycling or carrying children or groceries, when none of that is truly able to be done safely or wisely.

3.42   Then according to most amputees if one makes the mistake of asking how they can get involved in their own care and maintenance or building of their own prosthetic, the stonewalling begins politely, and soon one discovers the

amputee is not even allowed to buy their own parts or supplies direct.

3.43   Then according to most amputees if one asks advice as to what is the best components to use for a prosthetic, a keen mind becomes acutely aware they are seeking advice of a person who does not use the devices and only spouts what the literature says, and it is not until one gets the device on and wears it that one finds the limitations and tricks and issues not found in the literature.

3.44   The first hurdle is the medical community which has little clue about any specialty of amputation issues, and this makes the amputee a "medical leper" that no one wants to see as a patient because frankly they have no clue, and the rules of medicine do not apply to things like what pain means and how to fit a prosthetic limb to regain mobility especially for transfemoral amputees, which is where defendants Health Net and IHHI have failed grossly.

3.45   More alarming is that an amputee cannot purchase parts to repair or build their own prosthetic, and also "health plans" like defendant Health Net through partner providers restrict access to proper medical care that would find a proper physician addressing issues of an amputation, as they did to Burgess.

3.46   Then there are many places of public accommodation like Norm's Restaurants which lay "pretty and shiny" glazed ceramic tile floors that are slippery even when dry; and the yellow rubber mats with plastic bumps now laid in concrete walkways and at corners today which are slip and trip and fall hazards wet or dry, that some genius thought would be helpful, but in reality are dangerous.  (non-glazed ceramic tile floors are not as dangerous – often red 6 x 6 tiles found in public restrooms, because even wet they are not slippery)

Class Action Complaint
Case

3.47   Norm's Restaurants put a small rubber mat on a wet glazed tile floor and it was a recipe for disaster and when asked for simple accommodations and a copy of the statement left with them, there was no response but their heads stuck in the sand like they could not respond with any degree of humanity, later their insurance carrier made contact, but then fell silent also.

3.48   There are places like Norm's Restaurants which are fairly busy with persons persistently entering and exiting, the people of the general public  think they are helping and snatch a door from an amputee's hand to open the door wider thinking they are helping, when the fact is the amputee needs to hold the door to steady themselves going over the door threshold which is a trip hazard, or they rush to open a door and need to be told to let go of the door and go in – because the amputee needs to hold the door to steady themselves to enter, where power operated doors would alleviate this "helpful" thought process.

3.49   According to Burgess he wonders often if these people think they can drive a car for another in the passenger seat, so it would be a proper accommodation for busy places like Norm's Restaurants to install power doors so persons in wheel chairs or amputees can get in and out unfettered before installing negligently dangerous things like glazed tile floors and putting down unwelcome, welcome mats as trip and slip and fall hazards, if someone there would just think about it – even an elderly patron could slip or trip also.

3.50   Indeed glazed ceramic tile floors violate the USDOJ ADAAG standards.

3.51   For instance – as an indication of how serious a major government entity takes the limitation of an amputation, in order to gain or re-gain  a US Department of Transpiration Commercial Drivers License one must have the

required physical examination done by an Orthopedic Surgeon or a Board Certified Physiatrist, also known as a rehabilitation physician, as these are nerve, muscle, and bone experts who treat injuries or illnesses that affect how one moves to determine the medical issues as the case may be. See http://www.fmcsa.dot.gov/documents/safetyprograms/spe-certificate-package.pdf

3.52   A common general practitioner – or one staffing an emergency room – will have no knowledge or training to spot the signs of an injury or abnormality to an amputated residual limb, and certainly a prostheticist has absolutely no relation to an amputation injury as they are not medical professionals at all, but rather a common "body shop" looking to bill an insurance carrier the "max".

3.53   The overall design of a prosthetic limb can do harm in agitating the residual limb in many ways, and an amputee themselves will know the issues as they live with them day in and day out – not a corporation with design engineers.

3.54   The knees of transfemoral prostheses currently in use contain a wide and varied set of designs as knees – there is the SNS, which is basically a stick with a hinge and hydraulic support and polycentric types often much safer but more complicated to design and be built, and rotary type hydraulic knees, and the most simple – a common safety knee, all mostly mis-branded as to virtues.

3.55   A prosthesis is more than just a "knee"; it is a foot and ankle system and method of attachment to the residual limb all of which should be designed to mimic the human body counterpart as best possible  to provide the most natural gait, as the foot planar and dorsi- flexes, the heel absorbs heel strike, the knee flexes slightly to absorb the landing of the foot and these are things that pieces

of metal have never done well, but these are also things Otto Bock knew of when designing the C-Leg as well as other manufacturers when designing their contributions to the prosthetics market; but it is only Otto Bock that designed a complete knee shin and foot system which at its very core is designed in negligence and harmful to a wearer in so many scenarios Otto Bock knows of.

3.56  Such a scenario came together in this suit where poor prosthetic modular part design of the C-leg, and Otto Bock's hard headed stance to allowing the knee to have something as simple as a battery replacement be done by the owner, that contributed to the perfect storm for a slip and fall.

.

3.57  It is imperative the court understand that the defendants, save eBay, PayPal and Norm's have unlawfully made themselves a niche by preying on the misfortune of amputees and they are assuring their dominance over this disabled class by mis-branding under 21 USC 331(a) of prosthetic parts and medical devices and the service and repair of them as "prescription required" with a self appointed certification required when indeed they are not but are 510K exempt instead; and eBay and PayPal openly and actively continue to support mis-branding; and this scenario set forth in this complaint is beyond plausible and occurring.

3.58  Defendants Health Net and IHHI on the other hand in conspiracy use this mis-branding as "gatekeepers" to deny ADA qualified individuals from the access to goods and services in the setting most appropriate their needs as they have done to Burgess and as BOB DOE2 indicated has also happened to him.

3.59  The court may take Judicial Notice of the aspect of mis-branding under 21 USC 331(a) as the Commissioner of the FDA has defined what constitutes it in

Class Action Complaint
Case

the commission of a violation of ADA or other laws and is not required to wait on the FDA to rule and nor is the complaint asking the court interpose the FDA duty to rule on the issues put before it in two other petitions mentioned infra, and the FDA has summarized[3] some of the aspects of misbranding.

3.60   Misbranding[4] encompasses the "accompanying" label and labeling and "is interpreted liberally to mean more than physical association with the product. It extends to posters, tags, pamphlets, circulars, booklets, brochures, instruction books, direction sheets, fillers, etc. 'Accompanying' also includes labeling that is brought together with the device after shipment or delivery for shipment in interstate commerce.

3.61   Amputees are considered without question qualified Americans with Disabilities, entitled to protections under the Americans with Disabilities Act.

3.62   Defendants have intentionally created and operate a discriminatory marketing distribution model – without any exclusion to any right under law – that is designed to prevent Amputees from being able to buy or service their prosthetic or obtain  supplies and parts they need.

3.63   Defendants have created and actively support and participate in a contrived

---

[3]  See
http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/Overview/DeviceLabeling/GeneralDeviceLabelingRequirements/ucm052190.htm
[4]  Misbranding definitions and clarifications of aspects encompassing are found at
http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/Overview/DeviceLabeling/default.htm

Class Action Complaint
Case

-25-

certification model so only  "through contractual, licensing, or other arrangements, to a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity", as prohibited by 42 USC 12182(b)(1)(A)(i).  Sales are only "through contractual, licensing, or other arrangements", that defendants promote an unnecessary "certification" system which will then grant only certain individuals then called a Certified Prostheticist, as certified by an on-line operation of for example http://www.bocusa.org or http://www.abcop.org who by nature of the certification itself are violators of Title III of the Americans with Disabilities Act (42 U.S.C. § 12181,et seq.); as *Prostheticists ("a.k.a. certified practitioners") are NOT, nor considered, Medical professionals and no licensing or other over-sight component exists in to regulate them – or the company which issues them a certification.  Thus a Prostheticist certification is largely a mechanics' "purchased" title.*

3.64  Further and most importantly, no regulation or order of the FDA has declared any EXTERNAL prosthetic part or item a regulated or controlled distribution item, and in fact instead they are considered "510K" exempt medical devices generally safe for general public distribution and are found in the areas of 21 CFR 890.3420 and 3500 along with crutches, canes and wheelchairs as medical devices for general over the counter sale.  To have constructed such a discriminatory distribution model is a violation of 42 USC 12182 as to refusal to sell being a violation of the ADA, under 21 USC 331(a) "misbranding" items claiming a prescription is needed.

3.65  The current petitions before the FDA of plaintiff Burgess have to do with a 510K order and to modify 21 CFR 820.198, not misbranding.

Class Action Complaint
Case
-26-

3.66   The defendants of OTTO BOCK, ENDOLITE, OSSUR, FILLAUER, AND TRULIFE operate a conspiracy to the ADA to defy the rights found at 42 USC 12182 in that in violation to 21 USC 331(a) these defendants have misbranded their products to claim a prescription is needed, and in so much as OSSUR has claimed in writing this is what they and all manufacturers have done, is a conspiracy designed to keep amputees from procuring parts and supplies themselves to work on their own prosthetics.  (**EXHIBIT A**)

3.67   Defendants Health Net and IHHI utilize this conspiracy above to deny access to goods and service as an Olmstead violation

3.68   These defendants above have designed a complete system to operate in fraud to timely defraud Medicare and other insurance carriers on a regular basis by declaring items need replacing on interval when indeed they do not.

3.69   This fraudulent billing occurs at approximately five year intervals when it is known an insurance carrier and Medicare will pay for another completely newly built prosthetic as a matter of policy without question.

3.70   Defendants Health Net and IHHI in conspiracy therewith each other – use their physicians to conversely prevent an amputee from seeing a proper physician as a Physiatrist or Orthopedic Surgeon to assess the physiological issues of the amputation which may dictate a different prosthetic, repairs to the prosthetic or even corrective surgery to the residual limb.

3.71   For instance the Otto Bock C-Leg will in five years "mis-behave" and malfunction such that Otto Bock will declare it needs such extensive service it

would be best to replace it when indeed often it only needs a new battery.

3.72   Frankly the worst case scenario is it would need new hydraulic assembly.

3.73   By keeping these parts from the amputee themselves directly defendants save Norm's, eBay and PayPal, cause to be extorted a 20% co-pay from that person and bill for a new prosthetic when indeed often nothing is wrong with the item, and the flip side is the amputee is left with a dangerous prosthetic that they cannot even service themselves as a recipe for a public disaster.

3.74   Since the amputee can go nowhere else to obtain replacement parts, they are captive under duress to pay any billing presented to them or if denied access to a Physiatrist or Orthopedic Surgeon, may be left with a non-working or improper prosthetic for their scenario in the name of capping health plan costs.

3.75   The more ingenious amputees turn to eBay where often items are for sale that are being sold in the specter of misbranding or an inoperative state in fraud to get by or repair themselves or get lucky and find one from probate estate.

3.76   This "prescription" rule around which the prosthetics defendants have built this conspiratorial, discriminatory distribution model is admitted by OTTO BOCK, ENDOLITE, OSSUR and FILLAUER in their policy reply letters to the CLRA notices to cease and desist the discriminatory distribution practices sent them all per Cal. Civ. Code 1782(a) and attached hereto.  (**EXHIBIT A-C**)

3.77   Discriminatory distribution models violate the ADA at 42 USC 12182.

3.78   The common thread both Otto Bock, Ossur and Fillauer as defendants

present is a "direct threat" defense under the ADA to refuse to modify their policies to allow direct sales and service to the ADA wearer and purchaser.

3.79 When an FDA 21 CFR 820.198 complaint was filed as to Otto Bock for refusing to provide information how to change the battery in a C-Leg Otto Bock instead launched into a HIPAA violation – as plaintiff Burgess was not and never was a client of Otto Bock "healthcare"; never sought to be and did not want to be ever, thus investigating the complaint plaintiff Burgess insisting he come in to one of their "certified practitioners" and have his property disassembled and sent back to Otto Bock for service.

3.80 Everyday an amputee walks in a prosthetic device, it is a "direct threat" to their personal safety, but in this case it is fraud by misbranding and adulteration by the introduction of items in the marketplace that violate 21 USC 331(a) as hydraulic when indeed they are not hydraulic without power, and as required to be "prescribed" by a physician, when in reality there is no "prescription" but actually it is only a Detailed Work Order (DWO) – the wearer or anyone else could draft for a physician's signature to mandate a healthcare insurer simply be required to pay for it as a medical necessity.

3.81 In the case of the C-leg and the Ossur Rheo knee both are unsafe without sufficient battery power and no instructions for use are clear of the danger of the design of these items, and the insistence for the item to be set up by and / or returned to the manufacturer for all service – even a simple battery replacement – even though it is out of warranty no one has any right to demand as said return but for the extortion for refusing service instructions, - speaks to a cover up of the reality of the actual hydraulic scenario for at the very least the Otto Bock C-leg and operates to extort funds from disabled persons not

required by any application of law.

3.82   Finally, at least Otto Bock, Ossur and Fillauer seem to believe an amputee cannot follow the same directions for setup provided as required by law for the setup for safe use of the prosthetic devices they make, which is beyond an insult liken to that found in OLMSTEAD V. L. C. (98-536) 527 U.S. 581 (1999) which failed in 1999 against even mentality retarded ADA persons as to being able to make decisions for themselves, but in this case follow simple instructions as to setup – that only the amputee can FEEL and know if the item is setup properly – which is EXACTLY what any "certified practitioner" would be forced to ASK repeatedly of the amputee in any office visit.   See CLRA reply Letter of Stephen Carr from Otto Bock and Stephen Barham of the Chambliss law firm representing Fillauer and Christian Robinson representing Ossur Americas.  (**Exhibit A-C**)

## PROSTHESIS SAFETY AND WHO KNOWS BETTER ??

3.83   The defendants argue that a "certified prostheticist" or "certified practitioner" is why their products are only sold to them because of safety concerns for the ADA person being properly fitted safely, and this could not be farther from the actual truth, and violate the ADA at 42 USC 12182.

3.84   Not all amputees will be able to get a DWO from a physician and being able to have a prosthetic does not under law depend on this for its ownership or use.

3.85   External Prosthetic parts and items as medical devices can be used by even those who only need them for short errand issues as a crutch one wears, but the impetus of a DWO is a medical need to return everyday life which may never

Class Action Complaint
Case

be for some amputees, and some wear a prosthetic for cosmetic wishes only.

3.86  Plaintiff Burgess has a medical inability to effectively use a prosthesis according to what the ambulation definition is   by the Social Security regulations at the Musculoskeletal regs at 1.00B2b(2)[5] of being able to ambulate a full city block over rough and uneven surfaces, and the C-Leg is a very painful, dangerous and stiff walking prosthesis to attempt to do such a thing anyway, but he uses it only for short trips into a store behind a shopping cart as a walker, and has been medically declared unable to use a prosthesis, but this is not how Otto Bock advertised the C-Leg system item, and made it appear it might be a responsive solution for the needs of Burgess but when he received one, he found this advertising and marketing to be completely untrue.

3.87  As such above, Burgess would never ask, and no physician would ask an

---

[5] http://www.ssa.gov/disability/professionals/bluebook/1.00-Musculoskeletal-Adult.htm  1.00B2b(2) reads:  "(2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation."

Class Action Complaint
Case

insurance carrier to pay for an item plaintiff Burgess will not and cannot medically use in the way the Social Security Administration defines to be medically able to ambulate – and Burgess further requires surgery to correct a residual stump condition, to gain a DWO Certificate of Medical Necessity as it specifies for need; however that does not mean he cannot use a leg prosthesis in the  "most integrated setting appropriate to the needs of (he as) the individual." See  Part 36.203(a)  ADA manual, US Dept of Justice.

3.88   This was not and is not the business of Otto Bock or any other party the US Supreme Court has already defined in Olmstead as what is an act that is segregationist and discriminatory to limit the daily life abilities of Burgess by arbitrary and capricious rules they have created among themselves.

3.89   The only role a prostheticist truly has today is to fabricate a socket to fit prosthetics parts to, as they "setup" a prosthetic to manufacturers' directions

3.90   Worse yet, a prostheticist has no knowledge of how to build a proper socket for those like Burgess and in fact Burgess himself designed his own soft socket which makes the wearing and mounting of prosthetic leg parts bearable and spreads out the support evenly enough to not be excruciatingly  painful; yet companies like Otto Bock think they are the be all and do all for leg amputees when in fact they have no clue what they are doing beyond seeking to make profits, designing the simplest knee at effectively the highest cost and then fraudulently selling it off to the world as some kind of magic solution to those with two good legs who really have no clue or anything to compare it to.

3.91   The Otto Bock C-leg because of how it is designed and must be constructed is one of the stiffest walking – and for Burgess the most painful - prosthetic leg

builds because it can have no torsion and shock adapter due the C-Leg pylon positioned sensor and a very stiff foot to transfer the force of walking directly without error to the sensor mounted there in the lower pylon area to control the Microprocessor effects of the operation of the C-Leg.

3.92   It is not as though Otto Bock does not or did not know what a torsion and shock adapter is - Otto Bock calls theirs the Delta Twist prosthetic shock torsion 4R121 30; it is just that Otto Bock was negligent in failing to find a way to design such an advanced item into being able to be used on the C-Leg

3.93   While it was none of Otto Bock's business, a simple request be told how to replace a battery was turned into a demand that Burgess do things Otto Bock's way or get no service when in fact Burgess never was Otto Bock's client, did not seek to be, and never wanted to be which amounted to medical extortion.

3.94   Otto Bock launched its own investigation into Burgess as immediately thereafter and daily other parties connected to the Otto Bock practitioner system began to contact Burgess to try to influence him to visit them.

3.95   Worse, a prostheticist has no medical training in how to properly address ailments having to do with the fit and comfort of the socket to a residual limb of the amputee, and thus – especially for a weight bearing lower extremity amputation, this is the major area of concern that even the prosthetic parts manufacturers have no address over, and is the only true area the physician might be of true assistance in ordering a certain type of socket be built – IF the physician knew anything about crafting one – which indeed most all do not.

3.96   As far as a physician is concerned the best attachment of a modular

prosthetic device would be directly to the end of the bone – which just now is coming of age in America[6] and is known as "Osseointegration"

3.97   Some amputees are in such persistent pain, that no amount of a manufactured prosthetic leg system will help, but for a properly cushioned and designed socket to spread the suspension stress properly about the limb, and it needs to be one which absorbs the shock and forces in the mechanics of the prosthetic limb before – and not – actually transferring those force to the residual limb as pulling, pounding on,  or twisting of the flesh of the limb

3.98   Usually only the amputee after wearing the socket to any prosthetic device will know how and where it needs to be modified, and to prohibit the amputee from gaining access to the knowledge and materials to make these adjustments "in the setting most appropriate to their needs" is why the ADA prohibits this "segregated others know better attitude" as to disabled persons.

3.99   Just as a person might have several shoes, one which fit better and is more comfortably  than another, to force an amputee to have one limb that may not fit well at all – is barbaric, when the amputee may be able to build one better.

3.100  In terms of safety – there are three distinct areas this would apply.

      a.  A properly designed, built and fitted socket attachment device.

      b.  A properly setup mounting of the prosthetic parts to the socket; and,

      c.  A properly designed prosthetic device itself.

---

[6] One Orthopedic Surgeon has been granted conditional FDA humanitarian approval to do Osseointegration surgeries using a product manufactured for such purpose in Australia that are more commonplace and in other parts of the world.

Class Action Complaint
Case

-34-

3.101 To focus on what this suit is about, it is item "c" above.  Many above knee prosthetic knees have inherit design flaws which the manufacturer masks the disclosure of in its literature, and the C-Leg is the biggest offender to date found, as it is inherently dangerous because it is a powered hydraulic support solution, which if it always has a sufficiently strong battery, may perform as advertised, but if not the wearer will suffer an uncontrollable and unexpected loss of support and will fall as the device support terminates without warning, and this could also happen by a radio signal placing the C-Leg into "mode 2" also called "bicycle mode"; and is not a feature but a dangerous design flaw.

3.102 A certified prostheticist largely has the function of designing and building the socket of item "a"; and this part is the critical piece of the prosthetic. While the building of a socket is common artisan work also normally known well in the entertainment field or prosthetic and special effects make-up for movies and theater, most people do not know how to perform it or where to obtain the materials; however as this complaint will show, the external amputation prosthetic industry has gone out of its way to also treat the methods of the knowledge of building sockets for amputees a secret so as to force an amputee to come to the prostheticist when the truth is the prostheticist is actually not needed for that part of prosthetic building either.

3.103 A certified prostheticist has nothing to do with the design of the device to be mounted, but only item "b" – the setup of the device to a socket of item "a" they may or may not have built.  The setup of the device under "b" is done according to written instructions provided by the device manufacturer. ANYONE can read and follow these directions with an Allen wrench in hand.

3.104 Even if the prosthetic knee device is setup according to the instructions, there are adjustments needed ONLY the wearer knows of how to feel safe in walking in the device for their style of walking, and further – at least in the case of the C-leg the amount of "set back" of the knee recommended by the manufacturer is insufficient to walk safely in the knee should it fail.

3.105 As previously mentioned in the "parties" section, the C-Leg is a SNS type knee and that means it has no locking effect at heel strike and it depends on hydraulics to support the wearer in the step at heel strike and carry-over.

3.106 Hans A. Mauch is the co-inventor of the hydraulic cylinder upon which the C-leg is based, which has come to be known as the "Mauch" cylinder and "Mauch Knee" as set forth in US Patent 2,561,370[7] from July 24, 1951, and now called simply the Stance And Support knee system – abbreviated "SNS".

3.107 What seemed like a good idea at the time as documented in a Veterans Administration  paper at http://www.rehab.research.va.gov/jour/68/5/2/61.pdf, does not translate into a safe product if Microprocessor controlled because the hydraulic support depends on electricity to the valves to operate safely at all.

---

[7]

http://pdfpiw.uspto.gov/.piw?Docid=02561370&homeurl=http%3A%2F%2Fpatft.uspto.gov%2Fnetacgi%2Fnph-Parser%3FSect1%3DPTO1%2526Sect2%3DHITOFF%2526d%3DPALL%2526p%3D1%2526u%3D%25252Fnetahtml%25252FPTO%25252Fsrchnum.htm%2526r%3D1%2526f%3DG%2526l%3D50%2526s1%3D2,561,370.PN.%2526OS%3DPN%2F2,561,370%2526RS%3DPN%2F2,561,370&PageNum=&Rtype=&SectionNum=&idkey=NONE&Input=View+first+page

3.108 The loss of valve power to the hydraulics will collapse the knee completely.

3.109 This is not something Otto Bock made clear to the FDA when seeking approval to market the C-Leg, and indeed instead they covered this fact up.

3.110 Other knee designs such as the Ossur Total knee family, 1900, 2000 and 2100 as well as even the Otto Bock 3R60 are examples of polycentric type locking knee designs at heel strike, or simply standing, that will not collapse.

3.111 Many prostheticists do not like to build legs with the above knees because they cannot bill the carrier for as much money in those leg builds, and to set them up properly, is a manual process of both static alignment and manual adjustment of the knees to get them to walk properly and comfortably; and nor can they bill as wide a margin of profit in a 3R60 or Ossur Total Knee family

3.112 Prostheticists lack the feedback to get the setup done properly, and the MPC knees today are forgiving to a poor setup – until it is needed if the knee fails.

3.113 For an SNS knee it is always best to set it up more to the rear – or "posterior" - so it statically locks on body weight when walking to make it easier on the hydraulics and in the case of failure of the hydraulics at heel strike the knee will roll forward and lock rather than collapse without control

3.114 Defendant manufacturers  play to the fact that to keep the prices of their products artificially high to bill into the healthcare insurance industry at preset rates, the product must be sold on a Doctors' order, yet there is no law prohibiting  sales or possession of the prosthetic items as regulated medical

devices and indeed the opposite is true that the FDA considers external prosthetic devices "510K exempt" devices not subject to regulation but for record keeping of manufacturing supplies and customer complaints under 21 CFR 820.198.

3.115 Defendants Heath Net and IHHI in association with them and the need to hold down an cap medical costs give a run around to the patient to effectively keep a DWO from being issued for a replacement prosthetic, especially a high priced Microprocessor controlled one that might be the best answer.

3.116 There have been superior polycentric Microprocessor controlled knees of a better and safer design that never made it to the market to compete because of this mis-branding by other companies leading many to believe something like the c-leg was superior.  For example one was marketed by defendant Trulife – by "Seattle Systems" as a four bar knee similar to the one in the study below, and was on reason and belief made by a Japanese manufacturer, Nabtesco, still found at   http://welfare.nabtesco.com/english/gi/in_k4/in_k4.html, is a better knee.   See e.g. http://www.rehab.research.va.gov/jour/04/41/5/yokogushi.html

3.117 Otto Bock designed a high priced prosthetic knee in 1997 to usher in a new era of electro hydraulic prosthetics that were microprocessor controlled and did so by designing a complete leg – knee – foot combination, which had but one major flaw – in order to make it work; the hydraulics had to be fully powered, and as most any hydraulics engineer will tell you, hydraulics can only be controlled by closing valves when it is a non-pressure solution, and that means the C-leg would only be a successful design if the valve were normally open – meaning there is no hydraulic support without power to control the valves.

Class Action Complaint
Case

3.118 To cover the enormity of the this dangerous reality, Otto Bock devised an in-house maintenance and repair service and warranty operation so as to not let any parties external to Otto Bock proper come to realize the flaw of this dangerous C-Leg  design or be able to service the C-leg or discover its flaws.

3.119 Otto Bock's persistent excuse is that for the safety of the wearer they allow no service or repair or leg programming be done by the owner of the knee-leg and this flies in the face of the ADA at 42 USC 12182 because the owner is then forced by Otto Bock's policies and licensing and contractual arrangement with agents to be excluded from owning their own product they just paid for.

3.120 The crux of this complaint is that by use of  mis-branding by 21 USC 331(a) to claim a prosthetic item requires a "prescription" when indeed there is no such thing as a prescription for a prosthetic,  the external prosthetic industry uses this adoption in a conspiracy to keep all their pricing artificially high by a refusal to sell to anyone who wants build or service their own prosthetic, and while the Commissioner of the FDA has jurisdiction to decide mis-branding cases, the FDA has also published what misbranding is thus allowing any court judicial review to decide if it is a component as a violation of any other law.

**TO UNDERSTAND THE INJURY ONE MUST UNDERSTAND THE FLAW OF THE PRODUCT AND THE CAUSATION TO INJURY**

3.121 The human knee is NOT a simple hinge like a SNS knee is.  The human knee slides backward and up when walking, and only a polycentric – typically four bar knee - closely approximates this.

3.122 Many studies have been done on the C-Leg, and all tout its virtues, but none

make note of its inability to service by the owner, the lack of availability of a shock adapter or other feet other than those Otto Bock mandates be used, and most all studies enlist the help of amputees who are told what the study is expecting to "find", and some are compensated, so all studies are thus constricted as well as "seeded" to an outcome, not true of an everyday wearer.

3.123 All SNS type knees are dangerous – by their design they have no locking mechanism to prevent the knee from collapsing – but the hydraulic support.

3.124 An SNS knee by its very nature as its design is also a trip hazard whereas most polycentric – often called four bar knees - knees raise the foot slightly to give a better ground clearance on  the swing phase of a step.

3.125 For instance the Otto Bock 3R60 is a unique polycentric knee with geometric locking using a 5-bar linkage mechanism. This modular knee offers an EBS with a rubber bumper, which contributes to the production of a stable flexion stance, and provides an automatic swing control with a hydraulic unit.

3.126 This complaint does not allege Otto Bock makes no good prosthetic product, it alleges inter alia  that Otto Bock computerized the wrong knee – and the 3R60 would have been a better choice because for –one - the Otto Bock 3R60 is a unique polycentric knee with geometric locking using a 5-bar linkage mechanism, and they knew this – but for the added manufacturing costs to such a complicated knee, it would not have competed with the Endolite MPC SNS product, and this was both fraud and product negligence given what they knew of prosthetics  and had in production as a product line at the time.

3.127 Here, Burgess owned and walked in a Otto Bock 3R60 for three years with

an "Amputee Solution" torsion and shock adapter with a planar and dorsi flexing College Part Tru-Step foot and never once fell, and felt safe at all times taking the next step in comfort without a tearing twisting and pounding effect jarring up his residual limb, so he knows the difference, as the C-Leg component pylon has no shock adapter and the "Luxon Max" foot has no ankle component that planar and dorsi flexes on each step, as the sensor in the c-leg would then not work properly as it has been designed by Otto Bock.

3.128 It is interesting that OTTO BOCK has taken a partial position of an "injury to self and others" defense[8] to the ADA claim of refusal to sell, as it is they who have designed and are marketing one of the most dangerous knee-leg design combinations on the market in their C-Leg, as it is the C-Leg and through their clever and deceptive marketing campaign and warranty program; which is the leg that can and will go out from under the amputee unexpectedly at any time and has absolutely no mechanical safety feature to prevent same.

3.129 In the case of the true Mauch design SNS knee, - which the C-leg ONLY "appears" to be - at its' core it is a mechanical hydraulic cylinder which as previously said cannot completely collapse unless all fluid somehow catastrophically escapes the cylinder, BUT in the case of the C-Leg it is an electro-mechanical hydraulic cylinder of which all it takes is the loss of power or a sensor telling programming for the restriction valve to go wide open.

3.130 This is but one manner of which the C-Leg was negligently designed, and the second is that the sensor is located in the very bottom of the pylon

---

[8] In the CA Civ. Code 1750 Notice response, Otto Bock and others take a position this is why they refuse to sell direct when indeed no law exists preventing same.

Class Action Complaint
Case

-41-

preventing the owner from using anything but an Otto Bock pylon with the C-Leg knee component in addition to the torsion and shock pylon shortcoming.

3.131 Aside from the complete design of the C-Leg being one to cover its design and operating  flaws with a total "in-house" service system at Otto Bock only, its primary design was to build a more higher priced prosthetic leg combination so as to bill into healthcare providers in a fraudulent manner when the truth is a mechanical SNS Mauch style knee is safer, and the Otto Bock 3R60 is even safer than that, except Otto Bock does not own the Mauch patent and has no other SNS style knee but the C-leg which they completely designed.

3.132 One of the best advances in above knee prosthetic technology that has been invented in recent years is the shock and torsion pylon, which as its name implies absorbs shock at heel strike and twists right or left to absorb the twisting forces of directional walking of turns and general left or right movement and navigation, as in crowds - but the C-Leg cannot use this as it would not allow the sensor to operate properly and thus the C-Leg  knee would not operate, and hence the C-leg would walk unpredictably.

3.133 Otto Bocks' design response was to design and use very stiff feet so as to transfer the force to the sensor reliably and this makes the C-Leg walk like a sophisticated stick with a hinge.

3.134 The Endolite Smart Adaptive on the other hand actually had a knee and pylon kit which included a torsion and shock pylon Endolite called the TTPro.

3.135 The Ossur Rheo Knee has no restrictions on building it with a Ceterus foot that has torsion and shock built into it - it is now called the LP Rotate with

EVO which in the prosthetics industry is a well respected and durable shock and torsion adapter foot that CANNOT be used on the C-Leg system.

3.136 Even with the very best fitting socket and / or design, the C-Leg transfers a pounding and twisting effect up the leg into the residual limb to whatever section of the residual limb is most susceptible to receiving it.

3.137 Amputees that have never walked in a better more comfortable leg with a torsion and shock adapter or planar and dorsi flexing foot / ankle combination will not know the difference and believe that feel is "normal".

3.138 The only way this would not happen is if the amputee is an Osseointegrated subject – and then it is transferred directly up the femur – preferable for sure.

3.139 This transfer into soft tissue of the residual limb can result in residual limb complications ranging from sores to edemas to formation of calluses due the edemas that then turn in muscles masses or scar tissue inside the residual limb, as is what happened with plaintiff Burgess.

3.140 If Burgess would have been able to get a better leg he would have; but the no sell policy of the prosthetics industry in general affected and prevented that.

3.141 Plaintiff Burgess began this matter simply wanting to get instructions to put a new battery in the C-leg so he could sell it, but Otto Bock insisted on their plan seeking he disassemble his property and send it to them at further cost to him, of an item not under warranty, which was none of their business which resulted in further injury and loss of prospective economic advantage.

3.142 One can just imagine a female under garment manufacturer who insists on being there to don and remove the item each time it is used as Otto Bock seeks.

3.143 Burgess obtained the C-Leg pre-owned, and assembled; and when he mounted it on his socket, it was the first time he had walked in a prosthetic without a torsion and shock adapter, and thought it just took "getting used to"; but instead over time swelling developed, pain increased and blisters and sores had to be dealt with and finally what appears to be a permanent edema callous has formed which is growing in painfulness to walk in each time he does so.

3.144 After walking in a torsion and shock pylon equipped prosthetic since 2002, and having no residual limb issues like this, after the pounding a few months in the C-Leg, it changed his medical condition apparently forever to the worse.

3.145 Burgess initially obtained a C-Leg in an effort to gain a commercial drivers license,[9] but the pain of using it was so great that was abandoned and he only used it for quick trips into and out of shopping establishments.

3.146 A 2007 model C-Leg he obtained in to 2010 from a probate estate where the first owner never used it and in fact said the same things Burgess is now saying, the leg functioned fine in all other aspects, but was just hard walking.

---

[9] An Orthopedic Surgeon or Physiatrist must perform the USDOT Physical required for an amputee to gain a Commercial Drivers' License (CDL) and only the C-Leg was the knee leg combination surgeons would sign off on for pilots and truckers (CDL) licenses attesting to the gravity of that limb loss is.  See again e.g. http://www.fmcsa.dot.gov/documents/safetyprograms/spe-certificate-package.pdf

3.147 Because amputee cannot purchase their own parts and supplies, Burgess was stuck with this C-Leg and now four years later the damage and injury from using it is apparently permanent and being exacerbated daily the longer he is forced to keep the C-Leg because Otto Bock has devalued it refusing info.

3.148 The fall at Norm's Restaurant was so violent it must have torn capillary vessels and damaged nerves, and may have cracked open the end of the bone due to the "duck legged" walk which had to be maintained because it is an SNS knee and  for balance and to keep the leg from bending  much as it could not be trusted now knowing what Burgess knew of the C-Leg hydraulic issues.

3.149 Burgess reports pain is greater, the residual limb is very sensitive where the callous has formed internally, and he knows now he cannot trust the hydraulics of the C-leg so he is forced to walk with trepidation expecting the hydraulics to fail with each step, which results in a stiffening of the back and "hip-throwing" to keep the knee from bending and releasing unless he is supported by a walker assist device  like a grocery shopping cart or the like.

3.150 Burgess has fallen several times when the hydraulics just changed suddenly and broken socket attachment screws and the mounting plate twice he reports, but this time at Norm's it was a rubber mat wet underneath.  **EXHIBIT I**

3.151 Now by the words and actions of Otto Bock they have known of these issues Otto Bock sought to cover from the general amputee public by telling misnomers about the safety features of the C-Leg that are not true as told.

3.152 Otto Bock has taken a callous position that if they do not service the C-leg it cannot be serviced as though it is a leased item and refuses to release the

software to check it or program it directly by an owner after promising to do so and it contributed directly to a public slip and fall and injury at Norm's.

## CLASS ACTION SUMMARY AND ALLEGATIONS

3.153    There are several real parties in interest, proof available in camera, fearful to attach their name to full on litigation as they fear retribution from health plans, physicians and prostheticists in helping to keep them walking who all would like to service and build their own prosthetic devices and legs.

3.154   Plaintiffs bring this class action against Defendants to recover damages and other relief available at law and equity on behalf of themselves as well as on behalf of the members of the following class:

>    **A. Nationwide Class**: All ADA qualified individuals as amputees involved in a transaction, or sought a direct transaction with defendants and/or who are unable to sell and/or list products on eBay's website, due decreased valuing (for want of parts or software) or suffered adverse Buyer Protection rulings prior to October 10, 2012; and who are interested in pursuing this lawsuit since 1998.
>    **B. Nationwide Class**: All PayPal, Inc. account holders whose funds have been held by PayPal or whose accounts were closed, suspended, or limited by PayPal *as a result of eBay originating actions*, or suffered adverse Buyer Protection rulings prior to October 10, 2012; and who are interested in pursuing this lawsuit since 1998.

3.155   This complaint arises from also the fact that Defendants eBay and PayPal also use an unlawful, void contract pursuant to Cal. Civ. Code . 1608,  1667,

1668 and 1708 as found to be a violation of public policy and void shown by Bovard v. American Horse Enterprises, Inc. (1988) 201 Cal.App.3d 832

3.156 No defendant attempted to comply with the Civ. Code 1782 demand to cease and desist and modify policy to comply with the ADA at 42 USC 12182 and  rebuked same demand claiming a nefarious unidentified legal entitlement.

3.157  Defendants OTTO BOCK,   ENDOLITE, OSSUR, FILLAUER and TRULIFE  are under a public policy contract created by 21 CFR 820.198 and 21 CFR 820.200 by the placement of their items in the healthcare market regulated by Federal Law by the FDA to address service needs as requested.

3.158 As lower extremity SNS knee devices can often be easily upgraded to good as new by replacing simply the cylinder there is Fraud afoot with deliberate intent to cheat or deceive Medicare and insurance carriers for illegal gain.

3.159 OTTO BOCK terminates its warranty if the C-Leg changes hands or is sold, and this violates the implied contract under public policy created by 21 CFR 820.198 and 21 CFR 820.200, as well as devalues the product over all and to the extent this warranty is fraudulent to the product over time, it is void as to non-transferability by 21 CFR 820.198 ad 21 CFR 820.200.

3.160 Even if  OTTO BOCK may not be under any legal duty after 5 years of the stated warranty, it remains under the duty of the implied contract under public policy created by 21 CFR 820.198 and 21 CFR 820.200 to provide direct service information and support for its products remaining in the marketplace.

3.161   This complaint also arises from the fact OTTO BOCK has created and

utilizes a discriminatory marketing model for its lower extremity prosthetics products in that while US law does not require any kind of certified person be utilized for a wearer to service their own prosthetic, OTTO BOCK will not allow the owner-wearer of the product the information, software or assistance from them to allow the wearer to service their own item and members of the class are suffering experiences through purchases through eBay which violate eBay's own policy and promises to enforce California law in their "Buyer Protection Program" and this creates a desperate class of those who have insurance to cover the added cost OTTO BOCK creates without a legitimate business reason versus those ADA persons who do not have any such insurance and further also a class of those who have C-legs that are in warranty versus those not and OTTO BOCK as well and Endolite refuse to deal direct with the disabled person who seeks not to visit a not required by law "certified practitioner", and as such boycotts and blacklists ADA buyers directly.

3.162 OTTO BOCK claims that by its status as a class II Medical Device, the C-Leg requires sales through and setup as " . . . a prescription device wherein it must be prescribed by physicians and fitted by certified prostheticists. Therefore, it is not an "over the counter item" as referenced in your letter . . ." which is simply untrue.  As an "exempt 510K device" it may be sold by prescription OR over the counter, but by unfair business practices in marketing choose not to and instead ***isolate*** an ADA group keeping access from them.

3.163 OTTO BOCK, ENDOLITE, OSSUR, FILLAUER and TRULIFE support the unlawful refusal to sell axiom practiced throughout the prosthetic and prosthetics supply industry to prevent amputees as  buyers – even if they do hold a "prescription"; as the "prescription" is simply a "misbranding" word for adulteration what is really a   "Detailed Work Order"   (DWO) as a medical

order to **_pay_** for a prosthetic and not for any specific person to build one.

3.164 The prosthetics field falls under a billing acronym of DMEPOS.

3.165 DMEPOS means Durable Medical Equipment Prosthetics and Orthodontic Supplies, and herein "Prosthetic" **_shall always mean an external one_**.

3.166 Typically an external prosthetic item and device is expected to last at least five years, but the truth is they can often last twice that span of time or more depending on frequency and length of time of mechanical use of the item.

3.167 The problem this poses is one of revenue to both the manufacturer and the builder of the item – today called a prostheticist; as amputees are just not found in abundance and are all lined up waiting to purchase these expensive items.

3.168 OTTO BOCK, ENDOLITE, OSSUR, FILLAUER and TRULIFE and the EXTERNAL prosthetics industry in general have found a way to build in planned obsolescence to fraudulently bill insurance carriers, and Medicare on a five year interval by declaring the item worn out, when indeed it is not; and even can be repaired good as new at a fraction of the cost of a new build item.

3.169 OTTO BOCK has designed in an appearance of failure – and one such way is the end of life of the lithium ion battery which it will not allow anyone but themselves to replace, and this hides the true flaw of the design of the C-Leg.

3.170 When the item is sent in for repair often just barely in or out of warranty, it is declared to be in need of extensive repair to coerce the building of new item.

3.171 For instance a new battery replacement could be done by the owner at home for about $10, but OTTO BOCK will not reveal this to the owner or will claim other things more expensive to repair are wrong with the C-Leg knee item.

3.172 The true cost to fix the item might be under $10.00, whereas the cost to build a complete new prosthetic leg item would around $70,000 for a C-leg.

3.173 For instance pre-owned C-legs from often estate sales can be found on eBay for under $3,000, but have no software to program them because OTTO BOCK by claiming rights that are actually misbranding will not release it to the owner.

3.174 DMEPOS billing is done by a standardized chart with labor built in as authored and revised by Medicare as to what it will pay, and this is used throughout the industry. There is no "retail" sales price or competitive rates for direct buy of any parts or supplies if one wanted to repair their own item.

3.175 This is what an OTTO BOCK's top repair facility technician in Germany had to say on this subject when a person asked about buying a C-Leg used.

""I have worked with otto bock quite a bit in the past and have been to their main shop in Duderstadt, Germany... First these are my personal opinions; Otto bock is/are perfectionists to the highest level, before a new product hits the end user they go through the most rigorous testing I personally have ever seen.. Ossür in my opinion is the exact oposite...(i am reffering to the "power knee" its just not ripe yet..)they do also have good products though... ok back to topic; before a prostheticist is aloud to sell/provide a c-leg he has to go get specialy "c-leg" certified etc and a whole load of stuff. The software that is for the c-leg is some of the most "safe-guarded" I have ever seen. When you bring your leg

to checkup they can tell exactly who tinkered with it, every piece of software has its own serial number and is meant for one shop only--you sign (as a CP) contracts saying your in deep s*** if you share their software...(yes their software phones home, ask wireshark) scenario; you buy a "used" c-leg bring it to a non-c-leg-certified CP, not possible, only a CP that is c-leg-cert. has the proper software to change it, (that is legally speaking..) These are just some of bock's arguments, I think its just...making money. They insist that its quality managment...For the most part I do not agree with them. I dont know how much you intend on paying for the knee, I am sorry to say this; I would not buy it if it were over 3K and over a year and a half old... it would be horrible to pay a bunch and have it not setup properly or it break.. 9/10 c-legs that I have seen have had to be " seriously waited" on at some point.. on the other hand, I can imagine it would be wonderfull if you had one, I'm sorry, It all works down to Otto Bock making money..chris""

December 8, 2009 (type and spelling errors reproduced in full)

3.176 "Chris" was absolutely correct in that how OTTO BOCK flouts the requirements of 21 CFR 820.198 and 21 CFR 820.200 as to complaints and service by expiring their warranty on change of owners, and then refusing to adhere to any service requests as complaints or otherwise of that above of the actual end user because they are the ADA person and not a prostheticist.

3.177 There is no law or license granting a prostheticist any special rights to have exclusionary marketing and distribution rights as would be declared by 21 CFR 801.109 as a DMEPOS item is NOT a prescription medical device.

3.178 ENDOLITE, OSSUR, FILLAUER and TRULIFE does the same with its

Class Action Complaint
Case
-51-

marketing models as does OTTO BOCK.

3.179 These are extortive marketing models that violate section 12182 of the ADA

3.180 More importantly OTTO BOCK,  ENDOLITE, OSSUR, FILLAUER and TRULIFE use the DMEPOS pricing and renewal time period to fraudulently bill and re-build new prosthetics that only needed minor repair – if that at all – and to the chagrin of the uninsured or underinsured, caused excessive costs to remain high and co-pays to be paid which were higher than they ever needed to be because of the exclusionary policies as to being able to buy parts and supplies direct by the ADA person.

3.181 eBay and PayPal support this unlawful marketing and misbranding allowing fraudulent sale of medical devices they know will not function.

3.182 When an eBay member does try to sell ADA assistive devices that are lawful, eBay declares them against the medical device policy and removes them from sale or will interfere in the contract of the custom device as sold.

3.183 The FDA has been petitioned to Amend the order allowing marketing of the C-leg to read both "prescription" and "over the counter use" as petition number FDA-2013-P-0949 and can be found through the regulations.gov website at http://www.regulations.gov/#!docketDetail;D=FDA-2013-P-0949

3.184 Attached is FDA-2013-P-0949 (**EXHIBIT J**) and as a second petition FDA-2013-P-1080-0001 (**EXHIBIT K**) to address adding language to 21 CFR 820.198 as an "(a)(4)" section subject to the rights found in the ADA at 42 USC 12182.

# IV.  ALLEGATIONS

4.1   [Schadenfreude](http://en.wikipedia.org/wiki/Schadenfreude)[10] is a German word which means to have joy at the misfortune of others, and that is what the prosthetics industry and OTTO BOCK and ENDOLITE  operate under in discriminating against amputees under the ADA.

4.2   42 USC 12182(a)  states:  No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

4.3  California Civil Code 51(f) states:

   (f)  A violation of the right of any individual under the Americans with Disabilities Act of 1990 (Public Law 101-336) shall also constitute a violation of this section.

4.4   California Civil Code 51.5 states in part:

   51.5.  (a) **No business establishment of any kind whatsoever shall discriminate against**, boycott or blacklist, or refuse to buy from, contract with, **sell to**, or trade with any person in this state on account of any characteristic listed or defined in subdivision (b) or (e) of Section 51, or . . .  because the person is associated with a person

---

[10]  [http://en.wikipedia.org/wiki/Schadenfreude](http://en.wikipedia.org/wiki/Schadenfreude) see also ***The Joy of Pain: Schadenfreude and the Dark Side of Human Nature,*** Oxford University Press, Publication Date: July 31, 2013   ISBN-13: 978-0199734542

Class Action Complaint
Case
-53-

who has, or is perceived to have, any of those characteristics.

(b) As used in this section, **"person" includes any person, . . . or company.**

4.5   What constitutes "discrimination" is defined in the Americans with Disabilities Act, and plaintiff(s) is/are injured in fact due the policies of all defendants save eBay and PayPal refuse simple service information on field replaceable items like batteries and cylinders that can be installed by anyone and / or to repair and ship the good as contracted for and agreed directly.

4.6   For instance a complete replacement hydraulic unit for the ENDOLITE Smart Adaptive knee – including the microprocessor is only $2,500 to purchase to replace by literally removing two bolts, and that is a far cry from the entire knee cost wholesale of $18,000 to $20,000 dollars, but results in ***a new knee***, and this price is the cost without labor the prostheticist will ICD9 code to bill out at typically $28,000 to $30,000 without a foot, and $39,000 with a foot.

4.7   Schadenfreude is thus a violation of the ADA when surfacing for profit.

4.8   OTTO BOCK, ENDOLITE, OSSUR, FILLAUER and TRULIFE are all aware that to refuse to sell to the person who uses the item OR any person who wants the item is unlawful because it interferes with a prospective economic advantage through the use of and creation of an unlawful distribution model of an Americans with Disabilities Act specific  product that enjoys no legal distribution monopoly due a licensed or restricted distribution system without legitimate business reasons for doing so particularly when the manufacturer – the defendants in this case – do sell direct into their unlawful distribution marketing model using a certification scheme bound to no law or set of laws as

to legitimate licensing requirements.

## AN EXTERNAL PROSTHETIC AND PARTS COMPRISING IT ARE BY DEFINTION NOT PRESCRIPTION MEDICAL DEVICES

4.9   The FDA administers the Food Drug and Cosmetics Act of 1938 (FD&C)

4.10   On May 28, 1976, the FD&C Act was amended to include regulation for medical devices. The amendment required that all medical devices be classified into one of three classes:

- Class I: Devices that do not require premarket approval or clearance but must follow general controls. An external prosthetic can be a class I device.

- Class II: Devices that are cleared using the 510(k) process. Diagnostic tests, cardiac catheters, hearing aids, and amalgam alloys used to fill cavities are examples of class II devices. An external prosthetic can be class II devices.

- Class III: Devices that are approved by the Premarket Approval (PMA) process, analogous to a New Drug Application. These tend to be devices that are permanently implanted into a human body or may be necessary to sustain life. An artificial heart meets both criteria. The most commonly recognized class III device is an Automated External Defibrillator. Devices that do not meet either criterion are generally cleared as class II devices.  An external prosthetic is never considered a class III device unless it would be part of an Osseointegration system which the FDA has never in this country approved for use in conjunction with an external prosthetic part yet. [11]

4.11   If a product is labeled, promoted or used in a manner that meets the following definition in section 201(h) of the Federal Food Drug & Cosmetic (FD&C) Act it will be regulated by the Food and Drug Administration (FDA)

---

[11]  http://www.rehab.research.va.gov/jour/09/46/3/pdf/hagberg.pdf

Class Action Complaint
Case

as a medical device and is subject to premarketing and postmarketing regulatory controls. A device is:

- "an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including a component part, or accessory which is:

  o recognized in the official National Formulary, or the United States Pharmacopoeia, or any supplement to them,

  o intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals, or

  o intended to affect the structure or any function of the body of man or other animals, and which does not achieve its primary intended purposes through chemical action within or on the body of man or other animals and which is not dependent upon being metabolized for the achievement of any of its primary intended purposes."[12]

4.12   An external prosthetic device or part might be considered "intended to affect the structure or any function of the body of man" but the legal reality is it does not – it replaces an amputated part of the body, and thus is in a gray area

4.13   In the FD&C is a section known as "510(k)" which pivots on an exemption from or no thus regulation under the FD&C.   There is no 510(k) form, however, 21 CFR 807 Subpart E describes requirements for a 510(k) submission. Before marketing a device, each submitter must receive an order,

---

[12] From

http://www.fda.gov/medicaldevices/deviceregulationandguidance/overview/classifyyourdevice/ucm051512.htm

Class Action Complaint
Case

-56-

in the form of a letter, from FDA which finds the device to be substantially equivalent (SE) and states that the device can be marketed in the U.S. This order "clears" the device for commercial distribution.[13]

4.14   510(k) exempt medical devices are Medical devices that do not require FDA review before the devices are marketed are considered "510(k) exempt." ***These medical devices are mostly low-risk***, Class I devices and some Class II devices that have been determined not to require a 510(k) (named for a section in the Food, Drug, and Cosmetic Act) to provide a reasonable assurance of safety and effectiveness. These devices are exempt from complying with premarket notification requirements subject to the limitations on exemptions; however, they are not exempt from certain general controls. For example, 510(k) exempt devices must

- be suitable for their intended use

- be adequately packaged and properly labeled

- have establishment registration and device listing forms on file with FDA

- be manufactured under a quality system (with the exception of a small number of class I devices that are subject only to complaint files and general recordkeeping requirements)[14]

4.15   In granting certification of a restricted prosthetic medical device, the FDA makes clear that is how the approval of the item to market is granted as thus:

---

[13] From

http://www.fda.gov/medicaldevices/deviceregulationandguidance/howtomarketyourdevice/premarketsubmissions/premarketnotification510k/default.htm

[14] From http://www.fda.gov/AboutFDA/Transparency/Basics/ucm194468.htm

Class Action Complaint
Case

For instance the language found in the Novation Hip system at http://www.accessdata.fda.gov/cdrh_docs/pdf5/p050039a.pdf reads:

"***The sale, distribution, and use of this device are restricted to prescription use in accordance with 21 CFR 801.109 within the meaning of section 520(e) of the Federal Food. Drug, and Cosmetic Art (the act) under the authority***, of section 515(d)( I )(B)(ii) of the act. FDA has also determined that, to ensure the safe and effective use of the device, the device is further restricted within the meaning of section 520(e) Under the authority of section 515(d)(1)(B)(ii), (I) insofar as the labeling specify the requirements that apply to the training of practitioners who may use the device as approved in this order and (2).1insofa.-r as the sale, distribution, and use must not violate sections 502(q) and (r):of the act."   [emphasis added]

Similarly another approval to market an internal prosthetic at http://www.accessdata.fda.gov/cdrh_docs/pdf9/p090002a.pdf for the Pinnacle CoMplete Acetabular Hip System also states as below

"***The sale and distribution of this device are restricted to prescription use in accordance with 21 CFR 801.109 and under section 515(d)(1)B)(ii) of the Federal Food., Drug, and Cosmetic Act (the act)***. FDA has determined that this restriction on sale and distribution is necessary to provide reasonable assurance of the safety and effectiveness of the device. Your device is therefore a restricted device subject to the requirements in sections 502(q) and (r):Of the act, in addition to the many other FDA requirements governing the manufacture, distribution, and marketing of devices."   [emphasis added]

4.16    These two above devices are examples of INTERNAL surgically implanted installed prosthetics which are regulated by the FDA under the FD&C act and can only be ordered and implanted by a licensed physician.

4.17    The OTTO BOCK C-leg is an EXTERNAL prosthetic medical device which bolts onto a skin contact support socket system and has an authorization to market found at http://www.accessdata.fda.gov/cdrh_docs/pdf/k991590.pdf

Class Action Complaint
Case

-58-

which simply says:

> We have reviewed your Section 510(k) notification of intent to market the device referenced above and we have determined the device is substantially equivalent (for the indications for use stated in the enclosure) to devices marketed in interstate commerce prior to May 28, 1976, the enactment date of the Medical Device Amendments, or to devices that have been reclassified in accordance with the provisions of the Federal Food, Drug, and Cosmetic Act (Act). You may, therefore, market the device, subject to the general controls provisions of the Act. The general controls provisions of the Act include requirements for annual registration, listing of devices, good manufacturing practice, labeling, and prohibitions against misbranding and adulteration.

4.18    This above is as the same for all EXTERNAL PROSTHETIC devices.

4.19   There was no restriction requirement to a prescription prior to 1976, and there is none now, as it is a discriminatory marketing ploy to use the impetus language of the INTERNAL PROSTHETIC, to keep prices artificially high and marketing discriminatory to use insurance carriers to pay higher costs.

4.20  Defendants OTTO BOCK, ENDOLITE, OSSUR, FILLAUER and TRULIFE are all aware what they call a "prescription"  is actually nothing more than a "Detailed Work Order" – called a "DWO" used for the purpose to bill a healthcare insurance carrier and it has nothing to do with the "obvious" – an amputee needs a replacement limb or device to regain use of that part of the body, to which OSSUR has published proof of this in their Ossur Reimbursement Guide at page 6 of 12 also found on the Internet at http://www.ossur.com/lisalib/getfile.aspx?itemid=31138, and attached hereto as **Exhibit L** where it is clearly written "Under established Medicare policy, "[s]omeone other than the physician [i.e., the prosthetist] may complete the

Class Action Complaint
Case

DWO. However, the treating physician must review the DWO and personally sign and date the order to indicate agreement.", yet while not a "prescription" at all, this axiom is used to deny the sale of parts and other supplies so only those in the closed distribution loop may buy to re-sell items at inflated prices

4.21  Even Medicare does not use the term "prescription" it calls what the prosthetic manufacturers want to call a "prescription" - is a "certificate of medical necessity" in their Medicare Part B brochure CMS Publication Number 11045, and as such the defendants are all participating in and causing a "misbranding" in their sales literature and distribution mechanisms which rely on this adulterated misnomer, thus violating the ADA provisions in their refusal to sell direct when requested, as Medicare has a Form CMS-854[15]; HOWEVER, that form above is only part "C" – what is called the "Detailed Work Order" (DWO) portion and "D" which is the physician's attestation and agreement to the build order as proposed by the supplier OR wearer desires.

4.22  Part A contains the CERTIFICATION TYPE/DATE:, PATIENT INFORMATION:, SUPPLIER INFORMATION:, PLACE OF SERVICE: FACILITY NAME: HCPCS CODES:, PATIENT DOB, HEIGHT, WEIGHT AND SEX:, PHYSICIAN NAME, ADDRESS:, UP IN:, and the PHYSICIANS TELEPHONE NO:  and Part B contains the EST. LENGTH OF NEED:, DIAGNOSIS CODES:,  a QUESTION SECTION:, NAME OF PERSON ANSWERING SECTION B QUESTIONS:, and today this component portion may be freehand, but is normally incorporated into the Medicare Billing DMEPOS software and the instructions state at Section B, "(May not be completed by the supplier. While this section may be completed by a non-

---

[15]  http://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/CMS854.pdf

physician clinician, or a physician employee, it must be reviewed, and the CMN signed (in Section D) by the ordering physician.)"  and collectively is why defendants want to call this process a "prescription", but it is not, what it is – is simply and order of medical necessity for the parts billed for to be paid for by the insurer and all Healthcare Insurers follow this same procedure.

4.23   No regulatory law exists preventing a wearer purchasing their own parts.

4.24   Otto Bock's C-Leg (and new updated version the Genium) and Endolites' Smart Adaptive (and new updated version the Orion) are manufactured with default setup settings that make the knee safe out of the box when installed according to simple bolt on alignment  instructions that they even must provide to their / a prosthetician.

4.25    Where the confusion over a "prescription" emanates is that in order to bill an insurance carrier, the prosthetician artisan must have a doctors' order – a.k.a a "prescription"  - the "DWO" CMS-854 drafted by the prosthetician and signed onto by a physician who really has no idea what is actually needed – nor what was signed,  -  for the healthcare providers to pay for such an item, but there is no requirement by law preventing one from selling, purchasing, owning or building their own prosthetic or in many states for others to do as a business.

4.26    For instance other prosthetic knee manufacturers will sell direct, as indeed there is no "prescription" required to own a prosthetic knee and the company http://k12prosthetics.com, at http://k12prosthetics.com/faq.htm says so.  The company makes less expensive knees using bicycle shock parts that have been shown to work extremely well.  See http://k12prosthetics.com/products.htm

4.27    OTTO BOCK has taken this one step above to a higher level of Schadenfreude to do all things in-house secretively and through its network of certified practitioners it controls by and through loss of certification threats and termination of software use and upgrades to eliminate them if need be while the uninsured user cannot get a C-leg at all or service their own C-leg.

4.28    This marketing and distribution model forces a costly symbiotic and discriminatory relationship with defendants because they have designed their products to be coercive and extortive by manufacture and in distribution as nothing prevents the wearer from purchasing their own parts, building their own leg and billing for re-imbursement upon the physicians attestation.

## A CLOSED DISTRIBUTION MODEL THUS VIOLATES THE ADA

4.29    Unlawful is this practice so says the US Supreme Court in OLMSTEAD V. L. C. (98-536) 527 U.S. 581 (1999)  which is the landmark decision that in so many bluntly worded ways reads to be disabled - even a mental disability - does not equate to being stupid forced by others in life to their wishes.

4.30    There is a Healthcare crisis in America and this action illustrates the convenience of how perpetrators in the Prosthetics Industry use fraud and their entitlements as providers & suppliers, with violations of law to run up costs.

4.31    Between 1988 and 1996, there was an average of 133,735 hospital discharges for amputation per year.[16]    In the United States, there are

---

[16] Timothy R. Dillingham, MD, et al, "Limb Amputation and Limb Deficiency: Epidemiology and Recent Trends in the United States," Southern Medical Journal 95 (2002): 875-83.

Class Action Complaint
Case
                                    -62-

approximately 1.7 million people living with limb loss.[17]   It is estimated that one out of every 200 people in the U.S. has had an amputation.[18]   Lower-limb amputations accounted for 97 percent of all dysvascular limb loss discharges with 25.8 percent at above-knee level, 27.6 percent at below-knee level, and 42.8 percent involving numerous other levels.[19]

4.32   Now in 2012 there were actually about 185,000 amputations per year.[20]

4.33   An amputation surgery DOES NOT include a replacement prosthesis unless the patient has insurance which covers it, AND even then, because the prosthetic is simply akin to a "crutch" one wears – that anyone can literally make; if the patient DOES NOT have insurance which COVERS the prosthetic, they then find they cannot even BUY the parts themselves to build one themselves, and this is in violation of existing law to prohibit such purchase.

4.34   An amputation surgery COULD have a component part of a titanium attachment stud installed in the end of the bone instead of bone wax, which then would eliminate the need for the prostheticist completely, and the lower extremity external medical device would then attach directly to the bone extension stud protruding end of the residual limb.  This is a surgical process known as Osseointegration and has been known in the world of prosthetics

---

[17]  Kathryn Ziegler-Graham, PhD, et al. "Estimating the Prevalence of Limb Loss in the United States - 2005 to 2050," Archives of Physical Medicine and Rehabilitation 89 (2008): 422-429.

[18]  Patricia F. Adams, et al, "Current Estimates from the National Health Interview Survey, 1996," Vital and Health Statistics 10:200 (1999).

[19]  http://www.amputee-coalition.org/fact_sheets/amp_stats_cause.html

[20]  http://www.amputee-coalition.org/limb-loss-resource-center/resources-by-topic/limb-loss-statistics/limb-loss-statistics/index.html

Class Action Complaint
Case

-63-

since 1950 when Dr. Per-Ingvar Brånemark  of Sweden discovered the bonding properties of Titanium to bone and is now carried on by his son Rickard Brånemark who has done hundreds of Osseointegration surgeries and others around the world have learned the technique, and a pioneer here in American is Dr. Ronald Hillock of Las Vegas having done the first such surgery here in American sanctioned by the FDA as a trial.

4.35    The Prosthetics Industry operates as a quasi-medical component to the Healthcare Insurance Industry.  It is the mechanical manufacture of artificial limbs and body components mostly now found regulated under Section 510(k) of the Food, Drug and Cosmetic Act, also more fully known as TITLE 21 CHAPTER 9 the FEDERAL FOOD, DRUG, AND COSMETIC ACT; and, in that field prosthetic items are divided into two classes one being exempt, [See 21 CFR 890.3420 and 3500] not requiring a prescription as EXTERNAL devices, and INTERNAL devices which are surgically implanted requiring a prescription and are regulated as to manufacture materials and ability to distribute; *and this instant action concerns ONLY EXTERNAL devices.*

4.36    An *external* prosthetic can be anything from a stick to a limb prosthetic one wears – but no prescription is required to own, buy or wear one; however the Healthcare Insurance Industry (HII) has adopted a policy that collectively it will not pay for any such prosthetic device unless it is ordered by a licensed physician in the course of their professional and medical employment and opinion it is needed to restore body function or address a return quality of life.

4.37   How it is not intuitively obvious even the most casual observer that a person with a limb amputation needs a restorative prosthetic is an oxymoron.

Class Action Complaint
Case

4.38    Because anyone can bolt together and build a prosthetic assistance device, the prosthetics manufacturing industry of which all defendants save eBay and PayPal are component members have adopted a position which is counter to the ruling of the US Supreme Court in *OLMSTEAD V. L. C.* (98-536) 527 U.S. 581 (1999) 138 F.3d 893, affirmed in part, vacated in part, and remanded as ruled under the Americans with Disabilities Act in which they seek to keep away these components under the "anti-discrimination" provision of the ADA Act from the amputees that need them unlawfully.

4.39    Because the prosthetics industry through its "purchased certification" process and "prohibited purchase" process has created under what the industry erroneously believes is an FDA regulation entitlement on the matter, it seeks to discriminatorily keep away items, parts and repairs from Disabled Americans, the true "customers" who need to have and wear the manufactured prosthetics.

4.40   The manufacturer defendants save eBay and PayPal, in this case use the insulator of a "certified practitioner" prostheticist to extort fees to bill for and keep complaints and actions for product they know does not perform as intimated to keep product liability from attaching usually directly to them, as complaints land with the prostheticist and the prostheticist then blames the manufacturer who the patient (amputee) as customer cannot reach, and under the same axiom refuses to divulge simple service information to the end user upon complaint also few wearers know how to or find time to, make an FDA complaint to the FDA Medwatch program and website[21]

4.41    In this bravado cited above, the defendants suborn and encourage billing

---

[21] https://www.accessdata.fda.gov/scripts/medwatch/

and building fraud and increased prices as illustrated by this action at bar, and to most of these defendants – all of whom are largely staffed by persons with two good legs –  cannot understand what the amputee is complaining about – it is just fine from their perspective of getting up every morning and walking normally - in essence unqualified to work in the field at all.  They have no clue, and that is why the Americans with Disabilities Act is there.

4.42   In an example of how damages can occur, plaintiff BURGESS had arranged to sell his old knee to a prostheticist after sending it out for repair and upgrade to ENDOLITE,  but the prostheticist a non-party J. Daniel  NUNEZ attempted to re-direct the package using defendant ENDOLITE, not belonging to him, to his facility when he had first agreed to pay for it and then when instructions were sent to ship it there, reneged on the agreement and duty to pay for it.

4.43   Had Endolite not Interfered with the Prospective Economic Advantage and completed the arranged repair with Burgess, this would not have happened

4.44   ENDOLITE's policy found nowhere in the law - even though the buyer BURGESS through his company , HPC, was a fully qualified buyer – even by their own terms – is to use a "magical" non-existent medical  industry policy based on non-existent FDA law to refuse to sell – even when they have sent a quote and agreed to do initially.

4.45   Thus a convenient prostheticist – distributor  or  direct  manufacturer unlawful sales bar is a clever way fraud operates here to keep the truth about malfunctioning or deficiently designed and fraudulently promoted prosthetic items to continue to exist in the market and be sold and not retro-fitted.

Class Action Complaint
Case

4.46  For OTTO BOCK, ENDOLITE, OSSUR, FILLAUER, or TRULIFE, and OTTO BOCK especially; this results in an intentional devaluating of the product in resale that would result in a further sale of a new item instead

4.47  Though the revised Social Security Musculoskeletal regs at 1.00 J3 speak to a Medical Professional reviewing the build of prosthetics for fit and function, which dovetails the CMS-854; almost never does this occur, and when it does, still an amputee cannot always be assured the prostheticist will heed the guidelines (or the Law if it is Medicare-Medicaid billing) to specify and build a compliant prosthetic that is comfortable and also performs as 1.00 J3 dictates.

4.48    Here, there are actual witnesses and empirical evidence as to carnal knowledge to the acts and work performed, dates and times, and emails sent using a time and date stamping service to show by a clear preponderance of the evidence a formed agreement occurred and subsequent work performed; or should have occurred as law requires, exactly as plaintiff alleges herein and that **damages have occurred** and are occurring in the breach by ENDOLITE.

4.49  "Certified Practitioners" are thus the "brick and mortar" business-end of an immoral discriminatory and exclusionary ADA sales and marketing model.

4.50  The actions of defendants, save eBay and PayPal are discriminatory by 42 USC 12182 preventing an amputee from the goods and services of an item.

4.51  The actions of both defendants OTTO BOCK and ENDOLITE constitute FRAUD, and INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE and both should be made to SPECIFICALLY PERFORM and injunctive relief be provided to halt this discriminatory sales and marketing.

4.52 When both NUNEZ and ENDOLITE were made aware of their transgressions to contract and the law and the interferences thereof, both took separate but similar postures of BREACH and FRAUD.

## ENDOLITE AND OTTO BOCK SPECIFIC ACTIONS IN FRAUD

4.53 ENDOLITE is the US arm of Blatchford UK, a Britain based prosthetics manufacturer.

4.54 OTTO BOCK US is an American operation of a German manufacturer.

4.55 In the early 90's - The Intelligent Prosthesis Knee (IP) was the first commercially available microprocessor controlled (MPC) prosthetic knee. It was a pneumatic knee released by Chas. A. Blatchford & Sons, Ltd., of Great Britain, in 1993, (BLATCHFORD) and an improved version of the knee was released in 1995 by the name Intelligent Prosthesis Plus (IP+). BLATCHFORD released another knee, the Adaptive Prosthesis, (AP) in 1998.

4.56 One year earlier in 1997 OTTO BOCK had released the C-Leg a fully hydraulic microprocessor controlled knee.

4.57 Both companies exaggerated the capabilities of their knees, as OTTO BOCK made claims the knee was safer than it really was and in fact instead of going into safety mode when the battery dies, it goes free swinging, and the ENDOLITE product did not do stance support stumble recovery well, and the hydraulics were prone to failure by sensor issues and leaking oil.

4.58   As a result BLATCHFORD made repair replacement cylinder units available that cost about $2,500 on an $18,000 knee. It **_WAS_** and is the entire workings of the knee save the carbon fiber frame.

4.59   Pneumatic knees, being air filled by design as the name implies, cannot support weight firmly; and in the case of an Above Knee (AK) amputee, safely.

4.60   The 1998 AP family was a radical departure from the earlier IP and IP+ family of knees. It was a dual hydraulic and pneumatic knee all in one.

4.61   This was done because the competitor of BLATCHFORD, Otto Bock, had developed and introduced the fully hydraulic MPC C-Leg during the World Congress on Orthopedics in Nuremberg in 1997. The OTTO BOCK began marketing the C-Leg in the United States in 1999; and the C-Leg is a complete in house controlled service and setup all hydraulic MPC knee proposition.

4.62   It is on reason and belief that controlling the service, setup and repair of the C-leg might more closely guarantee and assure that the product will perform as advertised and the installers – as prostheticists – will follow design parameters to assure any issues can be addressed in continuing improvements to the product and minimize product liability or fraud, but when the warranty expires, no one can get service on a C-leg and cannot do it themselves because OTTO BOCK will not provide the software needed to program the leg to work at all to anyone but their "certified practitioners"; while ENDOLITE and the AP (AP = also now the Smart Adaptive) uses a Bluetooth linked hand-held programming box the end user gets with the leg.

4.63   The truth is to keep all service and repairs in house allows the design flaw

of the C-leg to remain covered up – being that when there is no power – the knee is NOT hydraulic at all and is thus a dangerous free swinging design.

4.64   A fully hydraulic knee is far superior to a pneumatic one – as just as hydraulics is what is used in "Hydraulic Excavators" to move Earth and do heavy mechanical "work" – because oil does not compress and air does; – BLATCHFORD recognized this and their knee no longer – and never did, or could have or be a valued product as a pneumatic – knee that could not support and allow an AK amputee to enjoy mobility in relative safety.

4.65   BLATCHFORD further knew their efforts would be a colossal failure if they could not release a competing knee to the C-leg – their solution being the 1998 Adaptive Prosthetic knee (AP) with the claim to fame being it was "self learning" as a derivative of the IP+ pneumatic knee, unlike the C-Leg.

4.66   The BLATCHFORD AP knee suffered from an obvious design flaw anyone who deals in sensor systems would immediately know, being that the relative fulcrum force needed to properly sense the shifts of the body weight to instruct the Microprocessor *needs to be collected from the ankle area* in order for the Microprocessor to be able to respond correctly for the hydraulic valve adjustments to provide functions while an AK amputee is using it.

4.67   BLATCHFORD instead designed the AP to do *STILL* a pneumatic swing and only hydraulics in the stance modes of standing, stair descent, slope descent and alleged stumble recovery – and thus located the sensor at the top of the knee and to the rear in the knee itself and then was able to claim no special pylon or foot was needed like the C-leg requires as a direct comparison.

Class Action Complaint
Case

4.68   The reality is to manufacture a pylon and place the sensor in the proper location would increase manufacturing costs and make the AP project knee not marketable and without apparent advantage compared to the C-Leg.

4.69   This was fraud, and deceit by BLATCHFORD as the static and dynamic mechanics for an Apples for Apples comparison was completely untrue, and not only was this theoretically untrue, OTTO BOCK in 2008 sponsored a study – which anyone can reproduce the results of – that shows the AP knee by BLATCHFORD does not perform as advertised.[22]

4.70   What the study also shows by implication is that only a full Hydraulic Knee is safe (or safer) to walk on, as the knees which performed well were all fully hydraulic knees or either the Radial or a straight cylinder SNS design and Blatchford is just now, introducing a knee they call **Orion** allegedly addressing these shortcomings long known to exist and that were defectively designed.

4.71   The Ossur Rheo Knee is magnetohydrodynamic hydraulic fluid operated by electricity; but is still hydraulic, and the Fillauer Rel-K is an imported knee by partnership with Rizzoli Ortopedia S~pA of Italy, which is a Hydraulic knee "substantially equivalent" to the C-leg according the FDA's 510K exemption order for the Rel-K.[23]

_____

[22] MECHANISMS OF STUMBLE RECOVERY: NON-MICROPROCESSOR CONTROLLED COMPARED TO MICROPROCESSOR-CONTROLLED PROSTHETIC KNEES,  Kenton Kaufman, PhD, PE; Todd Anderson, CP; Greg Schneider, CP; Kimberly Walsh, MS BME, Biomechanics/Motion Analysis Laboratory, Mayo Clinic, Rochester, Minnesota; Professional and Clinical Services, Otto Bock' Minneapolis, Minnesota.  (published in 2008) See http:// www.oandp.org/publications/jop/2008/2008-38.pdf

[23] http://www.accessdata.fda.gov/cdrh_docs/pdf10/K101859.pdf

Class Action Complaint
Case
-71-

4.72   OTTO BOCK has now released a new version of the microprocessor controlled knee of the C-Leg family called Genium. (another is the Compact)

4.73   The Genium has updated features of the C-Leg the C-leg latest version of the firmware for it allowed a C-leg to do by the latest software updates.

4.74   Both OTTO BOCK and ENDOLITE have declared the new knees in the family of the previous 510K exempted C-Leg and AP knee with the FDA.

4.75   Both the Orion and the Genium use the same business end bolt in hydraulic center to center distances and in many ways the parts between the knee designs could interchange inexpensively as to offer an upgrade to an existing knee shell; or could be designed less expensively as an upgrade kit or system.

4.76   OTTO BOCK also prepared and released a video explaining that all other MPC knee on the market go into free swing mode at "toe-off" and thus none have what would be "dynamic" stance support (stumble recovery) but the C-leg as all other knees – except the Ossur Rheo Knee are NOT full hydraulic knees because the C-leg requires POWER and sensors to work as advertised.

4.77   The average AK amputee does not know this – as there is no requirement of warning (even like on a pack of cigarettes) as to the limitations of the product and nor is there a Federal requirement (as on a pack of cigarettes) requiring the manufacturer to warn of limitations or hazards therefrom the product.  What exists is 21 CFR 820.198 and 21 CFR 820.200 as to a mandate to keep records of complaints and service issues as promulgated by the FDA.

4.78   Around the time this study was released, Burgess was walking on an AP, and it would not switch modes reliably and was a dangerous and uncomfortable knee to walk on – then the hydraulic cylinder failed and began leaking oil, and this is common issue which sends many amputees to eBay to search for a reasonably priced replacement from possibly a Probate Estate or the like.

4.79   The study is attached as **EXHIBIT M**.  See summary charts pg 2-3

4.80   BLATCHFORD is well aware that it had on the market a fraudulently built and marketed knee, and seeks to capitalize on the residual and often inept prostheticists market who cannot or will not attend OTTO BOCK C-leg training and follow a strict regimen of complete prosthetic leg setup and maintenance for safety and function of the item, yet the AP and C-Leg bills largely the same and is promoted as the same when the truth is that the AP was grossly inferior to a properly working  C-Leg.

4.81   Plaintiff Burgess has worn and walked in both legs and can attest to the study results.

4.82   ENDOLITE had published without access restriction in 2010 specifications, schematics and setup manuals on its website at http://www.endolite.com and on its customer service page spoke to direct "customer service" – as the "customers" are the wearers – an amputee; and, mentions ordering of parts direct and had no restrictions to accessing contact numbers and information.

4.83   This information as presented and published was untrue, as they would not service customers direct and as it was presented, would lead someone to believe that service and parts are available to induce them to buy, but it is not

true, so after being sued in 2011  they re-worked their website and removed it.

4.84   Plaintiff has a bit of a history with ENDOLITE dating back to late 2008 when he contacted the company complaining that the stumble recovery and slopes and stair feature never did work and that the cylinder had further began leaking and lost all hydraulic support and oil when he spoke with Malcolm Owens who described that the best way to go would be to upgrade the knee to a Smart Adaptive by putting in part number  239046U (Smart Adaptive upgrade) and not part number 239745U – the standard AP replacement and control card and programmer everyone at Endolite knows especially does not work well.

4.85   Plaintiff contacted ENDOLITE to affirm the upgrade was still available and sent detailed email (**EXHIBIT N**) outlining who would be purchasing it, and the  SPSCO (Southern Prosthetics Supply Company) HPC Manufacturing account number – as SPSCO is ENDOLITE's sole and approved distributor to show and verify that HPC Manufacturing is and was at all times a qualified purchaser and why this is and was a direct contact to ENDOLITE.

4.86   ENDOLITE replied with a fax quote shown as **EXHIBIT O**  which creates a binding electronic contract between plaintiff and Endolite pursuant to *Campbell v. General Dynamics Government Systems Corp.*, 407 F.3d 546 (1st Cir. May 23, 2005)  [citing the e-sign act - 15 USC 7001(a)] in that:

> Notwithstanding any statute, regulation, or other rule of law (other than this subchapter and subchapter II of this chapter), with respect to any transaction in or affecting interstate or foreign commerce — (1) a signature, contract, or other record relating to such transaction may not be denied legal effect, validity, or enforceability solely because it is in electronic form.

Class Action Complaint
Case

4.87   The ENDOLITE quote had minor errors – even though the initial email was clear it was an HPC Manufacturing purchase, and if there was confusion at ENDOLITE, they should not have sent the quote.

4.88   The knee and payment was rushed into the mail as Priority Mail at 5 pm.

4.89   This quote and promise to upgrade when sent by ENDOLITE was false.

4.90   NUNEZ had drafted from his bank account a certified check to pay – as his credit card did not have a sufficient daily limit, so against plaintiff BURGESS's wishes he obtained a cashiers check to pay Burgess direct.

4.91   The cashiers check turned out to be a problem because while his Bank would cash it – they would not issue a check from Burgess to ENDOLITE for the repair portion, thus plaintiff and NUNEZ travelled together to the bank so a cashiers check could be purchased for ENDOLITE from Burgess's sales payment and be able to thus get the item in the mail that day before 5 pm.

4.92   When the package arrived as addressed to Attn: Malcolm, and a clarification email was sent to be sure and return the item back HPC Manufacturing, something happened at Endolite which leads Plaintiff to believe that reservations were afoot in-house about selling a $15,000 product for an upgrade price of $2,500, after ENDOLITE called and spoke with NUNEZ who provided information to Teresa Stratton NUNEZ was not only not authorized to give, but on reason and belief provided in an erroneous fashion not emphasizing that NUNEZ too was a member of HPC Manufacturing.

4.93   ENDOLITE was sent another email making this clear once again, but

Class Action Complaint
Case

-75-

breached the agreement and returned the item without performing the work, claiming HPC was not an O&P facility or had Prostheticist on staff even though AGAIN . . . NUNEZ was a member of HPC and held an interest in it.

4.94   When an aggrieved party brings an action under which a violation of Title 42 USC, Chapter 126, §12182(b)(2), and/or Title 42 USC, Chapter 126, §12182(b)(1)(B) as alleged in Cause of Action Five, the remedy and procedure for the court to hear such a complaint is by LAW, an injunctive one, as set forth by Title 42 USC, Chapter 126, §12188(a)(1)

4.95   The defendants – OTTO BOCK and ENDOLITE  – insist on proceeding in brazen violation to Federal law and the ADA law section which reads

Sec. 12188. Enforcement

(a) In general

(1) Availability of remedies and procedures

**The remedies and procedures set forth in section 2000a-3(a) of this title are the remedies and procedures this subchapter provides to any person who is being subjected to discrimination on the basis of disability in violation of this subchapter** or who has reasonable grounds for believing that such person is about to be subjected to discrimination in violation of section 12183 of this title. Nothing in this section shall require a person with a disability to engage in a futile gesture if such person has actual notice that a person or organization covered by this subchapter does not intend to comply with its provisions.

4.96   Title 42, Chapter 21, Subchapter II, § 2000a–3  reads:

**§ 2000a–3. Civil actions for injunctive relief** as thus:

(a) **Persons aggrieved; intervention by Attorney General; legal representation; commencement of action without payment of fees,**

**costs, or security**

Whenever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice prohibited by section 2000a–2 of this title, a civil action for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order, may be instituted by the person aggrieved and, upon timely application, the court may, in its discretion, permit the Attorney General to intervene in such civil action if he certifies that the case is of general public importance. ***Upon application by the complainant and in such circumstances as the court may deem just, the court may appoint an attorney for such complainant and may authorize the commencement of the civil action without the payment of fees, costs, or security.***

4.97   ENDOLITE and OTTO BOCK  in this matter were and are operating as a "SALES ESTABLISHMENT" under the public accommodations definition found at Title 42 USC, Chapter 126, §12181(7)(E) through their "certified practitioner" requirement axioms as issued by OTTO BOCK and ENDOLITE are agents in their requirements as certified by the on-line operation of http://www.bocusa.org or http://www.abcop.org who by nature of the self appointed exclusionary certification itself are violators of Title III of the Americans with Disabilities Act (42 U.S.C. § 12181,et seq.);

4.98   ENDOLITE and OTTO BOCK  in this matter discriminated as found in  the public accommodations definition found at Title 42 USC, Chapter 126, §12182(b)(1)(A)(i).

4.99   Title  42  USC,  Chapter  126,  §12101(a)(2)  equates  "person"  with "individual" as thus:

Class Action Complaint
Case
-77-

"in enacting the ADA, Congress recognized that physical and mental disabilities in no way diminish a **person's right** to fully participate in all aspects of society, but that people with physical or mental disabilities are frequently precluded from doing so **because of prejudice, antiquated attitudes, or the failure to remove societal and institutional barriers**;" [emphasis added]

4.100 Defendants' attitudes are that a disabled individual who lacks the "purchased" certification, lacks intelligence to turn a set screw or follow setup directions also, absent any regulation by law found anywhere and especially not in the Federal Food Drug and Cosmetic Act *infra*, of which the FDA administers and has exempted the external knee device from anything but a record keeping requirement for complaints an quality of materials used in its manufacture by the manufacturer, but this is nothing but a ruse.  An external prosthetics knee is an over the counter item by classification and description.

4.101 That Title 42 USC, Chapter 126, §12101(b) sets enforcement purposes as:

(b) Purpose

It is the purpose of this chapter

(1) to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;

(2) **to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities**;

(3) to ensure that the Federal Government plays a central role in enforcing the standards established in this chapter on behalf of individuals with disabilities; and

(4) to invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities.

Class Action Complaint
Case

Thus no "manufacturer" exclusion may be added or argued without the express consent of Congress, and defendant argue thus without good faith to modify or reverse existing law.

4.102 There is NO exclusion for a manufacturer to discriminate and no argument as defense of same.  See Title 42 USC, Chapter 126, §12182(b)(1)(B)(a)(i)

4.103 Cal. Civ. Code 51(f) reads:

> (f) A violation of the right of any individual under the Americans with Disabilities Act of 1990 (Public Law 101-336) shall also constitute a violation of this section.

State law makes the definition of "individual" a "person" under State Law.

## OTTO BOCK AND ENDOLITE ARE ALSO CONSIDERED AS OPERATORS OF PLACES OF PUBLIC ACCOMODATION

4.104  *In Skaff v. Meridien North America Beverly Hills, LLC,* 506 F. 3d 832 - Court of Appeals, 9th Circuit 2007, the Ninth Circuit wrote in part:

> "The existence of standing turns on the facts as they existed at the time the plaintiff filed the complaint.   Lujan, 504 U.S. at 569 n. 4, 112 S.Ct. 2130. Though the party invoking our jurisdiction bears the burden of establishing that party's standing, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice." Id. at 561, 112 S.Ct. 2130."

4.105 As found in this complaint, ENDOLITE operates an "Education Department" at their facility "that will allow for customer visits and onsite training" and this is sufficient to meet the public accommodation requirement,

and as does OTTO BOCK but more importantly both parties utilize an agency relationship to "certified practitioners" which are their "brick and mortar" arms to the companies as sales and direct "installation" and manufacturing agents.

4.106 Endolite also operates a shipping department pursuant to 28 CFR 36.305(b)(1) to its customers.

4.107 Who the Endolite customers are, is defined at 21 CFR 820.198 called "complainants" by the FDA, FD&C Act; who would be the actual consumers or users of the device, and is further addressed in 21 CFR 803 et seq.

4.108 Nowhere in 21 CFR 803 is a "prostheticist" found as a licensed person, professional or type of facility covered in that section, nor can be a customer.

4.109 21 CFR 820 subparts "I" and "J" constitute the actions such as complaint, non-conforming product and the such which Endolite is required to maintain as records by the Food Drug and Cosmetic Act (FD& C) as even a 501K exempt device manufacturer, to comply with all other aspects of the FD&C Act.

4.110 One such compliance assistance company "mastercontrol.com"[24] describes their software compliance assistance solution product as it relates to 21 CFR 820 subparts "I" and "J" as providing the following features:

---

[24] MasterControl is a global organization with offices in North America, United Kingdom, and Asia. MasterControl software solutions enable over 400 companies around the world to accelerate their time to market, while reducing overall costs and increasing internal efficiency.  MasterControl Inc., 6322 South 3000 East, Suite 110, Salt Lake City, Utah 84121, P 1.801.942.4000, F 1.801.942.7088  See also  http://www.mastercontrol.com/21_cfr_regulations/21_cfr_part_820/

Class Action Complaint
Case

MasterControl CAPA integrates corrective action process with other quality processes. A CAPA form can be launched directly from another form (i.e., a nonconformance report). Automatically enters relevant data into a CAPA form, reducing data entry and eliminating errors from manual transfer of information. ***Through the Internet, <u>customers and vendors outside the company</u> can submit customer complaint or other forms that could lead to CAPA***. Provides customizable reporting capabilities to help managers monitor entire quality management life cycle.

Thus evidencing who Endolite calls "customers" ARE the consumers, users or wearers. Prostheticists would thus have to be "vendors". "CAPA" is short for "corrective and preventive action (CAPA) procedures".

4.111   When a person orders any product from Endolite, the company obtains the wearer's name, height, weight and other item specific ordering information, and thus the company's local "sales agent" with the direct connection to the company is often that person described as, or called, a "prostheticist"; however Endolite directly states it deals with its customers, and in any sense of the word it is still a place of public accommodation by its own descriptions.

4.112 An ADA plaintiff is not required to actually visit a facility so long as they become aware of a "policy" which will deter further patronage. In *Chapman v Pier One Imports #1132*, <u>593 F.3d 974</u> (2010), the 9th Circuit en banc January 7, 2011, ruled; {citing "'*Doran v. 7-Eleven Inc*., <u>524 F.3d 1034</u>, 1039 (9th Cir. 2008) (quoting *Trafficante v. Metro. Life Ins. Co*., <u>409 U.S. 205</u>, 209 (1972)).}

""Once a disabled individual has encountered ***or become aware*** of alleged ADA violations that deter his patronage of or otherwise interfere with his access to a place of public accommodation, he has already suffered an injury in fact traceable to the defendant's conduct and capable of being redressed by the courts, ***and so he possesses***

*standing under Article III*   [Doran, 524 F.3d at 1042 n.5.] . . .

As defined by the ADA, unlawful "discrimination" occurs when *features of an accommodation,*   [emphasis added]

subject an individual or class of individuals on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements, to a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity.   [42 U.S.C. § 12182(b)(l)(A)(i), (ii)]'"'

*Nowhere does this require any "purchase" or "ownership"* to have Article III standing, *only to be "aware" of the violations*

4.113 January 4, 2011, the 9th Circuit Court of Appeals issued *Enyardt v NCBE*, from an appeal of C09-5191 CRB (N.D. Cal 2010)(Document 58 filed 2/4/10 granting the ADA injunctive Relief)  where Judge Stephen Breyer went through a meticulous analysis of what the procedure for determining what an ADA Injunctive Relief standard is and what cases support argument upon it.

4.114 Plaintiff discovered and showed defendants the *Enyardt* course of hearing Injunctive Relief under the ADA.  In that order, as appealed to the Ninth Circuit found there as *Enyardt v NCBE*, 10-15286 and 10-16392 (9th cir Jan 4, 2011) as consolidated, the Ninth Circuit affirmed policy and ADA procedure

4.115 January 4, 2011, in *Enyardt v NCBE*, 10-15286 and 10-16392 (9th cir Jan 4, 2011) as consolidated, the Ninth Circuit was clear to begin with:

We have jurisdiction to review the district court's orders granting these preliminary injunctions pursuant to 28 U.S.C. § 1292(a)(1). Our review is for an abuse of discretion. *Does 1-5 v. Chandler*, 83 F.3d 1150, 1152 (9th Cir. 1996). "[I]n the context of a trial court's factual

findings, as applied to legal rules," to determine whether a district court has abused its discretion, "the first step of our abuse of discretion test is to determine de novo whether the trial court identified the correct legal rule to apply to the relief requested. If the trial court failed to do so, we must conclude it abused its discretion." *United States v. Hinkson*, 585 F.3d 1247, 1259, 1261-62 (9th Cir. 2009) (en banc) (footnote omitted). If the trial court identified the correct legal rule, "the second step . . . is to determine whether the trial court's application of the correct legal standard was (1) 'illogical,' (2) 'implausible,' or (3) without 'support in inferences that may be drawn from the facts in the record.' " Id. at 1262 (footnote and citation omitted). We may affirm the district court on any ground supported by the record. *Canyon County v. Sygenta Seeds, Inc.*, 519 F.3d 969, 975 (9th Cir. 2008).

4.116 For injunctive relief the ADA standard is the one followed in Enyardt

## REFUSAL TO SELL OR SERVICE IS AN ADA VIOLATION

4.117 At issue here is the refusal to sell product to or service product of an ADA individual – the amputee wearer – specifically because they are NOT an industry contrived "certified practitioner" found nowhere in medical science, and this is a violation of Cal. Civ. Code 51.5.

4.118 In *Lockett v. Catalina Channel Express Inc*, 496 F.3d 1061, (9th Circuit August 09, 2007), Lockett was not allowed to purchase a first class ticket due her guide dog and a pet dander issue policy of *Catalina Channel Express Inc* (CCE) in the First class cabin area where customers wanted to pay extra to be free of pets onboard and the allergy and dander issues of other passenger.

4.119 The Ninth Circuit found that the refusal to sell would have been an ADA violation, as thus ". . . CCE may well have violated the ADA had it not

changed its policy", citing to its footnote 6.

4.120  A few months later in *Skaff v. Meridien North America Beverly Hills, LLC*, 506 F. 3d 832 -  (9th Cir November 2007), was reversed and remanded on an issue of Attorneys fees because a Hotel staff that initially got a reservation wrong, but fixed the ADA issues immediately; and immediately settled when sued under the ADA, the court stated that though ***Meridien*** settled; the ADA person still had a viable cause of action because in his stay he found other things out of compliance to ADA law, and thus had standing to bring the suit.

4.121 *Skaff and Lockett* both illustrate that there and here also, it is the policy of Defendants Endolite and Otto Bock, not the actual refusal to have shipped the item based on any contrived contract or lack of it, that drives the law.

4.122 Further, the court in a previous order of June 20, 2011 myopically viewed the case from the defendants argument, rest on the fact the ADA claim fails because the Defendants Endolite and OTTO BOCK simply refuse to ship to non certified[25] personnel, is grand error and a violation of the ADA.

4.123  More recently in *Dudley v. Hannaford Bros. Co*. 333 F.3d 299 (1st cir June 24, 2003) the court found that refusal to sell alcoholic beverages to a disabled person who appeared intoxicated, but was really neurologically damaged due an auto accident was a violation under the ADA.

---

[25] NOTHING exists about prostheticists being LICENSED parties, but indeed rather the complaint makes it clear that prostheticists are NOT licensed in California and there is no oversight or licensing arm of the State government that does so.   They "purchase' a certification from the Internet which means NOTHING as to expertise, experience, training or success in crafting and building operating, well fitting, prosthetics for satisfied customers.

Class Action Complaint
Case

4.124 In Dudley, the court focused on the stereotype that other place on ADA individuals in rushing to judgment about them and their capabilities.

4.125 Here Endolite's policy and Otto Bock's policy and activities, and even yes many courts view of this in the past reflects that stereotypical discrimination.

4.126 There is no such thing as a licensed prostheticist in California and even if it were – a license means nothing about who is qualified to set up the item, BUT the actual wearer of it, the policy is instead a segregated distribution model.

4.127 In this case, a prostheticist can in no way be experienced at all in wearing or walking in a prosthetic and cannot tell if the wearer truly feels or is safe or not.

4.128 Then in *Townsend, v. Quasim*, 328 F.3d 511, (9th circuit May 1, 2003) is found the first evidence of a segregated distribution model of goods and services in an ADA Title II healthcare context.

4.129 In ***Townsend***, the case was one of entitlement to home care versus a requirement to then have to go to live in a nursing home based on "medically needy" versus "categorically needy", and the Ninth Circuit wrote in part;

> "But policy choices that isolate the disabled cannot be upheld solely because offering integrated services would change the segregated way in which existing services are provided. ***Olmstead*** makes that clear, for precisely that alteration was at issue in ***Olmstead***, and ***Olmstead*** did not regard the transfer of services to a community setting, without more, as a fundamental alteration."

4.130 Here we have the same stereotype AGAIN time and again it seems.

Class Action Complaint
Case

Endolite and OTTO BOCK seek to maintain a segregated distribution model for their own financial gain of keeping the prices of their product artificially high and out of the reach of many ADA individuals who want and need them or who do not want the assistance of a prostheticist who has two good legs trying to tell an amputee how the prosthetic works when the amputee walks in it every day and the prostheticist NEVER has – unless he too is an ***above knee*** amputee.

4.131 There are no "fundamental alteration" or "undue burden" or "direct threat" defenses to this clearly ADA discriminatory segregated distribution model that is without basis in law or fact, and defendants cannot make out any.

4.132 Prosthetic devices and parts are fancy over the counter hardware items as illustrated in particular by K12prosthetics – who builds knees using bicycle shock absorbers as parts – it is built of simple hardware normally.

4.133 Defendants cannot show any affirmative defense here available to them in ADA law which are "fundamental alteration"; "direct threat"; or "undue burden",; and they have no excuse as a defense. ***Dudley*** and ***Townsend*** **Id.**

## EBAY,  PAYPAL AND ALIEXPRESS TRANSGRESSIONS

4.134 With the advent of online selling, each domain owner has attempted to alleviate the legal issues to themselves of the legal realities of how their business is set up.

4.135    eBay has a system that is unfair and promotes fraud by allowing anyone to "bid" on an item, who is kept secret, and over a span of time they can

artificially increase the price of an item with no guarantee they are a true interested buyer, or will pay for same, and often the seller themselves has friends inflate the price by this bidding method if there is just one other person who appears interested, and eBay calls this "shill" bidding but turns a deaf ear and dead eye to it as all it really does is inflate the final value fee due eBay.

4.136  eBay persistently maintains it is not involved in the eBay and auction transactions, but a compendium of other laws, including especially 21 USC 331(a) and (c) clearly show that is, as eBay declares the "seller" is the eBay member who listed the item, while the Uniform Commercial Code does not.

4.137  eBay and Aliexpress utilize "feedback" customer reporting systems, a process started by eBay in its early days to identify how things might be improved and to identify problem transactions between users of their service.

4.138  It appears 47 USC § 230 protects the Internet provider who allows "Feedback" to be posted if it is unedited, but does not protect the poster, nor violations of other criminal, intellectual, state or privacy law applicable, [47 USC § 230(e)] and nor does it protect facilitators of such information delivery systems which by their construction allow or cause violation of said laws.

4.139  In many cases, consumers, and certainly those purchasing healthcare related items have a right under the Health Insurance Portability and Accountability Act  (HIPPA) to privacy, and it can be an unfair business practice and well as interference with prospective economic advantage or contract to publish such information as to purchases if the consumer does not want same done, but eBay and Aliexpress and many other online retailers have convoluted the spirit of intent of 47 USC § 230 to force an invasion of privacy

upon persons absent choice for their purposes of information with feedback.

4.140  In the case of any healthcare or disability item related sale, posting "feedback" is facilitating, causing and allowing a HIPPA violation.

4.141  Further if notified, or it is apparent the item for sale is a disability or healthcare related item, the supplier, vendor and seller, have a HIPPA duty.

4.142 In the cases where a User Agreement allows the User as a supplier to list an item for sale that binds the domain owner to a degree of liability such as a "Buyer Protection Program", that is an agency relationship and the true "seller" of the item is the domain owner no matter how the domain owner wants tio characterize the legal relationship to the supplier, and this is especially true if the domain owner collects the money in the sale for the supplier under terms the domain owner sets.

4.143  21 USC 331(c) is inclusive of any advertisement of a misbranded item as thus: "(c) The receipt in interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded, and the delivery or proffered delivery thereof for pay or otherwise."

4.144  Thus liability rests squarely on the domain owners who make promises like as eBay, PayPal and Aliexpress does in their "Buyer Protection Programs".

4.145  Whether an item is inclusive of those of 21 USC Chapter 9 - FEDERAL FOOD, DRUG, AND COSMETIC ACT is a matter of its use and design.

4.146  Each day persons with characteristics listed or defined in subdivision (b) or

Class Action Complaint
Case

(e) of Section 51, of sec 51.5 of the California Civil Code buy, sell or list items on eBay or use PayPal for transactions initiated in other ways and the Buyer Protection Program of eBay and PayPal unlawfully interferes with those transactions in a discriminatory manner depriving them of rights as promised by the eBay and PayPal User Agreements under California law and such interferences are both a tort and breaches of the User Agreement contract.

4.147 eBay is the primary place to purchase used prosthetic parts and C-Legs are always found there for sale or auction.

4.148 eBay has a Medical Device policy it does not follow that requires medical disclaimers and an address listing of the drop shipper eBay calls a "seller".

4.149 eBay began business as a sales facilitator, but today is actually the merchant as the seller who collects the funds, controls the shipping and returns, warrants the sale through a Buyer Protection Program and maintains a master servant agency relationship among its members and by law this makes today's eBay the merchant and the eBay User who lists the item a "drop ship supplier" today.

4.150 eBay has persistently maintained it is not a consignment vendor but the second restatement on agency finds that eBay is the merchant as a consignment vendor because of how eBay allows its members to bind eBay to a warranty policy as defined by California Uniform Commercial Code 2313 by listing any item on eBay which is then automatically covered by what eBay and PayPal call the "Buyer Protection Program" of which eBay prominently displays on every page "get the item you ordered or get your money back"; where eBay and PayPal step in to make a ruling and will back charge the suppliers account and provide a return shipping label to return the item top the supplier; and this fits

the 2nd Restatement on Agency as to liability of the principal and as to limitations on and controlling communications as eBay prohibits direct email communication between the supplier and buyer.

4.151 As to the medical device policy and to "misbranding", eBay freely allows this to be done by suppliers and then will not adjudicate the proper resolution to the issue when a supplier member commits such an infraction of the law for the buyer to "get the item you ordered or get your money back".

4.152 There is a provision in California law which provides instead for specific performance in California Uniform Commercial Code 2710 to 2713, due a repudiation by "misbranding" by a supplier, but eBay ignores this.

4.153 For instance, when sent the required CLRA demand notice under Cal. Civ. Code 1750 et seq at 1782(a)(2), eBay and PayPal responded without explanation or meeting or addressing the demands of the letter by reinstating the account of plaintiff Burgess on eBay and refunded the $6.77 that was taken as partial payment for a Buyer Protection Program ruling involving eBay member Barry Ames. Attached as **EXHIBIT P** respectively as required by Cal. Civ. Code 1782(a)(2) as proof to the court, but while eBay claimed it removed the suspension and zeroed out any balance due, the account remained suspended. See **EXHIBIT G**

4.154 On 11/2/2010 10:00 AM eBay removed a listing for artisan supplies to build a socket for an amputated limb claiming it required a prescription from a practitioner and no such thing is true. See **EXHIBIT Q MC036 eBay Listing Removed: Medical and Prescription Items (426349225)** - eBay item 170501441697 - Complete carbon fiber socket kit 4 prosthetic leg knee.

4.155   This action represented an ill-informed action of discrimination because it was only an instruction set, and no such prescription is required to form or build such a socket, and eBay cited no law which gave them any right to do so, but instead it violates rather the Unruh Act and the ADA at 42 USC 12182.

4.156   While obviously someone must have complained to eBay in fraud, likely a prostheticist who did not want the competition – as Burgess had received several emails from eBay members who represented themselves as prostheticists, angry that an amputee dare to build his own leg, eBay would not and did not reveal who brought any such complaint or the source of verification as to the veracity of it, and given that several kits had been sold, previously this represented an interference with prospective economic advantage and contract both intentional and by negligence.

4.157   The materials in the **MC036 eBay Listing that was Removed as a Medical and Prescription Item (426349225)** - eBay item 170501441697 - Complete carbon fiber socket kit 4 prosthetic leg knee were materials that can be bought at any plastics and fiberglass or boat repair store, and drug store or woman's boutique and in this act of removal eBay violated 42 USC 12182.

4.158   The removal of this listing also illustrated an Olmstead violation by stepping in to prohibit an ADA qualified individual the right to obtain and use goods and services in the setting most appropriate to their needs.

4.159   eBay also thus has a "Buyer Protection Program" it does not utilize to improve "safe buying experiences" as it claims and promises in its User Agreement and policies; and, it is aware the C-leg does not have software

Class Action Complaint
Case

available to program it and allows them to be sold absent full disclosure, when on most other places on eBay – such as to buy a cell phone – eBay puts up information about the item when listed to tell what is included or needed.

4.160 eBay and PayPal through its Buyer Protection Programs discriminates against ADA individuals "everyday" and they simply have no way to bring suit; but in particular eBay violates the Unruh Act at Cal. Civ. Code 51.5 to "boycott" and "blacklist", causing a refusal to sell to or buy from ADA persons by suspending accounts, removing listings and failing to adhere to state law and its own Medical Device policy even when it refuses to list an item, take proper action on a complaint or arbitrarily and capriciously causes damage in suborning fraud by a seller who seeks to unload a non-functioning prosthetic item claiming "like new" "condition unknown" or some other excuse the seller often knows is not true and is used to sell the item in fraud.

4.161 With regard to plaintiff Burgess, eBay removed an ongoing – self renewing - ADA individual listing in one case and in another allowed a buyer to damage an ADA "handicap control" item and return it; and in another case, eBay sided with a fraudulent seller going so far as moving to dismiss the litigation filed when eBay was not even named for any form of damages in USDC-CAND 5:09-cv-00629-JF  Burgess v. Forbes et al  filed 02/12/09 and closed 05/29/09 before Mr. Forbes a fraudulent C-Leg seller, could even be served, and given the promises made by the eBay User Agreement to be construed under and enforce California law, this simply has not been what is happening.

4.162 eBay and PayPal have both been operating under unlawful contracts and built their business systems from very nearly the beginning - as both have systems to escape the proper and required registration of DBA requirements of

Business and Professions Code Section 17900 – 17930

> Business and Professions Code 17918 specifies "No person
> transacting business under a fictitious business name contrary
> to the provisions of this chapter, or his assignee, may maintain
> any action upon or on account of any contract made, or
> transaction had, in the fictitious business name in any court of
> this state until the fictitious business name statement has been
> executed, filed, and published as required by this chapter. For
> the purposes of this section, the failure to comply with
> subdivision (b) of Section 17917 does not constitute
> transacting business contrary to the provisions of this chapter."

4.163 Yet eBay provides for on site DBA "User ID's" without checking it is the
a registered Fictitious name DBA filed in the county the eBay User Agreement
contract specified as the controlling jurisdictional county, and PayPal the same
using "email addresses" for the DBA contact, and allowing software that linked
to any web presence which could be called anything anywhere.  Most County
Recorders make it easy  to understand the process as the shown at the Los
Angeles County Recorders site[26]

4.164  It is entirely plausible avoiding that of averment of a DBA makes it easier
to avoid collection and payment of use or sales taxes as a California business
and eBay avoids the duty to collect tax as the eBay User Agreement contract
specifies will be the case for a California Business operating and to be

---

[26] http://rrcc.lacounty.gov/Clerk/Business_Name.cfm

Class Action Complaint
Case

-93-

interpreted under California law and avoids CA Franchise Tax Board issues.

4.165 The only way this is not unlawful is if the eBay supplier is a drop shipper upon a sale to eBay by a flat fee consignment price as is actually eBay's setup

4.166  It is entirely plausible upon reason and belief DBA avoidance  makes selling on eBay thus more attractive as costs and taxes would raise eBay fees by 15% to around at least 25 % of the sales amount, and be an unattractive reality.

4.167  Defendants by an unlawful contract using "policies" contrary to state laws, engage in a practice of indefinitely shutting down Plaintiffs' online stores and businesses efforts, in violation of other provisos of law as prohibited by Cal. Civ. Code  1608, 1667, 1668 and 1708 are thus interfering with them in the course of their business efforts, advantages and contracts without just cause or lawful right, and in violation of the procedures outlined in its own rules and regulations which are  then Tortuous Interferences to Prospective Economic Advantage and Contract as set forth and clarified  by the California Supreme court in  *Korea Supply Co. v. Lockheed Martin Corp., 131 Cal.Rptr.2d 29 (2003); 29 Cal.4th 1134, 63 P.3d 937*

4.168  Defendant eBay provides and operates a public defamation and interference with prospective economic advantage software platform and toolset they call a "Feedback System" and "Detailed Seller Rating" where anyone who purchases from an eBay supplier, can leave disparaging and untrue comments about the transaction, which is then used by eBay in punitive measures in violation of Cal. Civ. Code.  1608,   1667, 1668 and 1708 and as a tool of Unfair Competition violating California's UCL, (Bus & Prof Code 17200 et seq)

4.169   Defendants' eBay and PayPal "policies" which by links are integrated in their user contracts do not follow California or FTC law or express legal rights, many of which are found in the Cal. U. Com. Code. at Division 2; most the codes of which address all the issues of shipping, returns and repudiation of contract that defendants do not utilize in their decisions in Buyer Protection Arbitration Decisions and how the eBay Feedback and Detailed Seller Ratings (DSR) are used all amount to Tortuous Interferences to the class members.

4.170   A contract which has terms that are or induce unlawfulness is void by California law finds the parties then in a tortuous relationship covered by the Interference Torts to Contract and Prospective Economic Advantage.   The Ninth Circuit has further ruled that when one of the Interference Torts have been made out above, it also constitutes a violation of California's UCL, (Bus & Prof Code 17200 et seq)   See   _CRST Van Expedited, Inc v. Werner Enterprises, Inc 479 F.3d 1099 (9th Cir March 15, 2007)_   (supports the Erie Doctrine application and the interference torts citing the Korea Supply case apply even when two contracts are involved IS **_unlawful_** under the UCL ).  The only thing the Ninth Circuit got wrong, in the  _CRST_   ruling  was that there is no longer a "wrongful intent" component to the Interference Torts, as it was done away with in the very same case cited in  _CRST_   by the California Supreme court in   ***Korea Supply Co. v. Lockheed Martin Corp., 131 Cal.Rptr.2d 29 (2003); 29 Cal.4th 1134, 63 P.3d 937***

4.171 So it is either eBay and PayPal users are actually drop shipping suppliers in accord the master servant relationship of the 2nd Restatement on Agency, or eBay and PayPal are tortfeasors interfering in contractual relations and economic advantage;  but in both scenarios eBay and PayPal are mis-branders

of medical devices under 21 USC 331(a) being vended where eBay or PayPal collects a fee or facilitates the financial transaction in any mis-branded item.

4.172  The defendants have "made up" and coined new terms to avoid the application of the proper law associated with the action and that does not make it any more legal, and the court needs to address this by law and halt it.

## THE NEXUS OF THE ADA TO THE UNRUH ACT AND ALL DEFENDANTS ACTIONS AS VIOLATIONS TO LAW

4.173  There is no law which requires a prescription to sell, buy or own a prosthetic, or sell, buy parts of, or build a prosthetic device for one's self.

4.174  There is FDA regulation 21 CFR 820.198 and 21 CFR 820.200 which mandates record keeping, service and support  instructions and information with service records for sellers of medical devices with the goal being public safety which all defendants refuse to do – but instead seek the use of a third party to do so which may inflate the price or the item may not work at all when sold, or in the case of OTTO BOCK and the C-Leg will not work at all without further costs – unless it is sold assembled and in each case each transgression amounts to a violation of 42 USC 12182 by fraudulent and discriminatory selling of the item.

4.175  Further eBay and PayPal arbitrarily and capriciously interfere with the transaction by attempting to adjudicate upon the legal impetus of the transaction if a complaint is made which does not follow whatever terms of the offer for sale entailed or what the law entails as to each party's true liability

Class Action Complaint
Case

4.176  In California, "[c]onspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration." Applied Equipment Corp. v. Litton Saudi Arabia Ltd, 7 Cal. 4th 503, 510-511(1994). Liability for civil conspiracy generally requires three elements: (1) formation of the conspiracy (an agreement to commit wrongful acts); (2) operation of the conspiracy (commission of the wrongful acts); and (3) damage resulting from operation of the conspiracy. Id at 511; see also People v. Beaumont Inv., Ltd., 111 Cal. App. 4th 102,137 (2003) ("In addition to those three elements, it has been said that participants in a conspiracy also must know that their conduct is wrongful.... However, to the extent that knowledge of the scheme's unlawful purpose is required, it may be inferred from the surrounding circumstances, including the nature of the acts done, the relation of the parties, and the interests of the defendants.").

4.177 Proof of civil conspiracy triggers the "last overt act" doctrine. Wyatt v. Union Mortgage Co., 24 Cal. 3d 773, 786 (1979). "Under that doctrine, the statute of limitations does not begin to run until the final act in furtherance of the conspiracy has been committed." Beaumont, 111 Cal. App. 4th at 137.

4.178 Under California law, tortious interference with contract is governed by a two-year statute of limitations. Anderson v. Allstate Ins. Co., 630 F.2d 677, 683 (9th Cir. 1980); see also Marit: Inc. v. Carlson Mktg. Group, No. C 07-5585 JSW, 2009 WL 3561521, at *2 (N.D. Cal. Oct. 30,2009). eBay tortiously interferes in an ongoing basis with its User Members' contracts through its participation in a conspiracy, and therefore the "last overt act" rule governs when the statute of limitations began to run.

4.179   Each  class putative member or plaintiff may have additional and differing facts to their causes of action, but the common thread to all is that all ADA members who are amputees are prevented from direct purchase of items which are not restricted sale items from the FDA, and that eBay and PayPal allow the sale of fraudulently sold items which have been placed in the marketplace which are not assured to operate and are  of little value without the software to operate and setup the item being the C-Leg with eBay and PayPal have knowledge through a prior lawsuit is happening on their site and using the PayPal service  because it has been described that OTTO BOCK refuses to provide the software to the buyer, or sell parts needed to repair the item; and thus eBay and PayPal cooperates in the conspiracy to discriminate toward ADA persons and profit from same, as does ENDOLITE do likewise.

4.180   Prosthetic building – save the bolt on parts purchased – is an artisan field and materials can be purchased at most arts and craft stores or industrial plastics and marine repair stores even, and technique can be learned and application of artisan mold making supplies is seen demonstrated in even TV shows like "Face-Off" on the SyFy network ( http://syfy.com/faceoff ) which is found on the Internet for free also on websites like hulu.com, and direct instruction on how to make a prosthetic socket is found even on YouTube, and material available on line direct for even Orthotics and Prosthetics suppliers now owned by http://www.smooth-on.com , so all of this is not such a secret like the prosthetics industry and defendants OTTO BOCK and ENDOLITE would want one to believe by trying to direct ADA persons to a "certified practitioner" of theirs, and this it seems is the point as to why they are so intent on trying to keep it secret – but it is not – it is illegal, unlawful and immoral.

4.181 It is rather about being able to bill into the Healthcare Insurance industry.

Class Action Complaint
Case

## HEALTH NET AND IHHI AS OLMSTEAD VIOLATORS

4.182   The sad reality is, before an amputee can get any kind of service for a medical issue or prosthetic issue – they are forced into a physician's presence who duty it is to hold down costs, and that means denying access to care.

4.183   Amputees have medical issues only a specialist like a Physiatrist or Orthopedic Surgeon who specialized in amputation issues would know, yet routinely amputees are denied access to these proper physicians who are not affiliated with a health plan having a duty and allegiance to hold down costs.

4.184   Olmstead was about not only choice but the ability to receive service in the setting most appropriate to the needs of the ADA qualified individual.

4.185   In the simplest terms, an ADA qualified individual cannot be put into a "health plan" if they do not want to be put there, but this was ignored.

4.186   Initially Los Angeles county interpreted Olmstead as meaning this and would not place ADA qualified individuals into health plans for Medi-Cal and would allow them to continue "fee for service"; then as more and more counties began to get Medicaid waivers for health plan concoctions, and no one brought a challenge to the Olmstead issue, in 2012 the State of California ordered managed care statewide in violation of Olmstead also.

4.187   Burgess's experiences with how this transgression works for an amputee at least in found in his visit to the IHHI Western Medical Center  emergency room where he was denied access to his Orthopedic surgeon referral by a

Class Action Complaint
Case

young general practitioner who really had no clue about amputee issues.

4.188   Letters were sent and ignored asking for same and his x-Ray images.

4.189   This is Medical Malpractice, Negligence and Fraud all presented in one felt swoop in the name of "managed care" and holding down costs, already declared unlawful for ADA qualified individuals in Olmstead in 1999

4.190   Subsequent follow up letters requesting same were ignored.

4.191   The correspondence is attached as **EXHIBIT D, E and F**

**BURGESS'S eBay, PAYPAL AND ALIEXPRESS EXPERIENCES**

4.192 Some of Plaintiff Burgess's experiences are incorporated into the complaint to illustrate the core issues of the causes of action

4.193   In another example Burgess listed an ADA Custom Handicap Clutch Vehicle Hand control on eBay, and buyer after purchasing damaged the item and then filed a claim to return it, claiming it arrived damaged, after first admitting he was the one who damaged same, and the item being "custom".

4.194   After putting Burgess thorough a Buyer Protection Case anyway – even though it was a "custom item" not entitled to same; and ruling against Burgess in which PayPal charged back the funds from his PayPal account even though the item was returned damaged, a letter to PayPal as a claim for the damaged item returned to him and the  interference which is **EXHIBIT R**, PayPal reversed themselves and refunded the money back to Burgess, but as an ADA

person selling on eBay, under California law he had a rig ht to enjoy the protection the California Uniform Commercial Code offered at especially 2313 which provided that no warranty was provided which the listing said; and that special skill would be required depending the vehicle to which it would be installed to get it working properly, eBay and PayPal interfered anyway.

4.195 Burgess's **EXHIBIT NINE MC036 eBay Listing that was Removed: Medical and Prescription Items (426349225)** - eBay item 170501441697 - Complete carbon fiber socket kit 4 prosthetic leg knee, was nothing more than a collection of the materials needed, and a video on artisan techniques mashed up together on how to, build one's own socket, yet eBay claimed it was a prescription item, at the complaint obviously of a discriminator who did not want an ADA person to have the information and materials to build their own socket and free themselves from the extortion of the prosthetics industry and that is where the principles of self reliance outlined in ***Olmstead*** meet the prosthetics industry and defendants marketing models and manners and failure to address the law at 42 USC 12182 and Federal Regulations on the issue.

4.196 So, in summary an ADA person can buy all the materials they need to build their own prosthetic but the parts to use for the actual working pieces of it.

4.197 The five major prosthetics manufacturers, defendants OTTO BOCK, ENDOLITE, OSSUR, FILLAUER, and TRULIFE have all put MPC knees in the market misbranded claiming a prescription was needed per 21 USC 331(a)

4.198 eBay and PayPal treat ADA persons as thought they do not exist and to discriminate against them is their open policy as though they are the same as all others on the eBay sites when in fact extended forms of  law protects some the

Class Action Complaint
Case

ADA members actions as to both buying and selling that eBay ignores.

## V.   FIRST CAUSE OF ACTION

(For violations of Title III of the Americans with Disabilities Act (42 U.S.C. § 12181,et seq.); as amended as to "discrimination and reasonable accommodations" in commerce as to ALL DEFENDANTS)

5.1 Plaintiff brings forth the previous paragraphs here as if fully set forth.

5.2  21 CFR 820.198 and 21 CFR 820.200 create public policy contracts of duties to those who manufacture and / or sell medical devices, including external prosthetic devices to service and support those devices if they manufacture or sell them as to maintain safe use of the device for the consuming public.

5.3  Plaintiffs are ADA Act (ACT) qualified disabled individuals as amputees of Title 42 USC, Chapter 126, §12102 of the Americans with Disabilities Act of 1990, now aware of a ADA discriminatory "no sales and no-ship" policy.

5.4  *For instance* , plaintiff Burgess created a lawful contract with Endolite via the exchange of email under with a fax quote shown as **EXHIBIT O**  which creates a binding electronic contract between plaintiff and Endolite pursuant to *Campbell v. General Dynamics Government Systems Corp*., 407 F.3d 546 (1st Cir. May 23, 2005)  [citing the e-sign act - 15 USC 7001(a)] in that:

Notwithstanding any statute, regulation, or other rule of law (other than this subchapter and subchapter II of this chapter), with respect to any transaction in or affecting interstate or foreign commerce — (1) a

Class Action Complaint
Case

signature, contract, or other record relating to such transaction may not be denied legal effect, validity, or enforceability solely because it is in electronic form.

5.5     Pursuant to the Code of Federal Regulations, Title 21, Volume 8, Revised as of April 1, 2010 [CITED AS: 21CFR890.3420] External Prosthetic devices are EXEMPT from regulation under the FDA, by the Federal Food, Drug, and Cosmetic Act (FD&C Act) are NOT regulated by the FDA or restricted to be shipped only to approved medical facilities, or professionals and refusal to sell these items to members of the General Public and ESPECIALLY to ADA Act individuals – if they were prostheticists would not be able to receive them as they are NOT considered Medical Professionals.

5.6     Pursuant to Title 42 USC, Chapter 126, §12182(b)(1)(B) which reads "Integrated settings. Goods, services, facilities, privileges, advantages, and accommodations shall be afforded to an individual with a disability in the most integrated setting appropriate to the needs of the individual."; thus no amputee can be forced to visit a non-medical practitioner if they want to adjust and service their own prosthetic item themselves.

5.7     Specifically Title 42 USC, Chapter 126, §12182(b)(2) reads "Specific prohibitions.", as thus:

(A) Discrimination. For purposes of subsection (a), discrimination includes:

(i) the imposition or application of eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any **goods**, services, facilities . . .

5.8     Because NO ITEM sold by ENDOLITE, OTTO BOCK, OSSUR, FILLAUER or TRULIFE, or any person in the O & P profession with, using or vending a

Class Action Complaint
Case

category device to 21 CFR 890.3420 is regulated to require installation by ANYONE; and, to put such "imposition or application of eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities" from receiving the very item they need is absolutely discrimination under the ADA Act.

5.9   To require an individual with a disability be locked into a healthcare plan or provision forcing them be able to receive the service or item ONLY at a care plan approved facility where the individual does not want to go, is a violation of the ACT pursuant to *OLMSTEAD V. L. C.* (98-536) 527 U.S. 581 (1999) 138 F.3d 893, using a segregated distribution of services.  ***Townsend,*** supra

5.10   Further the acts of defendants, and all of them, violate the spirit and intent of Presidential Executive Order 13217 signed June 18, 2001, re: *Olmstead*, and further cause injury in fact by refusing to allow a privilege of the ADA law

5.11   The Defendants have failed to comply with Presidential Executive Order 13217, which has the binding effect of law,  addresses this kind of scenario discrimination,  as that order specially at Section (1) Policy at (e) states:

"The Federal Government must assist States and localities to implement swiftly the Olmstead decision, so as **to help ensure that all Americans** have the opportunity to live close to their families and friends, to live more independently, to engage in productive employment, and to participate in community life." [emphasis added]

Thus Defendants' arguments can also in no way reverse an Executive Order.

5.12   The Olmstead ruling was one about choice for ADA qualified individuals to make choices for themselves absent discrimination from others trying to decide things for them or keep things from them, and defendants Health net and IHHI have illustrated how the cornerstone language of the Supreme Courts' Olmstead ruling is found also in 42 USC 12182(b)(1)(B) Integrated settings:

> Goods,   services,   facilities,   privileges,   advantages,   and accommodations shall be afforded to an individual with a disability in the most integrated setting appropriate to the needs of the individual.

Thus a 42 USC 12182 violation is also an Olmstead violation.

5.13   There is no adequate or speedy remedy at law for the Defendants conduct described above. Because Defendants' discriminatory conduct is ongoing, declaratory and injunctive relief against the Defendants are appropriate pursuant to 42 U.S.C. § 12188(a)(1) as well as attorneys fees per the statute.

## VI.  SECOND CAUSE OF ACTION

(For Unruh Civil Rights Act (Cal. Civ Code § 51, et seq.); and under 21 USC 331(a) for "Misbranding" Against Defendants

6.1  Plaintiff brings forward all previous paragraphs as if fully set forth.

6.2   Defendants OTTO BOCK, ENDOLITE, OSSUR, FILLAUER, and TRULIFE have placed into the marketplace and interstate commerce medical devices which are fraudulently "misbranded" as defined at 21 USC 331(a) that do not work as advertised or claimed, also claiming to require prescriptions to purchase them, when no such thing is true and have dangerous flaws the

manufacturers knew existed at the time of release and did not disclose these flaws and in fact misrepresented the flaws to conceal them.

6.3   21 USC 332 defines the US District Courts as the venue of adjudication and jurisdiction over claims under 21 USC 331 et seq. as §332. Injunction proceedings that the district courts of the United States and the United States courts of the Territories shall have jurisdiction, for cause shown to restrain violations of section 331 of this title, except paragraphs (h), (i), and (j) and that in case of violation of an injunction or restraining order issued under this section, which also constitutes a violation of this chapter, trial shall be by the court, or, upon demand of the accused, by a jury.

6.4   "Misbranding" in this case is an ADA 42 USC 12182 violation by refusing to sell.

6.5   At all times relevant to this action, Plaintiffs were all American ADA citizens.

6.6   Plaintiffs all have a disability in being leg amputees that substantially limits any ability to ordinary mobility absent assistive prosthetic aid devices.

6.7   The Defendants have failed to provide reasonable accommodations by modifying their policies, and these are violations of the ADA.

6.8   The Defendants are excluding and/or discriminating against. Plaintiff solely on the basis of his disability in a stereotype of believing and insisting they are too stupid to set up a simple item themselves they wear every day.

6.9   As a result of this behavior, Plaintiff s have suffered and will continue to

Class Action Complaint
Case

-106-

suffer extreme hardship and actual and impending irreparable harm.

6.10   Plaintiffs are entitled to declaratory and injunctive relief. Plaintiffs are also entitled to recover reasonable attorneys' fees and costs.

6.11   Plaintiffs  have in the past requested be allowed to obtain parts directly they may install and save themselves future funds levied.

6.12    There is no adequate or speedy remedy at law for the Defendants conduct described above. Because Defendants' discriminatory conduct is ongoing, declaratory and injunctive relief against the Defendants are appropriate pursuant to 42 U.S.C. § 12133.

6.13   Plaintiff is also entitled to recover reasonable attorneys' fees and costs incurred in bringing this action pursuant to 42 U.S.C. § 12205.

## VII.   THIRD CAUSE OF ACTION

California Disabled Persons Act (Cal. Civ. Code §54, et seq.);

7 .

7.1   Plaintiff realleges and incorporates the previous paragraphs as though fully set forth herein.

7.2  Defendants all operate  a "public place" within the meaning of Section 54.1.

7.3  Defendants utilize certified practitioners as agents of their marketing models

7.4  Defendants have violated law within the meaning of Section 54.1(d).

7.5  Defendants are violating Plaintiff's right to full and equal rights under 54.3

7.6  By violating the ADA, as set forth above, the Defendants have also violated the  California Disabled Persons Act.

7.7  ***As an example of how the failure to sell axiom operates*** conspiratorially and unlawfully the following facts apply in illustration.

7.8  January 13, 2011, defendant ENDOLITE falsely and fraudulently represented to plaintiff that they would perform the work shown in **EXHIBIT O**.

7.9  On or about January 19, 2011, NUNEZ had an unauthorized telephone disclosure pursuant to his limitations of  leading ENDOLITE to repudiate and breach the agreement based on whatever NUNEZ said.

7.10   It is on reason and belief according to NUNEZ that when he stated the knee was for a new patient, the discussion flavored toward wants of breach.

7.11   ENDOLITE did not want to sell a $15,000 item, by upgrading an existing knee of which the design frame has not changed since its first AP build in 1998

7.12   ENDOLITE's promise of January 13, 2011 was indeed thus false.

7.13   When the defendants both made these representations NUNEZ and ENDOLITE knew them to be false, and these representations were made by defendant with the intent to defraud and deceive plaintiff and with the intent to induce plaintiff to act in the manner herein alleged and not be allowed to get his work done and sale completed.

7.14   The representations made by defendants NUNEZ and ENDOLITE were in fact false. The true facts were NUNEZ did all he could to gain possession of the AP knee without fully paying for it, and as using ENDOLITE, sought to manipulate them to do so, but in this case ENDOLITE upon discovering the work they promised to perform would produce basically a low cost knee for a new patient, reneged and breached the agreement directly and consciously.

7.15   At the time defendant NUNEZ made the initial promises to plaintiff which comprised the Quid Pro Quo, to get plaintiff  a replacement AP knee defendant NUNEZ had no intention of performing in a manner to allow the entire arrangement to be completed.

7.16   Plaintiff, at the time these representations were made by defendant and at the time plaintiff took the actions herein alleged, was ignorant of the falsity of defendant's sociopathic and narcissistic representations believing them true.

7.17   Plaintiff, at the time this promise was made and at the time plaintiff took the actions herein alleged, was ignorant of defendant's secret intention not to perform and plaintiff could not, in the exercise of reasonable diligence, have discovered defendant's secret intention.

7.18   In reliance on these representations, plaintiff was induced to and did perform work beyond that agreed to on the promise he could be paid or re-compensated for but had plaintiff known of the actual intention of defendant(s) plaintiff would not have taken such action.  Plaintiff's reliance on defendant(s) representations was justified because they seemed trustworthy in writing.

7.19    Plaintiff  has no adequate or speedy remedy at law for the Defendants conduct described above. Because the discriminatory conduct is ongoing, Plaintiff is entitled to declaratory and injunctive relief. Plaintiff is also entitled to recover his reasonable attorneys' fees and costs.

7.20   At all times relevant to this action, Plaintiff Burgess in the above example was and is a resident of Orange, California.

7.21   Plaintiff has a disability in that he is a leg amputee that substantially limits any ability to ordinary mobility absent assistive prosthetic aid devices.

7.22   The Defendants have failed to provide reasonable accommodations by modifying their policy.

7.23   The Defendants are excluding and/or discriminating against. Plaintiff solely on the basis of his disability in a stereotype of believing and insisting he and his kind are too stupid to set up a simple item they wear everyday.

7.24   As a result of this behavior, Plaintiff  has suffered and will continue to suffer extreme hardship and actual and impending irreparable harm.

7.25   Plaintiff and nor his kind of what would be the class, have any adequate or speedy remedy at law for the Defendant's conduct described above. Because the District's discriminatory conduct is ongoing

7.26   Plaintiff is entitled to declaratory and injunctive relief. Plaintiff is also entitled to recover his reasonable attorneys' fees and costs.

Class Action Complaint
Case

# VIII.   FOURTH CAUSE OF ACTION

Breach of Contract

(as to Defendant eBay and PayPal)

**8.**

8.1   Plaintiffs incorporate by reference each paragraph set forth above and assert this cause of action on behalf of themselves and on behalf of the Class alleged herein.

8.2  In relation to 21 USC 331(a), eBay and PayPal operate to perpetuate the "misbranding" by allowing the sale of items that are misbranded as 21 USC 331(a) specifically states:

> The following acts and the causing thereof are prohibited:
>
> (a) **The introduction or delivery for introduction into interstate commerce** of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded.
> . . . .
> (c) The receipt in interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded, **and the delivery or proffered delivery thereof for pay or otherwise.**

8.3   Pursuant to the laws of the State of California, as found applicable in minimum in the Cal. U. Com. Code, at Division 2 and 9, eBay and PayPal have failed to enforce and apply the law of said State as promised in the choice of law proviso of the contract, and further that the general policies practices and procedures of eBay and PayPal have operated instead contrary to said laws and in interference to the rights of the parties under said laws.

8.4   *For instance*, Plaintiff  Burgess sold a CUSTOM modified item, had terms in his eBay listings which in addition to stating "no refunds" in the eBay listing

Class Action Complaint
Case

selection check box, also at clause eleven stated that no warranty applied as Cal. U. Com. Code at §2313 allows the creation of  a warranty and at §2316 under California law allows the disclaimer of any implied warranty, yet while promising that California law shall apply, eBay through its BPP case and PayPal through its BPP forced Burgess to accepted returns of the items and tortuously interfering by sending the buyer a return label, and removing the funds from his PayPal account placing a hold on the account from the moment the disputed claim was levied.   Similar experiences exist for the other plaintiffs, though not cast in the proper light of California law.

8.5    Pursuant to the general policy of eBay and PayPal, Plaintiffs and the other members of the Class, individually entered into a contract with eBay entitled "User Agreement" and/or "Agreement".

8.6    eBay' s and PayPal's USER AGREEMENT is not  lawful, enforceable, and is not binding upon the Parties, even though it satisfies all the elements necessary for formation of a valid contract.

8.7    The Plaintiffs and the other Class members have duly executed the AGREEMENT by agreeing to it and have performed it by providing their personal and billing information to eBay.

8.8    The User Agreement defines the rights and obligations of Defendants and each User member as it relates to the laws of the State of California and thus the breach of contract claim relates to the contract between the user member in the role of a seller and eBay or PayPal, not to seller's buyer.

8.9    At the time the contract / agreement was entered into by Plaintiffs and eBay

and /or PayPal, the AGREEMENT was a contract of adhesion that, as stated above, contained various non-negotiable terms, procedures and  programs at the time of inception. These unconscionable and non-negotiable terms are void and unenforceable as being contrary to public policy and statutory law as so stated at Cal. Civ. Code 1608, 1667, 1668 and 1708.

8.10   Both the User Agreements of eBay and PayPal allow a member to occupy dual roles, in the capacity of consumer or merchant.

8.11   PayPal has several different types of "accounts", a consumer account that is limited to a receiving limit of $500, over a given period of time and then an upgrade to a  Premier or Business account that  allows an unlimited receiving limit, but also mandates the member link it to a bank account,

8.12   In creating this  upgrade it is a one way transaction and one cannot return  to the consumer $500 limit account, and nor can one have both.

8.13   According to US District Judge Jeremy Fogel, in his order in Case 4:10cv02500 SBA  in Document 49 Filed 02/15/11 at Page 8 of 11 at line 4 to 6 that "Holders of Premier or Business Accounts are required by the user agreement to "attest that [they] are not establishing [those accounts] primarily for personal, family, or household purposes." Id. Ex. 1 at 2, § 2.2 (emphasis added). and that this makes the holder of such an account thus ineligible to make a claim or prosecute for Violation of the California Consumer Legal Remedies Act, CAL. Civ. CODE §§ 1750-1784.

8.14   This requirement above violates Cal. Civ. Code 1608, 1667, 1668 and 1708 as  by PayPal's contract to use PayPal services one is forced to use, they can no

longer have any advantage in the capacity of a consumer who might purchase anything, and certainly are forced into the role of a business when indeed, it could be one or several transactions as a "hobby" seller that by law does not elevate the user member to the status of a business, yet PayPal's terms interfere with California  law and the user's right to enjoy any prospective economic advantage or contract with  any other.

8.15   In the role of consumer, the PayPal User agreement can force a member to occupy the legal role of a business at all times and that is absurd.

8.16   The AGREEMENT allowed Plaintiffs to list and contract with other site members and the general public to sell their products using eBay's website, as well as communicate with consumers regarding their sales as their own business, and the consideration given to eBay was adherence to its rules and regulations, and a percentage of all sales made by Plaintiffs.

8.17   For instance eBay has a FEEDBACK system and MINIMUM SELLER requirement which would not be conductive to minor sales of prosthetic items, as they are not high volume items and such action violate the ADA to put performance standards on an account not meant to be high volume because of what it sells to a limited ADA community.

8.18   eBay   represents   on   its   website   that   the   MINIMUM   SELLER REQUIREMENTS AND THE REQUIREMENTS TO BECOME TOP RATED SELLERS are applicable to all sellers. In addition, eBay represents on its website that all eBay users are expected to minimize the amount of negative and neutral Feedback received. Those web representations constitute the operative contractual documents of eBay' s AGREEMENT with its customers,

Class Action Complaint
Case

but in fact the seller has no control over these issues.

8.19    Pursuant to and in reliance on the terms of the AGREEMENT, Plaintiffs and the members of its Class provided the monies, and performed all other conditions, covenants, and promises under the AGREEMENT. Specifically, Plaintiffs made every effort to comply with the MINIMUM SELLER REQUIREMENTS AND THE REQUIREMENTS TO BECOME TOP RATED SELLERS, including, inter alia, making all efforts to provide high level customer service to buyers.

8.20    Defendant eBay is in breach and interfered with the sellers contracts with buyers and the sellers prospective economic advantages  in enacting the provision of the contract pertaining to the MINIMUM SELLER REQUIREMENTS AND THE REQUIREMENTS TO BECOME TOP RATED SELLERS by taking action including, but not limited to:

a) Indefinitely shutting down Plaintiffs' online stores and businesses for reasons not related to sellers' efforts to comply with the minimum seller requirements;

b) Refusing to reinstate Plaintiffs' accounts after receiving multiple counter-notices that the negative feedbacks provided by buyers were baseless.

c) By removing low detailed seller ratings for some sellers and refusing to do so for others;

d) By freezing DSRs and posting them all in one lump sum on sellers' dashboard to create an unfair surprise for the sellers;

e) By intentionally manipulating DSR ratings;

f) Refusing to assist Plaintiffs with the problems they encountered with buyers, as promised and represented by eBay's feedback Policy.

g) Cutting off Plaintiffs off from all communication with current customers

with whom Plaintiffs had already entered into transactions.

h) Disallowing and interfering with Plaintiffs completions of their business efforts and procedures with its current customers with orders waiting to be filled.

i) Allowing other sellers to unfairly dictate eBay's performance of the AGREEMENT, thus effectively allowing Plaintiffs no remedy.

8.21   The AGREEMENT, when properly construed under California law for any reasons not found in the Cal. U. Com Code absent a court order[27] and Federal law, does not permit eBay to ever suspend Plaintiffs and their class members' accounts in an unreasonable and arbitrary fashion.

8.22   On the contrary, because they were adhesion contracts, they impose upon eBay a duty to enforce them in a fair and reasonable manner. eBay failed to enforce these contracts in a fair and reasonable manner under the auspices of California legal principles by failing to provide its customers with an opportunity to appeal pursuant to the principles and guidelines of California law found in the Cal. U. Com. Code in minimum, as pursuant to Federal MAIL ORDER RULE regulations of the Federal Trade Commission (FTC) of what were in effect eBay's and PayPal's arbitrary decisions made by parties not licensed to practice law or trained to even understand it supervised by a licensed member   of the California Bar, to then to suspend their member customers' accounts whether in a buyer or seller capacity.

---

[27] [see   [Pacific Gas & Electric Co. v. Bear Stearns & Co. (1990) 50 Cal. 3d 1118 [270 Cal. Rptr. 1, 791 P.2d 587]]  (the only form of interference which is not tortuous is when a court of law is encouraged to adjudicate the matter)

Class Action Complaint
Case

8.23   eBay has failed and refused, and continues to fail and refuse, to perform the conditions of the AGREEMENT on its part, which is reinstatement of Plaintiffs' online accounts, among others. This has caused Plaintiffs and the members of its class to lose millions of dollars in lost sales as well as experience lost investment in eBay's interference to the contract sellers were allowed to make with buyers and towards future sales as prospective economic advantages for the failure to enforce California law.

8.24   As a direct and proximate result of eBay's breach of the AGREEMENT, Plaintiffs are entitled to specific performance of the terms of the AGREEMENT and / or an award of special and exemplary damages in an amount equaling the value of all profits Plaintiffs would have made but for eBay's breach, and interferences including all income and benefit derived therefrom, of which Plaintiffs have been deprived by or on behalf of Defendant eBay and / or PayPal.

8.25   Plaintiffs are also entitled to recover its actual attorneys' fees and costs incurred in relation to this action, according to proof, and for such other and further relief that the court may deem proper

## IX.   FIFTH CAUSE OF ACTION
### Cal. Civ. Code 1750 et seq

9

9.1   Plaintiff brings forth the previous paragraphs here as if fully set forth.

9.2   Plaintiffs and other CLRA Subclass members are consumers within the meaning of the CLRA given that Defendant's business activities involve trade or commerce, are addressed to the consumer market generally, and otherwise

Class Action Complaint
Case
-117-

implicate consumer protection concerns. Even when selling items via PayPal's Service, Plaintiffs and the CLRA Subclass are consumers of PayPal's payment processing service.

9.3    Plaintiffs and other CLRA Subclass Members have used the service at least in part to BUY items for personal, family and/or household purposes.

9.4    Consumers within the meaning of the statute are a "consumer" under the CLRA who is "an individual who seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purposes." CAL. CIV.CODE § 1761(d).

9.5    A Medical Device is always "for personal, family, or household purposes"

9.6    Although the Agreement provides that PayPal may require sellers to convert their accounts to business or premier accounts, the Agreement does not require sellers to have such accounts, but does not also ALLOW a seller to have a consumer (under $500 receiving limit) account either. Section 2.2 of the Agreement provides that holders of business and premier accounts attest that they "are not establishing the account primarily for personal, family or household purposes." The Agreement does not prohibit sellers, even those holding business or premier accounts, from using the Service for personal, family and household uses provided that those uses are not the primary uses of the Service, but again does not allow them to have the other account at the same either.  It is a one way conversion.

9.7    The acts and practices of Defendant as described above were intended to deceive Plaintiff s and the CRLA Subclass members as described herein and

have resulted and will result in damages to Plaintiff s and the CLRA Subclass members. These actions violated and continue to violate the CLRA in at least the following respects:

(a) In violation of § 1770(a)(5) of the CLRA, Defendant's acts and practices constitute representations that the Service has characteristics, uses and/or benefits which it does not;

(b) In violation of § 1770(a)(7) of the CLRA, Defendant's acts and practices constitute representations that the Service is of a particular quality which it is not; and

(c) In violation of § 1770(a)(9) of the CLRA, Defendant's acts and practices constitute the advertisement of the service in question without the intent to sell them as advertised forcing one into a Business account posture.

9.8   By reason of the foregoing, Plaintiffs and the CLRA Subclass members have been irreparably harmed.

9.9   By committing the acts above, Defendants violated the CLRA.

9.10   In compliance with the provisions of California Civil Code § 1782, prior to the filing of this complaint, Plaintiffs notified Defendant in writing of the particular violations of § 1770 of the Act and demanded Defendant to rectify the actions described above by modifying their policies.  Plaintiffs sent these notices by certified mail, return receipt requested, to Defendant's principal place of business.  **EXHIBITS  S through CC**

9.11   Defendants failed to adequately respond to Plaintiffs' demand to rectify the wrongful conduct described above on behalf of all Class members within thirty days after receipt of the § 1782 notice. Accordingly, Plaintiffs now seeks actual

and punitive damages against Defendant for violations of the CLRA on behalf of himself and the CLRA Subclass.

9.12   Plaintiffs and CLRA Subclass members are entitled, pursuant to California Civil Code §§ 1780(a)(2) and (3), to an order: (1) enjoining the above-described wrongful acts and practices; and (2) requiring the payment of restitution to Plaintiff and the Class. Plaintiff and the Class are also entitled to the payment of costs and attorneys' fees and any other relief deemed appropriate and proper by the Court under California Civil Code § 1780(e).

9.13   WHEREFORE, Plaintiffs and the Class pray for relief further below.

# X.   SIXTH CAUSE OF ACTION

(For Breach of Covenant of Good Faith and

Fair Dealing

10.1  Plaintiff brings forth the previous paragraphs here as if fully set forth

10.2   California law implies a covenant of good faith and fair dealing in all contracts between parties entered into in the State of California.

10.3   Defendants, save Norm's, all sell misbranded items in California.

10.4   For instance in the case of Endolite contract offers were made and were accepted in the State of California, though by electronic means,  and thus California law applies

10.5   For Endolite the offer and acceptance of the Quote of **EXHIBIT O**

Class Action Complaint
Case

constitutes a contract so long as the terms are certain and the amount is tendered.  ENDOLITE admitted all this was done and the amount returned. HOWEVER, to refuse the amount tendered does not excuse the breach of contract nor creation of a tort due the breach.  See *Erlich v. Menezes*, 21 Cal 4th  543, (1999) and in that case the court wrote" An omission to perform a contract obligation is never a tort, unless that omission is also an omission of a legal duty." ' " (Ibid., quoting Jones v. Kelly (1929) 208 Cal. 251, 255 [280 P. 942].)"; and here the legal duty is found in the ADA law.

10.6   As a result of the actions of defendants, both of them, set forth hereinabove, said defendants have violated the implied covenant of good faith and fair dealing contained herein as against said Plaintiff herein, and as a result thereof, Plaintiff is entitled to damages as prayed.

10.7   It is perplexing that the PayPal User Agreement according to Judge Jeremy Fogel, in his order in Case 4:10cv02500SBA  in Document 49 Filed 02/15/11 at Page8 of 11 at line 4 to 6 that "Holders of Premier or Business Accounts are required by the user agreement to "attest that [they] are not establishing [those accounts] primarily for personal, family, or household purposes." Id. Ex. 1 at 2, § 2.2 (emphasis added). and that this makes the holder of an account ineligible to make a claim or prosecute for Violation of the California Consumer Legal Remedies Act, CAL. Civ. CODE §§ 1750-1784, but this makes eBay Users "merchants", but "misbranding" does not discriminate.

10.8   The operand of this would be to limit an ability for a cause of action as this one to be levied upon defendants and is by design drafted in the agreement that way to cause an interference with the enjoyment of State law rights.

Class Action Complaint
Case

10.9   Implied in the AGREEMENT between Plaintiffs and eBay was a covenant by eBay that they would act in good faith and fair dealing with Plaintiffs, and would do nothing to interfere with, or to deprive Plaintiffs of the benefits it was entitled to under the AGREEMENT.  See Civ. Code 1708

10.10  Here specific exact language was added to terms of a condition the  PayPal user is forced to sign up or on for which limits legal exposure of Defendants by fraudulently causing a waiver to Cal. Civ. Code 1750 et seq.

10.11  Defendant eBay breached this obligation under the implied covenant, among others, by also:

a) Soliciting Plaintiffs with promises of coaching, guidance, assistance and favorable resolution of problems related to its eBay's account if they meet the minimum seller requirements, and then unilaterally, indefinitely shutting down their accounts based on false, unsubstantiated, and contested reasons without giving it any reasonable opportunity to defend itself or protect its business;

b) Coaching, advising, and promoting Plaintiffs' sale of items on its platform, and then unilaterally, indefinitely shutting down their accounts for selling these same specialty items based on false, unsubstantiated, and contested reasons, and without giving Plaintiffs any reasonable opportunity to defend itself or protect its business;

c) Completely cutting Plaintiffs off from all communication with current customers with whom Plaintiffs had already entered into transactions;

d) Allowing third parties (bigger sellers) to unfairly dictate eBay's performance of the AGREEMENT, thus effectively allowing Plaintiffs no remedy;

e) by failing to remove baseless and unfounded feedbacks given to Plaintiffs

by buyers; Defendant's breach of the covenant of good faith and fair dealings has caused Plaintiffs unnecessary and unwarranted attorney's fees by obtaining counsel to represent Plaintiffs in the prosecution of this action. At all times herein mentioned, Defendant knew or should have known that Plaintiffs would incur substantial damages in these blatant interferences, when actually the Cal. U. Com. Code applied to these relations, not eBay's arbitrary and capricious creation of "policies" not founded in CA law.

10.12  The conduct of Defendant eBay has been intentional and willful, and has been fraudulent, malicious, and/or oppressive in nature, and Plaintiffs are entitled to exemplary damages in an amount subject to proof at trial.

10.13  Plaintiffs are also entitled to recover its actual attorneys' fees and costs incurred in relation to this action, according to proof, and for such other and further relief that the court may deem proper.

10.14  WHEREFORE, Plaintiffs and the Class pray further for relief as also set forth below.

10.15  Because the Defendants' discriminatory, unlawful and bad faith conduct is ongoing, Plaintiff is entitled to declaratory and injunctive relief. Plaintiff is also entitled to recover his reasonable attorneys' fees and costs.

## XI.   SEVENTH CAUSE OF ACTION

(For prongs 1, 2 and 3 of the California Unfair Competition Law, B&P 17200 et seq Unfair Business Practices

11

11.1  Plaintiff brings forth all the previous paragraphs here as if fully set forth.

Class Action Complaint
Case

11.2  The Unfair Competition Law ("UCL") prohibits "unfair competition" which is defined as "any unlawful, unfair or fraudulent business act or practice . . . ." Cal. Bus. & Prof. Code § 17200. The Legislature intended this "sweeping language" to include "anything that can properly be called a business practice and that at the same time is forbidden by law." *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 17 Cal. 4th 553,  560 (1998) (quoting *Bank of the West v. Sup. Ct.*, 2 Cal. 4th 1254, 1266 (1992)). "When determining whether a practice is 'unlawful,' section 17200 'borrows' violations of other laws, and makes them independently actionable under the [UCL]." *Aicco, Inc. v. Ins. Co. of North Am.*, 90 Cal. App. 4th 579 (2001) (citing *Cel-Tech*, 20 Cal. 4th at 180). "When a plaintiff who claims to have suffered injury from a direct competitor's 'unfair' act or practice invokes section 17200, the word 'unfair' in that section means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise  significantly threatens or harms competition." *Cel-Tech*, 20 Cal. 4th 163. But "[v]irtually any law - federal, state or local - can serve as a predicate" for a UCL claim, "unless the defendant is privileged, immunized by another statute, or the predicate statute expressly bars its enforcement" under the UCL. *Stevens v. Sup. Ct.*, 75 Cal. App. 4th 594, 602 (1999).

11.3  Using a no-ship policy and false advertising claims of parts and their prosthetic parts and items, defendants promote and promulgate an unlawful ADA segregated distribution model which is designed to circumvent 21 CFR 820 subparts "I" and "J as a "business act or practice" by for example Defendant Blatchford and Nunez to not allow complaints to reach them for Corrective Assessments and Preventative Action  (CAPA, ¶ 4.149) and thus

in violation of the UCL.

11.4  Defendant Blatchford fraudulently had posted a page on its website leading customers - wherever they intend to initially get the prosthetic item - to believe they can get service direct from ENDOLITE [Blatchford], but this is not true and ENDOLITE [Blatchford] had no intention of honoring its publicly available online sales claim once a person has the item and needs service or seeks to make a complaint of the item." **EXHIBIT DD**

11.5   Plaintiff alleges Defendant Blatchford violates the UCL by only selling over the counter non-regulated prosthetic parts and items ONLY to certain non-licensed, non-qualified persons despite statements that make it seem like it sells to everyone.

11.6   Plaintiff thus alleges a violation of the fraudulent prong of the UCL by an illustrating example through Defendant ENDOLITE [Blatchford] and Nunez.

11.7   In *Levine v. Blue Shield of California*, 189 Cal.App.4th 1117 (Nov. 5, 2010), the Court of Appeal (Fourth Appellate District, Division One) stated without analysis that a UCL "fraudulent" prong claim predicated on an omission (as opposed to an affirmative misrepresentation) does not lie absent a duty to disclose.  Id. at 1136

11.8   Plaintiffs also alleges a violation of the unfair prong of the UCL by Defendants OTTO BOCK. ENDOLITE, OSSUR, FILLAUER and TRULIFE

11.9   In *Rubio v. Capital One Bank*,  (No. 08-56544)  613 F.3d  1195 (9th Cir. July 21, 2010), the Ninth Circuit addressed UCL standing and held that loss

of a line of credit constitutes a loss of money or property sufficient to confer Prop. 64 standing.  Slip op. at 10400-01.

11.10 The *Rubio* court also noted the split in authority on the definition of "unfair," but found it unnecessary to choose between the different definitions because the defendant's conduct was unfair under both.  Id. at 10402.

11.11 In Federal Trade Commission v. Neovi, Inc., (No. 09-55093) 604 F.3d 1150 (9th Cir. May 14, 2010), the Ninth Circuit construed the Federal Trade Commission Act, 15 U.S.C. § 45(n). The opinion is an interesting one, especially to the extent that some Court of Appeal panels may be adopting the FTC Act standard as a third formulation of the UCL's "unfair" prong.  See, e.g., *Davis v. Ford Motor Credit Co*., 179 Cal.App.4th 581 (2009). But see *Overstock.com, Inc. v. Gradient Analytics, Inc*., 151 Cal.App.4th 688, 715 (2007) ("the California UCL contains no directive to interpret our consumer protection statute consistently with the FTC Act").

Here is a notable passage:

> To support its argument that the FTC's showing of causation was insufficient, Qchex urges us to seek interpretive guidance from several California state cases that were decided under California Business & Professions Code § 17200—the so-called "Little FTC Act." We decline the invitation. While it is common practice for states with consumer protection statutes modeled on the FTC Act to rely on federal authority when interpreting those statutes, the reverse is not the case. As the FTC points out, given the abundance of state laws on which such interpretations could be based, this practice would likely result in a sea of inconsistent rulings. See Orkin Exterminating Co., Inc. v. FTC, 849 F.2d 1354, 1363 (11th Cir. 1988) (noting that there is nothing constraining the FTC "to follow judicial interpretations of state statutes in construing the agency's section 5

authority").

11.12 But  in *Drum v. San Fernando Valley Bar Association*, 182 Cal.App.4th 247 (Feb. 24, 2010), the California Court of Appeal (Second Appellate District, Division Five) upheld a judgment entered after the defendant's demurrer to the plaintiff's UCL claim was sustained without leave to amend. Plaintiff **Drum** was a former attorney and private mediator who sought to buy the San Fernando Valley Bar Association's membership list so that he could market his services to its members.  Slip op. at 2.  The Association refused to sell it to him, so he filed suit under the UCL seeking a mandatory injunction.  Id.  The Court of Appeal held (without deciding whether this was a "consumer" or a "competitor" action) that the Association's conduct was not "unfair" under any of the three formulations:

> A voluntary bar association's unilateral refusal to sell its membership list to any particular buyer, even if the association's reason was to protect some of its members from price competition, is not an "unlawful, unfair or fraudulent business act or practice" under the UCL (§ 17200).

Id. at 5.  The Court of Appeal also observed that plaintiff "did not allege that he lost or expended or was denied any money or property as the result of the Association's refusal to sell him its membership mailing list," and therefore lacked Prop. 64  standing to bring the action.  Id. at 4.; however here, plaintiff has lost and expended money and property value and was denied money.

11.13 Plaintiff thus also alleges a violation of the unlawful prong of the UCL by Defendant Blatchford and Nunez.

Class Action Complaint
Case

-127-

11.14 By way of the ADA law, the previous allegations of this action brought forward here illustrate the "unlawful prong"

11.15 In *Shroyer v. New Cingular Wireless Services*, 606 F.3d 658 (9th Cir. 2010), issued in May and amended in September, in which the Ninth Circuit addressed the UCL's "unlawful" prong:

> "In his complaint, Shroyer alleged that New Cingular violated the common law of unfair competition and breached his contract. These practices alone do not amount to a violation of the "unlawful" prong of § 17200; Shroyer must also allege that New Cingular engaged in a business practice "forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made." Saunders v. Superior Court, 27 Cal. App. 4th 832, 838-39 (Cal. Ct. App. 1994). In other words, a common law violation such as breach of contract is insufficient. See Allied Grape Growers v. Bronco Wine Co., 203 Cal. App. 3d 432, 450-54 (Cal. Ct. App. 1988) (finding a § 17200 violation only after finding three violations of the California Food and Agriculture Code); see also Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc., 319 F. Supp. 2d 1059, 1074-75 (C.D. Cal. 2003) (holding that a violation of common law can support a § 17200 claim, provided that the conduct is also unlawful, unfair, or fraudulent)."

Here however, both Defendants have violated all three prongs in that the conduct is also unlawful, unfair, and fraudulent

11.16  The California Supreme court at the request of the Ninth circuit addressed this as thus in *Munson v Del Taco* 46 Cal.4th 661, (6/11/09):

> "Assuming all other requirements for such an action were met, therefore, violations of the ADA's accessibility mandate, whether involving intentional discrimination or not, would be remediable through Business and Professions Code sections 17200 and

17203."

11.17   Defendants have violated California Business and Professions Code 17200 et seq. by consummating an unlawful, unfair, and fraudulent business practice, designed to deprive plaintiff of his prospective economic advantage of his HPC product line defendant knew depended on being able to get this work done as agreed and it would affect direct delivery to an ADA person.

11.18   By reason of the foregoing, Plaintiffs have suffered and continues to suffer damages in a sum which is, as yet unascertained. Plaintiffs will ask leave of court to amend complaint when the true nature and extent of the damages have been ascertained.

11.19   Plaintiff shows by affidavit attached, and reference to the relevant sections of this complaint the known extent of damages thus far.

11.20   ENDOLITE had fraudulently posted a page on its website leading customers – wherever they intend to initially get the prosthetic item - to believe they can get service direct from ENDOLITE, but this not true and ENDOLITE has no intention on honoring its publicly available online sales claim once a person has the item and needs service or seeks to make a complaint of the item.   See **EXHIBIT DD**. This also violates the requirements of 21 CFR 820 et seq as to "CAPA" complaints.

11.21   ENDOLITE has known their Adaptive knee was designed properly nor worked as promoted, and now are rushing to bring to market one that allegedly does work as the C-Leg always did; they now call the ORION knee, but the truth is both knees are defectively designed as to current technology

11.22   Because the Defendants' discriminatory conduct is ongoing, Plaintiff is entitled to declaratory and injunctive relief. Plaintiff is also entitled to recover his reasonable attorneys' fees and costs.

## XII.   EIGHTH CAUSE OF ACTION

(For Intentional Interference with Prospective Economic Advantage

12.1   Plaintiff brings forth the previous paragraphs here as if fully set forth.

12.2   The elements of the tort of   Intentional Interference with Prospective Economic Advantage are:

"`(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff;

(2) the defendant's knowledge of the relationship;

(3) specific intent is not a required element of the tort of interference with prospective economic advantage. While a plaintiff may satisfy the intent requirement by pleading specific intent, i.e., that the defendant desired to interfere with the plaintiffs prospective economic advantage, a plaintiff may alternately plead that the defendant knew that the interference was certain or substantially certain to occur as a result of its action.

(4) actual disruption of the relationship; and

(5) economic harm to the plaintiff proximately caused by the acts of the defendant."

*Korea Supply Co. v. Lockheed Martin Corp., 131 Cal.Rptr.2d 29 (2003); 29 Cal.4th 1134, 63 P.3d 937*

12.3   Here Defendants interfere with the ability of plaintiff sell or re-sell there

personal property by making parts and items needed unavailable to them to complete their advantage to sell or re-sell the items and "knew that the interference was certain or substantially certain to occur as a result of its action" in complete indifference to the circumstances in depriving plaintiff of known business funding, defendant required the account opened and titled as, all five prongs are met.

12.4    Intentional interference with prospective economic advantage requires proof of the following: (1) the existence of an economic relationship between plaintiff and the third party; (2) defendant's knowledge of the existence of the relationship; (3) defendant intentionally engaged in acts or conduct that was intended to disrupt the economic relationship; (4) actual disruption of the relationship; (5) plaintiff suffered damages as a result. *Steinberg Moorad & Dunn, Inc. v. Dunn*, Case No. CV 01-07009 RSWL (RZX), 2002 WL 31968234, at *24 (C.D. Cal. Dec. 26, 2002.)

12.5   As an example Defendant Endolite [Blatchford] interfered in plaintiff's economic relationship with Nunez.

12.6   Nunez interfered in plaintiff's economic relationship with Defendant Blatchford.

12.7  Blatchford know of the relationship and in fact confused it as being something it was not – and employee – employer relationship.

12.8  When Blatchford discovered the true relationship they refused to do business further causing disruption in the relationship.

Class Action Complaint
Case
-131-

12.9  Blatchford caused a disruption in plaintiff's economic advantage   by speaking with non-HPC personnel and confused them (her) without any authority to do so and thus "induced the breach of contract" of Blatchford.

12.10   Plaintiff Burgess was just starting out to build an enterprise in which future economic benefit of a good relationship would be ongoing.  As NUNEZ's credit was bad, plaintiff has set up his own immediate pay "cash accounts" to alleviate strain on the relevant firms for future sales.

12.11 Blatchford in turn caused the disruption to the relationship with Nunez

12.12   The elements of that tort of are: '(1) an economic relationship between [the plaintiff and some third person] containing the probability of future economic benefit to the [plaintiff], (2) knowledge by the defendant of the existence of the relationship, (3) intentional acts on the part of the defendant designed to disrupt the relationship, (4) actual disruption of the relationship, [and] (5) damages to the plaintiff proximately caused by the acts of the defendant.' (*Buckaloo v. Johnson* (1975) 14 Cal.3d 815, 827.)

12.13    Plaintiff Burgess owns the Adeptprostheics.info and Adeptprosthetics.com domains, thus Adeptprosthetic.info IS HPC Manufacturing.

12.14   The tort of Intentional Interference with Prospective Economic Advantage is the broader of the two so-called interference torts. The other is interference with contract. The tort of 'interference with contractual relations has its roots in the tort of 'inducing breach of contract." (Seaman's Direct Buying Service Inc. v. Standard Oil Co. (1984) 36 Cal.3d 752, 765.) The latter is merely a species of the former. The principal difference between them is that 'the

existence of a legally binding agreement is not a sine qua non to the maintenance of a suit based on the more inclusive wrong.' (*Buckaloo*, supra, at 823.) 'Both the tort of interference with contract relations and the tort of interference with prospective contract or business relations involve basically the same conduct on the part of the tortfeasor. In one case the interference takes place when a contract is already in existence, in the other, when a contract would, with certainty, have been consummated but for the conduct of the tortfeasor. . . . Rather than characterizing the two as separate torts, the more rational approach seems to be that the basic tort of interference with economic relations can be established by showing, inter alia, an interference with an existing contract or a contract which is certain to be consummated, with broader grounds for justification of the interference where the latter situation is presented.' (*Builders Corporation of America v. U.S.* (N.D.Cal.'57) 148 F.Supp. 482, 484, fn. 1, revd. on other grounds (9th Cir.'58) 259 F.2d 766, see also *Pacific Gas & Electric Co. v. Bear Stearns & Co.*(1990) 50 Cal.3d 1118, 1126.)

12.15 Because the Defendants' discriminatory conduct is ongoing, Plaintiff is entitled to declaratory and injunctive relief. Plaintiff is also entitled to recover his reasonable attorneys' fees and costs.

## XIII.  NINTH CAUSE OF ACTION

### (For Fraud as to OTTO BOCK, ENDOLITE and ALIEXPRESS)

13

13.1   Plaintiff brings forth the previous paragraphs here as if fully set forth.

13.2   Defendants have negligently violated their duties to operate in a discrimination-free manner in accord law and professional responsibility.

13.3   Defendants have a moral and legal a duty to operate  in a manner that is free from unlawful discrimination, and to hire, train, supervise, and discipline their employees and one another to fulfill that duty. Defendants negligently violated that duty by discriminating against Plaintiff with policy against on account of his disability. The ways that Defendants violated that duty include, but are not limited to, negligently failing to train their employees and one another regarding the requirements of federal and state disability rights laws, negligently failing to hire persons who were familiar with the requirements of federal and state disability rights laws, negligently failing to supervise employees and agents regarding compliance with state and federal disability rights laws, and negligently failing to discipline or terminate employees who did not comply with the federal and state disability rights laws.

13.4   Defendant ALIEXPRESS makes representations on its website as to a "Buyer Protection Program" it does not honor, it confuses the fact it is the seller in their setup and by their own admission in their own documents and Aliexpress offers for sale medical device prosthetic items which are not adequately described and are thus misbranded in their offer for sale as shown in the documentation of  **Exhibit CC.**

13.5   **Exhibit CC** references one of four "buyer protection" cases filed which do not honor the "full refund and keep the item" promise, and the item sold was one for medical uses to an ADA qualified individual, and the prosthetic item of **Exhibit CC** is misbranded as to what it does and what the sale includes.

13.6   Because the Defendants' discriminatory conduct is ongoing, Plaintiff is entitled to declaratory and injunctive relief. Plaintiff is also entitled to recover

Class Action Complaint
Case
-134-

his reasonable attorneys' fees and costs.

## XIV.  TENTH CAUSE OF ACTION

(Fraud )

14

14.1   Plaintiff brings forth the previous paragraphs here as if fully set forth.

14.2   Specific performance requires the existence of a contract, that created when ENDOLITE replied with a fax quote shown as **EXHIBIT O** which creates a binding electronic contract between plaintiff and Endolite pursuant to *Campbell v. General Dynamics Government Systems Corp.*, 407 F.3d 546 (1st Cir. May 23, 2005)  [citing the e-sign act - 15 USC 7001(a)] in that:

> Notwithstanding any statute, regulation, or other rule of law (other than this subchapter and subchapter II of this chapter), with respect to any transaction in or affecting interstate or foreign commerce — (1) a signature, contract, or other record relating to such transaction may not be denied legal effect, validity, or enforceability solely because it is in electronic form.

14.3   The terms were specific and certain as to model, shipping and work.

14.4   California Civil Code § 3390(5), an "agreement, the terms of which are not sufficiently certain to make the precise act which is to be done clearly ascertainable," cannot be specifically enforced thus does not apply

14.5  Despite Plaintiff's compliance, ENDOLITE informed Plaintiff they would be breaching on January 27, 2011 and in fact did so.  (**EXHIBIT EE**)  There is a four year statute of limitation on contract matters in California.

Class Action Complaint
Case

14.6   As shown heretofore, Plaintiff Burgess had performed all of the conditions of the contract that are required to be performed by plaintiff Burgess.

14.7   Plaintiff Burgess remains ready to perform all terms of the agreement applicable to plaintiff Burgess and to receive the goods and services as promised by defendants.

14.8   Plaintiff has no  remedy at law because the contract described herein was a contract for the sale of specific peculiar  property, and pursuant to Civil Code section 3386 money damages are presumed inadequate for its breach.

14.9 Plaintiff has been harmed because he has a separate contract ENDOLITE has now interfered with in which plaintiff Burgess licensed the item for use.

14.10 Because the Defendants' discriminatory conduct is ongoing, Plaintiff is entitled to declaratory and injunctive relief. Plaintiff is also entitled to recover his reasonable attorneys' fees and costs.


## XV.  ELEVENTH CAUSE OF ACTION

(Negligence  as to Otto Bock)

15

15.1   Plaintiff brings forth the previous paragraphs here as if fully set forth.

15.2   Defendant Otto Bock is now, and at all times mentioned in this complaint was, in the business of designing, manufacturing, constructing, assembling, inspecting, and selling various types of modular prosthetic limb devices including prosthetics knees and the especially the C-leg system consisting of

a mandated knee, pylon and foot of exclusively an Otto Bock model make.

15.3   In 2010, plaintiff Burgess purchased an assembled Otto Bock C-Leg system, which he mounted on his personal socket and it worked fine until early 2013 when Burgess surmised the battery in the C-leg needed replacing

15.4   In July 2013, plaintiff attempted to obtain replacement instructions from Otto Bock, and he was met with stonewalling and run-around, at which time it malfunctioned  loosing all hydraulic support contributing to and causing the injuries and damages described herein.

15.5   At all times mentioned in this complaint, defendant Otto Bock so negligently and carelessly designed, manufactured, constructed, assembled, inspected, and sold the C-Leg system – misleading the wearers and general public into believing it was a hydraulic knee system when indeed it was only a powered hydraulic system and without battery power, it offered no support at all and was thus dangerous and unsafe for its intended uses.

15.6   At all times mentioned in this complaint, defendant Otto Bock mislead the general public, the wearers of the item and the FDA as to its safety so negligently and carelessly inspected, maintained, installed, and sold the c-Leg in full knowledge of this contrived a warranty program to cover and hide this defect anyone would have discovered had they removed the battery revealing that it was dangerous and unsafe for its intended uses.

15.7   As a direct and proximate result of the negligence and carelessness of defendants as described above, the C-Leg purchased by plaintiff Burgess has become worthless and fearful to be used by plaintiff Burgess.

Class Action Complaint
Case

15.8   As a further direct and proximate result of the negligence and carelessness of defendants as described above, plaintiff sustained the following serious injuries and damages in a fall at Norms Restaurant – while no caused by the C-Leg was contributed to because of the walking style plaintiff burgess had to maintain to walk more safely in the C-Leg of keeping the leg stiff and preventing the knee fro bending so as go out from under him at any moment, which has resulted in permanent soft tissue injury to his residual limb leaving him in, pain and suffering, further permanent disability, and expecting medical expenses to repair the nerve and tissue injury special to amputees.

15.9   WHEREFORE, plaintiff demands judgment as set forth below.


# XVI.  TWELFTH CAUSE OF ACTION

(Strict Products Liability  as to Otto Bock)

16

16.1   Plaintiff incorporates by this reference all previous  allegations contained herein this complaint, as though fully set forth  here.

16.2   At all times mentioned in this complaint, the C-Leg system and its component parts were defective as to design, manufacture, and having misbranded warnings, causing the C-Leg and its component parts to be advertised and sold  in  a dangerous and defective condition that made them unsafe for their intended use.

16.3  At no time and in no literature were persons ever advised or warned that loss of power would result in loss of support in that the C-Leg was a powered

hydraulic solution leg only.

16.4    As a direct and proximate result of the defective and dangerous condition of the C-Leg described above, plaintiff has suffered damaged in loss of value and ability to re-sell the item.

16.5    As a further direct and proximate result of the defective and dangerous condition of the oven described above, plaintiff Burgess has sustained the injuries and damages yet to be ascertained when defendants Health Het and IHHI are ordered to cease the Olmstead violation and allow Burgess to be examined for all  injuries relevant to an amputee by his Physician of choice

## XVII.  THIRTEENTH CAUSE OF ACTION

(Negligence – Slip and Fall  as to Norm's Restaurants)

17

17.1    Plaintiff brings forth the previous paragraphs here as if fully set forth.

17.2    That on or about November 25, 2013, the Plaintiff was walking on common property on the premises owned and managed by the Defendant Norms and he fell as described in **Exhibit I**

17.3    Prior to his fall, Defendant had re-tiled the floor with smooth shiny glazed ceramic tile that violations the ADAAG (Americans with Disabilities Act Accessibilities Guidelines) of the USDOJ, and then placed a rubber mat on a wet floor over the floor at the door they also kept waxed.

17.4    Solely as a result of the failure of the Defendant to properly follow the law

and the ADAAG in all common areas, Plaintiff Burgess sustained serious and severe injuries to his person, including, but not limited to, the following injuries: contusions to her right arm;; soreness in right shoulder; post-traumatic pain in right shoulder, arm, and wrist; soft tissue injuries to his amputated left leg residual limb of a nature that does not heal naturally, anxiety; and other serious and severe personal injuries.

17.5    Solely as a result of the injuries aforementioned, Plaintiff Burgess has incurred damages, including:

   a. Medical expenses;

   b. Lost wages;

   c. He has, may, and probably will for an indefinite time in the future suffer great pain, inconvenience, embarrassment, and mental anguish;

   d. He has, may, and probably will for an indefinite time in the future be deprived of ordinary pleasures of life, loss of well-being, and equanimity; and

   e. His overall health, strength, and vitality has been greatly impaired.

17.6    The aforesaid incident occurred as a result of and was proximately caused by the careless, negligent, grossly careless, and reckless conduct of the Defendant, Norm's Restaurants Inc., which consisted inter alia of the following particulars:

a. Failing to properly supervise the common areas in question so as to furnish to the Plaintiff Burgess and all ADA qualified persons, a safe and properly slip resistant walkway, free from hazards which were recognized or should have been recognized by Defendant, as causing or likely to cause the serious physical harm to the Plaintiff,  and others;

b. Failing to maintain the common area in a safe condition to insure that the

Plaintiff would not be caused to slip and fall as a result of the waxing of the floor which were known and should have been known to the Defendant;

c. Failing to properly inspect the common area walkway wherein the Plaintiff was caused to fall as a result of placing a small mat on a wet floor;

d. Failing to maintain the premises owned by the Defendant Norm's in good and safe condition for the Plaintiff and others;

e. Failing otherwise to comply with the applicable laws and regulations of the State of California and the applicable USDOJ ADAAG Federal laws and regulations;

f. Otherwise failing to exercise the degree of care required under the circumstances; and

g. Otherwise being negligent.

17.7   As a result of the aforesaid conduct and breach of care of the Defendant Norm's, Plaintiff Burgess sustained the injuries, losses, and damages which were more fully described above, without any negligence of the Plaintiff contributing thereto.

**PRAYER FOR RELIEF**

**WHEREFORE,** on behalf of themselves and the Class defined herein, Plaintiffs pray for judgment as follows:

a. For an order certifying the Class and appointing Plaintiffs and their counsel to lead counsel to represent the Class;

b. For an order awarding Plaintiffs and the members of their Class treble, statutory and punitive damages, together with interest thereon;

c. For an order awarding Plaintiffs and the members of their Class

Class Action Complaint
Case

compensatory damages in an amount which may be proven at trial, together with interest thereon;

d. For an order awarding Plaintiffs and the members of their Class restitution of all monies acquired by Defendants from Plaintiffs, the Class, and the general public, as a result of Defendants' wrongful practices described above;

e. For an order awarding Plaintiff and the members of their Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs;

f. For an order or judgment finding the arbitration provision in Defendants' Used Agreements to be unenforceable;

g. For an order imposing a constructive trust upon all monies and assets Defendant have acquired from Plaintiffs and the members of their Class as a result of Defendants' unlawful, unfair, fraudulent, and deceptive practices;

h. For an order awarding Plaintiff and all other similarly situated individuals equitable and declaratory relief, as the Court deems appropriate;

i. In the event of a default for an order of 5 million dollars to be distributed as a cy pres award among the class after actual claimed costs are distributed to the named plaintiffs against each and any defendant

j. For an order awarding such other and further relief as this Court may deem just and proper, and;

k. For an order of Injunctive Relief under the ADA to halt the unlawful conduct so stated herein.

## CERTIFICATION OF INTERESTED ENTITIES TO PERSONS

Pursuant to Civil L.R. 3-16, the undersigned attorney certifies that as of this date, other than the named parties, there is no such interest to report

Class Action Complaint
Case

# DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all causes of action so triable. Plaintiffs an their class also hereby demand a jury pursuant to the Federal Arbitration Act, 9 U.S.C. § 2 et seq. for those issues regarding arbitration that involve material issues of fact.

Respectfully submitted,

Dated:  January 21, 2014

Garrett Skelly
**Attorney for Reginald Burgess, William Everden and the named class members.**

Class Action Complaint
Case